# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SHANIKA DAY, Individually, and as Administrator for the Estate of TERRELL DAY; and HARVEY MORGAN, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:17-cv-04612-TWP-TAB |
| THE CITY OF INDIANAPOLIS; SERGEANT FRANKLIN WOOTEN, Individually, and as an IMPD Officer; and OFFICER RANDALL DENNY, Individually, and as an IMPD Officer, | ) ) ) ) ) ) | |
| Defendants. | ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT**

OFFICE OF CORPORATION COUNSEL

*/s/ Adam S. Willfond*
Adam S. Willfond (31565-49)
Assistant Corporation Counsel
200 E. Washington Street, Suite 1601
Indianapolis, IN 46204
317.327.4055 (T)
317.327.3698 (F)
adam.willfond@indy.gov

*Attorney for Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... iv

STATEMENT OF THE ISSUES ................................................................................................. 1

STATEMENT OF THE CASE .................................................................................................... 1

STATEMENT OF MATERIAL FACTS NOT IN DISPUTE .................................................... 2

    Day robs a Burlington Coat Factory. .................................................................................... 2

    Law enforcement is dispatched to the scene. ....................................................................... 3

    CPD arrives on scene. ........................................................................................................... 3

    IMPD arrives on scene. ......................................................................................................... 4

    IMPD Sergeant Wooten and CPD Lieutenant Roger Waggoner arrive on scene. ............... 7

    Wooten monitors Day and calls an ambulance. ................................................................... 7

    Indianapolis EMS ("IEMS") is dispatched. ......................................................................... 9

    Wooten signs a release allowing Day's custody to be transferred back to IMPD. ............... 11

    Law enforcement officers' reliance on IEMS' assessment of suspects in custody. ............ 13

    Denny requests a jail wagon. ............................................................................................... 14

    MCSO Deputy Monday arrives on scene to transport Day. ................................................. 14

    Wooten requests a second ambulance. ................................................................................. 15

    Denny adds a second set of handcuffs on Day. .................................................................... 15

    The second ambulance arrives. ............................................................................................. 16

    Day passes away. ................................................................................................................... 16

    Day's position on the pavement from the time of the first ambulance's departure to the time of the second ambulance's arrival. ................................................................................. 17

    The reasons for Day's arrest. ................................................................................................ 18

    IMPD's positional asphyxia training. ................................................................................... 18

    The timeline of the incident on September 26, 2015. ........................................................... 19

ARGUMENT .............................................................................................................................. 20

    I.    Federal claims ............................................................................................................. 20

        A.    The Defendants are entitled to judgment as a matter of law on the claims against Officer Denny and Sergeant Wooten in their official capacities. ....................................................... 20

        B.    The Defendants are also entitled to judgment as a matter of law on the individual-capacity claims. ................................................................................................... 20

        C.    Denny and Wooten are entitled to qualified immunity. ....................................... 33

II.   The plaintiffs' state-law claims .......................................................................... 36

    A.   Officer Denny's and Sergeant Wooten's conduct was intentional, not negligent; so the
    plaintiffs' negligence claim fails. ................................................................................ 36

    B.   Even if the Court determines that the IMPD officers' conduct could be negligent, the City is
    still immune. .................................................................................................................. 37

    C.   Day was also contributorily negligent as a matter of law. ........................................ 38

    D.   The plaintiffs' wrongful-death and loss of child's services claims fail. ..................... 39

CONCLUSION ................................................................................................................ 40

# TABLE OF AUTHORITIES

**Pages**

**Cases**

*Abbott v. Sangamon Cnty., Ill.,* 705 F.3d 706 (7th Cir. 2013). ................................................. 21, 33

*Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir. 2005) ..................................................... 31, 35

*Anderson v. Creighton*, 483 U.S. 635 (1987). ................................................................. 34

*Ashcroft v. al-Kidd*, 563 U.S. 731 (2011) ..................................................................... 34

*Baird v. Renbarger*, 576 F.3d 340 (7th Cir. 2009) ........................................................... 21

*Brower v. Cnty. Of Inyo*, 489 U.S. 593 (1989) .............................................................. 29

*Burritt v. Ditlefsen*, 807 F.3d 239 (7th Cir. 2015) .......................................................... 33

*Carter v. Indianapolis Power & Light*, 837 N.E.2d 509 (Ind. Ct. App. 2005) ........................... 39

*City of Gary v. Conat*, 810 N.E.2d 1112 (Ind. Ct. App. 2004) ...................................... 38

*D.C. v. Wesby*, 138 S. Ct. 577 (2018) ................................................................... 34

*Denius v. Dunlap*, 209 F.3d 944 (7th Cir. 2000) ..................................................... 34

*District of Columbia v. Chinn*, 839 A.2d 701 (D.C. 2003) ........................................... 36

*Edwards v. Matthews*, 2018 WL 3462506 (S.D. Ohio 2018) ....................................... 24

*Estate of Escobedo v. Martin*, 702 F.3d 388 (7th Cir. 2012) ..................................... 33

*Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997) .................... 32, 33

*Findlay v. Lendermon*, 722 F.3d 895 (7th Cir. 2013) ............................................. 33, 35

*Funston v. Sch. Town of Munster*, 849 N.E.2d 595 (Ind. 2006) .............................. 38, 39

*GJR Investments, Inc. v. Cnty. of Escambia*, 132 F.3d 1359 (11th Cir. 1998) ............. 33

*Graham v. Connor*, 490 U.S. 386 (1989) .................................................................. 21

*Harness v. Schmitt*, 924 N.E.2d 162 (Ind. Ct. App. 2010) ...................................... 37, 38

*Hope v. Pelzer*, 536 U.S. 730 (2002) ....................................................................... 35

*Howell v. Smith*, 853 F.3d 892 (7th Cir. 2017) .......................................................................... 23

*Jacobs v. City of Chi.*, 215 F.3d 758 (7th Cir. 2000). ................................................................ 21

*Johnson ex rel. Ind. Dep't. of Child Servs. v. Marion Cnty. Coroner's Office*, 971 N.E.2d 151
    (Ind. Ct. App. 2012) ............................................................................................................ 37, 38

*Kenley v. District of Columbia*, 83 F.Supp.3d 20 (D.D.C. 2015) .............................................. 36

*Kingsley v. Hendrickson*, 801 F.3d 828 (7th Cir. 2015). ..................................................... 34, 35

*Kisela v. Hughes*, 138 S. Ct 1148 (2018) ................................................................................... 34

*Leaf v. Shelnutt*, 400 F.3d 1070 (7th Cir. 2005) ....................................................................... 32

*Los Angeles v. Heller*, 475 U.S. 796 (1986) .............................................................................. 35

*Lynn v. City of Indianapolis*, Case No. 1:13-cv-00179-JMS-TAB (S.D. Ind. 2014) .................. 23

*Martin v. Yeoham*, 419 S.W.2d 937 (Mo. Ct. App. 1967) ......................................................... 36

*Mayes v. City of Hammond*, 442 F.Supp.2d 587 (N.D. Ind. 2006) ............................................ 38

*McNair v. Coffey*, 279 F.3d 463 (7th Cir. 2002) ....................................................................... 29

*Monell v. Dep't. of Soc. Serv. Of N.Y.C.*, 436 U.S. 658 (1978) ................................................. 20

*Muhammed v. Pearson*, 900 F.3d 898 (7th Cir. 2018) .............................................................. 33

*Mullenix v. Luna*, 136 S. Ct. 305 (2015) ................................................................................... 34

*Padula v. Leimbach*, 656 F.3d 595 (7th Cir. 2011) ................................................................... 25

*Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003) ................................................................... 21, 24

*Pearson v. Callahan*, 555 U.S. 223 (2009) ............................................................................... 33

*Penn Harris Madison Sch. Corp. v. Howard*, 861 N.E.2d 1190 (Ind. 2007) ....................... 38, 39

*Phillips v. Cmty. Ins. Corp*, 678 F.3d 513 (7th Cir. 2012) ........................................................ 23

*Plumhoff v. Rickard* 572 U.S. 765 (2014) ............................................................................ 21, 23

*Rabin v. Flynn*, 725 F.3d 628 (7th Cir. 2013) ............................................................................ 34

*Rooni v. Biser*, 742 F.3d 737 (7th Cir. 2014) ....................................................................... 24, 33

*Sanzone v. Gray*, 884 F.3d 736 (7th Cir. 2018) ................................................................ 34

*Saucier v. Katz*, 533 U.S. 194 (2001) ............................................................................... 35

*Scott v. Edinburg*, 346 F.3d 752 (7th Cir. 2003) .............................................................. 30

*Stainback v. Dixon*, 569 F.3d 767 (7th Cir. 2009) ........................................................... 27

*Thompson v. City of Chi.*, 472 F.3d 444 (7th Cir. 2006) ................................................... 30

*Thompson v. City of Indianapolis*, 2017 WL 4155224, Case No. 1:15-cv-01712-TWP-DML
    (S.D. Ind. 2017) ........................................................................................................... 40

*U.S. v. Brown*, 851 F.3d 532 (7th Cir. 2017) ................................................................... 30

*United Nat. Ins. Co. v. Tunnel, Inc.*, 988 F.2d 351 (2nd Cir. 1993) ................................. 36

*Veolia Water Indianapolis, LLC v. Nat'l Trust Ins. Co.,* 3 N.E.3d 1 (Ind. 2014) ............ 37

*Walker v. Sheahan*, 526 F.3d 973 (7th Cir. 2008) ........................................................... 20

## Statutes

IND. CODE § 34-13-3-3(8). ............................................................................................... 37

IND. CODE § 34-13-3-5 ..................................................................................................... 38

IND. CODE § 34-23-2-1 ............................................................................................... 39, 40

IND. CODE §§ 34-13-3-3, 5 .............................................................................................. 38

IND. CODE §§ 36-8-3-10(a)(1), (3), and (14) .................................................................. 38

## Other Authorities

U.S. CONST. AMEND. IV. .................................................................................................... 21

## STATEMENT OF THE ISSUES

The Fourth Amendment prohibits using greater force than is reasonably necessary to make an arrest. After Terrell Day stole from a department store, brandished a gun at the store's loss-prevention officer, fled, and attempted two carjackings at gunpoint, a police officer arrived on scene and detained him in handcuffs. Did handcuffing Day while that officer conducted an on-scene investigation violate the Fourth Amendment? Was that officer required to use two sets of handcuffs even though courts have not clearly established a right to the use of two sets of handcuffs? Did the Fourth Amendment require a second officer on scene to remove Day's handcuffs after Day refused to stay seated upright and instead laid back on his back? If neither officer violated Day's constitutional rights and neither was on notice that their conduct was unlawful, are the officers entitled to qualified immunity?

The Indiana Tort Claims Act immunizes the City of Indianapolis from tort claims arising from police officers' attempts to enforce the law within the course and scope of their employment. Is the City immune from Day's tort-based claims arising out of two police officers' attempts to enforce the law by arresting him for theft and brandishing a firearm?

## STATEMENT OF THE CASE

Terrell Day died of sudden cardiac death after he was detained at the end of a violent crime spree. As his autopsy later showed, he suffered from multiple conditions that increased his risk for such an event. Day's estate now sues the arresting and supervising officers for alleged constitutional violations and the City of Indianapolis under state-law theories. But the unrebutted evidence shows that neither officer violated Day's constitutional rights. And they are entitled to qualified immunity in any event. So the federal claims fail as a matter of law. For a variety of reasons, the state claims against the City fail too.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

**Day robs a Burlington Coat Factory.**

Michael Nesbitt worked as a loss-prevention officer at Burlington Coat Factory in Washington Square Mall. [Nesbitt Dep. 7:2-9; 8:7-10] On September 26, 2015, he saw Terrell Day and a friend enter Burlington on the store's surveillance cameras. [Nesbitt Dep. 12:5-10] Day was eighteen years old, obese, had congestive heart failure, and a family history of heart disease. [Exhibit R at 2-4; Ex. S at 4] Nesbitt recognized Day because he stole items from the store on two previous occasions. [Nesbitt Dep. 9:16-10:18; 11:1-12:1; 43:20-25] Both times, Nesbitt asked Day and his friend to leave the store, and said they would be arrested if they returned. [Nesbitt Dep. 10:10-18]

As Nesbitt watched the surveillance video, he saw Day pick up a watch, put it in his front pocket and exit the store. [Nesbitt Dep. 12:10-17] Nesbitt followed Day into the mall area. [Nesbitt Dep. 12:15-18] He confronted Day and asked to talk to him about the watch in his pocket. [Nesbitt Dep. 12:18-13:2] Day cursed at Nesbitt and denied stealing anything. [Nesbitt Dep. 13:2-4] Nesbitt pressed Day to return to the store with him; however, Day continued cursing and told Nesbitt to take the watch from him if he wanted it. [Nesbitt Dep. 13:5-20] Day then started to walk away. [Nesbitt Dep. 13:21-14:15]

Nesbitt called mall security to assist him and security officer Anna Mahoy approached; Day reached into his pocket and Nesbitt saw him grip the butt of a gun sticking out. [Nesbitt Dep. 14:15-15:13; Mahoy Dep. 5:15-6:5; 6:16-7:7; 8:2-15] Nesbitt pushed Day away from him and took cover. [Nesbitt Dep. 15:14-17] Day pulled out his gun and started running through the mall, prompting Nesbitt to call 911. [Nesbitt Dep. 15:17-20] Shortly after Day started running, he turned around and pointed his gun at Nesbitt. [Nesbitt Dep. 16:3-22] Nesbitt began relaying the events

unfolding in real time to the 911-dispatcher as he chased after Day. [Nesbitt Dep. 16:8-10; 17:25-18:9; Mahoy Dep. 14:18-22]

Day barreled out of the mall exit and ran full speed across the parking lot toward 10th Street and Mitthoeffer Road. [Nesbitt Dep. 18:7-24; 19:1-10; 22:19-25; Mahoy Dep. 15:6-20] While running across the lot, Day approached an occupied vehicle, pointed his gun at the occupant, and unsuccessfully attempted to carjack her. [Nesbitt Dep. 19:12-20:1] Nesbitt was still on the phone with the 911-dispatcher, relaying what he was observing. [Nesbitt Dep. 21:14-18] When Day arrived at the intersection of 10th Street and Mitthoeffer Road, he accosted another vehicle stopped at the red light and again attempted an unsuccessful carjacking. [Nesbitt Dep. 22:6-23:6] He then ran through a Speedway gas station parking lot with his finger still on the trigger. [Nesbitt Dep. 23:15-20] He ran behind the gas station, then stumbled and fell on a grassy hill. [Nesbitt Dep. 23:22-24:14]

**Law enforcement is dispatched to the scene.**

Meanwhile, a call went out over dispatch of an armed shoplifter who brandished a gun at a loss-prevention officer at Burlington Coat Factory then fled toward the gas station at 10th Street and Mitthoeffer. [Denny Dep. 9:11-17; Ex. M at 3]. Officer Randall Denny and Sergeant Franklin Wooten of the Indianapolis Metropolitan Police Department ("IMPD"), and Officer John Covington and Lieutenant Roger Waggoner, both of the Cumberland Police Department ("CPD")—responded to the call.[1] [Ex. M at 3; Waggoner Dep. 20:9-11]

**CPD arrives on scene.**

---

[1] CPD has concurrent jurisdiction with IMPD in part of Marion County. [Waggoner Dep. 7:20-25; 9:16-19]

CPD Officer John Covington arrived on scene first. [Covington Dep. 10:23-24; Ex. M at 3] Nesbitt showed Covington where Day was positioned—laying on his back at the top of the grassy hill behind Speedway. [Covington Dep. 12:15-18; 13:7-10; 17:9-12] Covington drew his weapon, and used his car door for cover; he knew from dispatch that Day was armed. [Covington Dep. 13:18-22; 14:3-7] He kept Day "under cover." [Covington Dep. 14:13-16; Waggoner Dep. 21:10-12] Covington asked Day to show his hands, and to point to the gun's location. [Covington Dep. 14:16-19] Day complied. [Covington Dep. 14:16-19] The loaded gun, which Day was not licensed to carry, rested just inches from his hands. [Denny Dep. 10:16-18; 11:13; 85:2-5; 86:6-7]

**IMPD arrives on scene.**

Seconds later, Officer Randall Denny arrived. [Covington Dep. 15:24-25:2; Denny Dep. 9:4-7; 105:22; Ex. M at 3] Denny is a seventeen-year veteran with IMPD. [Denny Dep. 4:9-10] Over the course of his career, he has arrested or detained at least a couple hundred suspects. [Denny Dep. 91:14-17] The information Denny had on arrival was that Day had fled and pointed a gun at Nesbitt. [Denny Dep. 88:9-14]

Since Covington had Day at gunpoint, Denny approached and placed him in a single set of chained handcuffs. [Denny Dep. 11:3-4; 18:13-15; 75:3-6] When Denny handcuffs a suspect, he checks for tightness then double locks them to ensure they are not too tight or too lose. [Denny Dep. 76:9-11] Double locking prevents the cuffs from inadvertently tightening on the suspect's wrists. [Denny Dep. 76:11-77:11] Denny encountered no difficulty in cuffing Day – his hands came together behind his back very easily. [Denny Dep. 75:23-76:1] Denny detained Day because he had probable cause to believe he committed an armed felony. [Denny Dep. 80:19-81:1] While IMPD officers have discretion in placing a second set of handcuffs on larger suspects for their

comfort, Denny initially just placed a single set on Day. [Wooten Dep. 30:6-24; 98:18-25; 99:1-9; 114:19-23; Waggoner Dep. 25:19-22; Denny Dep. 11:3-4; 18:13-15; 42:1-8; 62:14-23; 75:3-6]

Within minutes of Covington's arrival, Denny had Day in custody and located the gun. [Ex. M at 3; Nesbitt Dep. 27:9-11] As the arresting officer, Denny was responsible for identifying the suspect, speaking with witnesses, collecting evidence, handling the overall investigation, completing paperwork, and other administrative duties. [Denny Dep. 93:8-14; Waggoner Dep. 113:8-114:3] Consequently, Denny's only contact with Day was the short period after he first arrived on scene. [Denny Dep. 119:11-17] Other officers kept watch over Day. [Denny Dep. 13:15-24]

When handcuffing Day, Denny observed that he was overweight, sweating, and winded from running. [Denny Dep. 18:21; 20:16-20; 113:23-114:15] Denny moved Day so he was sitting on his buttocks near the top of the hill with his feet facing down in front of him at an angle and his hands handcuffed behind his back. [Denny Dep. 12:2-7; 96:16-20; Covington Dep. 17:16-20; 18:6-14; 64:22-65:15] Although Denny did not actually observe any signs of distress, Day said he was having trouble breathing. [Denny Dep. 12:4-9; 18:17-25; 114:13-15] Denny told Day that he just ran about a half mile, and that he really exerted himself. [Denny Dep. 15:9-13; 94:2-7] He instructed Day to take deep breaths in and breathe out to slow his heart rate down. [Denny Dep. 15:13-14; 114:8-10] Day was never gasping for air and Denny never saw him actually exhibit any breathing difficulty. [Denny Dep. 112:5; 113:22; 114:13-15]

Denny sat Day in this upright position because he believed it to be the best and most comfortable position for Day to be in while he began the investigation. [Denny Dep. 83:1-5] Denny told Day to stay seated. [Denny Dep. 97:18-23] Suspects can be detained in a variety of positions. [Denny Dep 83:6-11] They can sit on their butt, lay on their back, their chest, their side, or stand.

[Denny Dep. 83:6-84:4; Wooten Dep. 110:1-7] The ideal position for a suspect to be in is sitting on his butt with his legs straight out in front of him—a comfortable one but one that makes it hard to stand up because his arms are cuffed behind his back. [Denny Dep. 84:9-20] If a suspect is not sitting, the next best position is for him to be on his side or back. [Denny Dep. 84:21-23; Waggoner Dep. 84:19-85:5]

    If a suspect stands, he poses greater risk to officers' safety with the possibility of flight or attack—even when handcuffed. [Denny Dep. 84:5-7; Wooten Dep. 102:18-23] On numerous occasions, Denny has arrested individuals after they have fled or attempted to flee and has dealt with individuals who fled, got caught, and then attempted to flee again after being detained. [Denny Dep. 91:21-92:5] Denny is always cognizant of the possibility of a suspect's escape or flight. [Denny Dep. 92:6-93:1] This is especially so where the suspect has already fled and faces serious charges like Day faced. [Denny Dep. 93:2-7]

    As Denny moved Day to sit at the top of the hill, he noticed that Day had defecated on himself. [Denny Dep. 12:8-10] In Denny's seventeen years as an officer, he has occasionally encountered suspects who defecated in custody to delay going to jail, because they over-exerted themselves, had a medical condition, or because they are scared, anxious, or mad at law enforcement. [Denny Dep. 21:1-5; 89:17-91:2]. Given the circumstances, when Denny saw that Day soiled himself, he took it as a sign of over exertion. [Denny Dep. 21:11-12]

    As Denny sat Day on the hill, he was non-compliant and did not follow Denny's commands. [Denny Dep. 19:5-12; 97:18-98:3; Covington Dep. 65:2-66:1] When Denny sat Day up, he rolled back on to his back and rolled sideways down the hill about halfway. [Denny Dep. 12:17-20; 96:21-25; 97:2-4] Day did not roll a full rotation. [Denny Dep. 97:4-6] Once he started to roll, Denny stopped him and sat him back up on his butt in the middle of the hill with his legs

facing the bottom of the hill. [Denny Dep. 12:21-13:2; 96:25-97:7] Denny told Day he could not

do that and that he needed to sit up on his butt. [Denny Dep. 12:20-23] Denny did not want Day

on his stomach due to concerns of positional asphyxia. [Denny Dep. 12:23-24; 83:14-21]

After Denny sat him up, Day did the same thing again and rolled farther down the hill, near

where the grass met the pavement. [Denny Dep. 13:1-12; 97:8-11; Covington Dep. 35:1-23].

Denny then decided to place Day on his side. [Denny Dep. 97:12-13; Ex. K at 9] Denny did not

think Day was defying his commands because of any medical reason. [Denny Dep. 111:11-12]

**IMPD Sergeant Wooten and CPD Lieutenant Roger Waggoner arrive on scene.**

Sergeant Wooten heard the incident unfolding over his radio and "backed on to the run,"

meaning he went to the scene to assist and supervise Officer Denny. [Wooten Dep 31:17-20; 33:21-

23; 34:21-24; 35:6-10] He arrived shortly after Day was detained, and approximately three minutes

after Denny arrived. [Ex. M at 3; Denny Dep. 104:24-105:2]

When Wooten arrived, Covington was monitoring Day on the hill and keeping an eye on

the gun. [Covington Dep. 25:13-17; Wooten Dep. 39:1-4; 42:15-19; 43:1-11; 45:6-21; 103:9]

Wooten started talking with Denny. [Wooten Dep. 43:17-44:5] Because Denny had to begin his

investigation, he had Wooten and other officers monitor Day. [Denny Dep. 13:15-24] Wooten or

a CPD officer remained near Day to watch him from that point forward. [Waggoner Dep. 73:21-

74:1; Nesbitt Dep. 35:19-36:1; Denny Dep. 82:14-19] CPD Lieutenant Roger Waggoner arrived

on scene shortly after Wooten. [Ex. M at 3] Waggoner saw that Day was a large man and sweating,

but nothing he saw led him to believe Day was experiencing any medical emergency. [Waggoner

Dep. 24:1-6]

**Wooten monitors Day and calls an ambulance.**

Wooten was fine with Day laying on his side as Denny had placed him after he rolled down the hill, but Day did not stay on his side; he rolled onto his stomach. [Denny Dep. 97:14-17; Wooten Dep. 50:8-9; 74:18-19; 131:18-21; Covington Dep. 18:16-17] Recognizing the dangers of positional asphyxia, Wooten and other officers repositioned Day several times to prevent him from laying on his stomach. [Denny Dep. 98:8-15; 130:6-9; Wooten Dep. 74:18-21; Ex. K at 16] Day was again placed in a seated position on his butt but did not want to stay there either. [Wooten Dep. 111:1-13; 123:6-124:3]

Once Wooten started monitoring Day, he complained that he could not breathe. [Wooten Dep. 49:3-9; 51:8-10; Ex. K at 15] Day also claimed "[he] didn't do anything wrong" and asked Wooten to "let [him] go." [Wooten Dep. 49:8-9; 51:8-10] In Wooten's and Denny's law enforcement experience, suspects can portray themselves as vulnerable to gain a tactical advantage over police to attempt an attack or escape. [Wooten Dep. 52:18-21; 100:14-21; Denny Dep. 94:8-22]

Nevertheless, based on Day's complaints, Wooten called for an ambulance to evaluate him about three minutes after Wooten arrived on scene (fewer than six minutes after Denny arrived on scene and detained Day). [Ex. M at 3; Wooten Dep. 49:3-10; Denny Dep. 15:19-23] Denny had no problem with an ambulance being called. [Denny Dep. 15:21-25] It made no difference to him whether Day, or any suspect, went to the hospital for treatment or to jail. [Denny Dep. 103:22-25] No extra paperwork is involved. [Denny Dep.104:1-2]

Wooten was monitoring Day, in part, to ensure that he never rolled onto his chest or stomach due to positional asphyxia concerns. [Wooten Dep. 51:11-21; 56:23-25] Before the first set of medics arrived, Day continued talking to the officers on scene. [Covington Dep. 25:13-17] As Wooten watched him, he calmed down and began breathing normally. [Wooten Dep. 49:20-

25; 101:2-5; 104:13-22] Wooten was unaware that Day had defecated in his pants. [Wooten Dep. 97:17-21] It did not appear to Wooten or Denny that Day was in any discomfort from the handcuffs. [Wooten Dep. 112:15-17; Denny Dep. 42:14-16] And, in any event, Day posed a threat—he just fled an armed robbery and attempted two armed carjackings. [Wooten Dep. 99:19-22; 100:22-24; 102:24-103:4].

**Indianapolis EMS ("IEMS") is dispatched.**

An IEMS ambulance was dispatched to the scene. [Ex. N at 3] Douglas York, a paramedic, and James Brown, an emergency medical technician ("EMT"), arrived within minutes. [Ex. N at 3; York Dep. 23:21-24] York, a twenty-six-year veteran with IEMS, is frequently dispatched to runs involving police custody issues. [York Dep. 6:1-4; 31:6-12] The EMT or paramedic documents each run with a report. [York Dep. 9:2-7] The report is created on a small computer notebook or laptop/tablet called a Toughbook. [York Dep. 26:14-21] Brown created the report for the run involving Day. [Brown Dep. 9:9-11; Ex. N at 5]

When IEMS encountered Day, he was lying on his back with his hands cuffed behind him on the grassy hill. [York Dep. 30:23-31:5; Brown Dep. 43:6-8; Waggoner Dep. 37:19-20; Wooten Dep. 135:9-13] Although Day complained of difficulty breathing to IEMS, he spoke to them clearly and in full sentences without issue. [York Dep. 34:10-15; 35:3; Ex. N at 1; Nesbitt Dep. 29:22-30:4] York did not observe Day have any difficulty breathing; he thought Day was breathing normally upon arrival. [York Dep. 72:24; 89:25] Day denied any prior medical history. [Ex. N at 1; York Dep. 41:7-42:4]

York and Brown conducted a thorough medical evaluation.[2] [York Dep. 34:20-21] First, they checked Day's vitals. [Ex. N at 1; York Dep. 52:1-5; Brown Dep. 34:3-4] They attempted to take Day's blood pressure, but he refused to let them. [York Dep. 25:1-2; 52:23; Brown Dep. 17:19-24] They obtained his heart rate, respiratory rate, and blood oxygen saturation ("SpO2") by placing a pulse oximeter on his finger. [Ex. N at 1; Brown Dep. 34:5-21; York Dep. 25:10-11; 33:12-21] Day's SpO2 was a very good 97 percent—meaning he did not need any oxygen. [Ex. N at 1; York Dep. 34:22-25; 54:22-23; 55:6] IEMS also used a stethoscope to listen to Day's lungs to determine whether bilateral breath sounds (BBS) were present. [Ex. N at 1; Brown Dep. 20:5-7; 21:4-7; 49:23-50:8] They were present and clear. [Ex. N at 1] They concluded he was breathing regularly and normally. [Ex. N at 1]

IEMS also conducted a Glasgow Coma Scale ("GCS") analysis on Day. [Ex. N at 1; York Dep. 44:10-17] A GCS is a numerological scale that gives a rating of how oriented and responsive an individual is. [York Dep. 45:4-18] Day scored a perfect fifteen. [Ex. N at 1; York Dep. 45:4-6] During the evaluation, Day's hands remained cuffed behind his back. [York Dep. 49:10-12] This did not impede the medics' ability to do their full evaluation. [York Dep. 49:24-50:1] If IEMS believed that loosening or removing Day's handcuffs was necessary to assist with medical treatment, they knew they could request that officers do so. [Brown Dep. 57:17-23] At some point during the medical evaluation, York, Brown, and Sergeant Wooten, helped Day to stand up on the pavement. [York Dep. 94:6-16; Brown Dep. 43:9-11; Wooten Dep. 57:22-24] Shortly thereafter, Day laid down on the pavement. [York Dep. 62:11; Wooten Dep. 67:3; 111:4-6]

---

[2] The plaintiffs sued IEMS for medical negligence in state court under the Indiana Medical Malpractice Act. The medical review panel has yet to issue an opinion. *See* Claim No. 1017026 at https://www.indianapcf.com/Public/Claim-View.aspx

When IEMS arrives on scene where a suspect is in police custody, the medical personnel and suspect have complete autonomy and control over the medical treatment provided. [Brown Dep. 49:3-9; York Dep 70:19-21; Wooten Dep. 108:23-109:5; Denny Dep. 73:11-18; Covington Dep. 68:8-13] A law enforcement officer cannot interfere in the provision of a suspect's medical treatment or override any IEMS decisions about treatment. [Denny Dep. 73:11-18; 103:4-7; Covington Dep. 68:8-13; Waggoner Dep. 55:13-21; 118:23-119:2; 119:24-120:1; Wooten Dep. 106:5-12; 108:23-109:5] So if a suspect asks to go to the hospital, IEMS must take him and needs no permission from police to do so. [York Dep. 70:22-71:2; Denny Dep. 100:11-14; 102:22-103:3] Day did not ask IEMS to be transported to the hospital. [York Dep. 75:4-11]

Based on their medical evaluation, York and Brown concluded that Day did not need to be transported to the hospital for additional medical treatment and had no medical issues. [York Dep. 71:15-25; 73:14-22; 79:6-9; Brown Dep. 36:16-24; 50:24-51:6; Wooten Dep. 68:14-19; Nesbitt Dep. 31:17-24; Ex. N at 1] IEMS then told Sergeant Wooten that Day did not need to be transported. [York Dep. 73:24-25; Wooten Dep. 63:21-23]

**Wooten signs a release allowing Day's custody to be transferred back to IMPD.**

When IEMS determines after a medical evaluation that a suspect in custody does not need to be transported to the hospital for further medical treatment, and the individual does not request that IEMS take them to the hospital, the custody of the suspect must be transferred back to IMPD. [Ex. K at 3-4; Denny Dep. 98:16-24; Brown Dep. 50:24-51:6; York Dep. 75:25-76:4] To effectuate and memorialize this transfer of custody, IEMS has police sign a form known as a signature of release ("SOR") in a witness capacity. [Ex. K at 3-4; Denny Dep. 100:15-101:20; Covington Dep. 66:12-68:7; Brown Dep. 39:4-8; 50:17-23] The officer does not sign the SOR on behalf of the

suspect, but simply as a witness to the transfer. [Denny Dep. 101:16-20; Wooten Dep. 79:9-10; 126:18-19; 156:16-19]

IEMS personnel will frequently say, "I need a witness signature. Who is going to witness this release back to [law enforcement]?" [Denny Dep. 101:20-23] The suspects do not sign the SOR because they are handcuffed and in custody. [York Dep. 75:25-76:4; Brown Dep. 15:17-20; Waggoner Dep. 117:25-118:3] Due to officer safety concerns, the suspect's handcuffs are not removed for them to sign the SOR. [Waggoner Dep. 118:5-11; Wooten Dep. 79:6-8]

IMPD does not actually sign a physical paper form, but rather a blank screen on the IEMS tablet (Toughbook) with no words or language on it. [Denny Dep. 98:25-99:10; 101:24-102:1; 120:15-20; Monday Dep. 55:12-18] The SOR-signature process is very common. [Denny Dep. 102:19-21; York Dep. 93:18-94:5] It has not undergone any changes in recent years. [Denny Dep. 100:3-10] IEMS asks an officer to sign the tablet, and the officer signs it. [Denny Dep. 101:20-23; 102:2-11; Wooten Dep. 76:4-6; 127:13-20; York Dep. 93:18-94:5]

After IEMS evaluated Day, the medics asked Wooten to sign the SOR for Day to be released or transferred back into IMPD's custody. [Wooten Dep. 77:11-21; 81:21-82:2; 89:6-17] Wooten saw the same SOR completed hundreds of times by IMPD. [Denny Dep. 102:2-11; Wooten Dep. 76:4-6; 127:13-20] When Wooten signed the SOR on the IEMS tablet, he just signed his name in a box showing no accompanying words or instructions on the screen. [Wooten Dep. 76:1-77:3; Waggoner Dep. 52:10-20] IEMS documented that Wooten signed the SOR on the first page of their run report. [Ex. N at 1]

Unbeknownst to Wooten, his signature for the SOR ended up being engrafted onto another IEMS standard form called "Treatment/Transport Refusal" that a patient would sign when s/he refuses to be transported to the hospital after being evaluated by IEMS. [Ex. N at 5; York Dep.

75:1-5; Wooten Dep. 75:8-13; 81:10-22] When Wooten signed the SOR, he did not observe any "Treatment/Transport Refusal" language on the tablet screen and had never seen the form before. [Wooten Dep. 75:24-76:21; 127:21-23] Denny has never observed any such language either in the approximately one hundred SORs he has signed. [Denny Dep. 98:16-18; 99:1-100:10] Wooten's understanding of what he signed on September 26, 2015 was an SOR for Day to be released back into IMPD's custody from IEMS, not to refuse Day medical treatment or the ability to be transported to the hospital. [Wooten Dep. 81:10-82:2; 83:17-21]

In any event, the medical professionals concluded that Day did not need to go to the hospital and Day never asked to go. [York Dep. 71:15-25; 73:14-22; 75:4-11; 79:6-9; Brown Dep. 36:16-24; 50:24-51:6; Wooten Dep. 68:14-19; Nesbitt Dep. 31:17-24; Ex. N at 1]

**Law enforcement officers' reliance on IEMS' assessment of suspects in custody.**

IMPD officers are not medical professionals. [Denny Dep. 68:14; Waggoner Dep. 119:3-22; Covington Dep. 7:11] Both Sergeant Wooten and Officer Denny possessed very limited medical training on September 26, 2015. [Denny Dep. 7:8-18; Wooten Dep. 23:19-25] It consisted of basic first aid for law enforcement: splinting arms, bandaging cuts, and CPR. [Denny Dep. 7:8-18; Wooten Dep. 23:19-25] They are not trained to recognize or treat signs or symptoms of heart attacks. [Denny Dep. 88:17-25; 89:10-13; Wooten Dep. 25:23-26:13; 103:10-25; 153:18-21]

Unsurprisingly, officers rely on the medical professionals' expertise to determine whether a suspect can be released back into police custody or if the suspect needs further medical treatment at a hospital or simply wants to go to one. [Covington Dep. 30:12-17; 68:2-7; Waggoner Dep. 51:2-22; 55:23; 119:3-22] The medics are the experts. [Waggoner Dep. 51:16-22] Since IEMS evaluated Day and determined he was medically cleared and did not need to be transported to the

hospital, Wooten and Denny believed Day could be transported to jail. [Wooten Dep. 77:8-24; 88:16-19; Denny Dep. 16:1-25; 106:4-9; Waggoner Dep. 118:12-22]

**Denny requests a jail wagon.**

When a suspect is arrested, IMPD generally has a Marion County Sheriff's Office ("MCSO") jail wagon transport them to the appropriate detention facility. [Monday Dep. 6:15-25; Ex. P at 3] Once IEMS determined that Day did not need to be transported to the hospital for further medical treatment, Denny requested a wagon and continued to complete paperwork. [Denny Dep. 16:16-17; 38:24-39:16; 106:2; Ex. M at 2] Denny would not have requested a jail wagon until IEMS determined they were not going to transport Day. [Denny Dep. 106:4-9]

**MCSO Deputy Monday arrives on scene to transport Day.**

When MCSO Deputy Steve Monday arrived to transport Day, he first spoke with Wooten, who stood near Day. [Monday Dep. 7:10-20; 17:21-18:6; Denny Dep. 16:19-25] Wooten told Monday that Day was previously evaluated by the medics and explained why Day was under arrest. [Monday Dep. 17:24-18:3] Other officers were also standing near Day for safety and security purposes. [Monday Dep. 48:7-49:16] Day was lying on his back on the pavement with his hands cuffed behind him. [Monday Dep. 18:4-8; 20:5-8] His eyes were open and he was breathing, and Monday noticed no sweat. [Monday Dep. 19:19; 21:9-11; Wooten Dep. 96:17-19] Day never said anything to Monday. [Monday Dep. 18:13-14]

With Day still laying on the ground, Monday grabbed his left leg and lifted it up to take Day's shoe off so he could search it for contraband. [Monday Dep. 18:18-21] Monday let Day's foot drop to the ground a little bit. [Monday Dep. 18:22-23]. He asked Day if he was okay, and Day did not respond. [Monday Dep. 18:24-25] Monday then did the same thing to his right leg to search the right shoe. [Monday Dep. 18:25-19:5] Monday dropped Day's right leg to the ground

to see if Day would react. [Monday Dep. 19:1-5] Day then moved his leg. [Monday Dep. 19:6-7] Monday and Wooten attempted to stand Day up, but Day was uncooperative. [Monday Dep. 19:7-9; Wooten Dep. 95:8-9] He locked his legs out in a straightforward position and refused to bend them. [Wooten Dep. 95:9-10]

In Sergeant Wooten's experience, suspects will lock their legs when an officer is attempting to raise them from the ground as a form of passive resistance making it harder for the officer to load them into a wagon or vehicle. [Wooten Dep. 155:1-14] Wooten and Monday laid Day back down on the ground. [Monday Dep. 19:10] At that point, Monday did not know if Day was refusing to communicate with him, or if he was unable to do so. [Monday Dep. 21:25-22:8] Based on Day's lack of responses, Monday did a sternum rub on Day's chest to which Day did not verbally or physically respond. [Monday Dep. 19:13-15; 20:23-25] Monday then lifted up Day's shirt and did a second harder sternum rub on his bare skin to which Day showed no response. [Monday Dep. 19:17-19]

**Wooten requests a second ambulance.**

Monday observed that Day's eyes were open and he was breathing; however, he informed Wooten that he could not transport Day because he was unresponsive and having a possible medical emergency. [Monday Dep. 19:19-25; 29:10-14] Wooten immediately called for a second ambulance and a different IEMS ambulance was dispatched. [Monday Dep. 19:24-25; Wooten Dep. 100:2-8; Denny Dep. 57:10-13; Ex. O at 5]

**Denny adds a second set of handcuffs on Day.**

While Denny initially put Day in a single set of handcuffs, he decided to add a second set for comfort sometime between the time when the first ambulance left and the second one arrived. [Denny Dep. 18:13-16; 41:12-21; 42:1-8; 43:5-13; Nesbitt Dep. 36:2-4; 103:20-24; 104:1-3]

Although Denny did not believe another set was necessary, he nevertheless added them at someone's suggestion in preparation for the second ambulance's arrival. [Denny Dep. 43:5-44:3; 62:1-23] Denny had no problem doing so. [Denny Dep. 43:25]

**The second ambulance arrives.**

The second ambulance arrived within minutes. [Ex. O at 5; Denny Dep. 106:13-15] Medics asked the officers near Day to assist them in placing him on a gurney. [Covington Dep. 45:15-17; Waggoner Dep. 66:10-15] Day was still breathing and his eyes open. [Wooten Dep. 93:25-94:4; 139:3-5; Waggoner Dep. 65:3-12; 66:15; Covington Dep. 37:7-9; 46:2-3] But Covington heard the medics say that Day's pulse was weak. [Covington Dep. 46:14-16] This was Denny's first indication that something serious was occurring with Day's health. [Denny Dep. 17:18-20] Denny gave IEMS his handcuff key so the handcuffs could be removed. [Denny Dep. 121:21-25; Covington Dep. 46:4-7] Denny received two sets of handcuffs back from IEMS. [Denny Dep. 121:23-122:3]

**Day passes away.**

IEMS put Day in the back of the ambulance, where they performed CPR on him. [Denny Dep. 17:24-25; Wooten Dep. 137:15-19] Those efforts continued for thirty minutes. [Denny Dep. 18:1; Wooten Dep. 137:13-24; 142:11-19] At approximately 2:30PM, medics exited the ambulance and announced that Day was deceased. [Wooten Dep. 143:3-4; Denny Dep. 18:2-3; Ex. O at 1, 3] Deputy Coroner Carrie England was then summoned to the scene as part of the Critical Incident Response Team ("CIRT"). [Ex. S at 1, 4; Wooten Dep. 143:22-144:16; Denny Dep. 18:5-8] She examined Day in the back of the ambulance and noted no trauma to Day's body. [Ex. S at 1, 5]

After an autopsy, Day's cause of death was determined to be sudden cardiac death due to acute ischemic change. [Ex. R at 2] Contributing factors included "[s]ustained respiratory compromise due to hands cuffed behind the back, obesity, [and] underlying cardiomyopathy." [Ex. R at 2] Day also had congestive heart failure, an enlarged heart (cardiomegaly), and a family history of heart disease. [Ex. R at 3, 6; Ex. S at 4; Ex. T at 1] Risk factors of sudden cardiac death include familial history of heart disease, obesity, and cardiomyopathy—all of which Day had. [Ex. V at 1-2; Ex. S at 4; Ex. R at 3]

Despite his family history of heart disease, neither Day nor his family was apparently aware of his underlying conditions. [Ex. S at 4; Ex. N at 1; York Dep. 41:7-42:4] The autopsy also revealed no encircling contusions or lacerations on either wrist from the handcuffs and no overlying imprints of handcuffs on Day's wrists. [Ex. R at 3] When Denny and Wooten were on scene, they had no reason to think an eighteen-year-old man would suffer a heart attack or heart failure. [Denny Dep. 113:6-10; Wooten Dep. 86:10-11; 88:4-8; 95:16-18; 103:10-13] Until Monday arrived, Day was responsive, conscious, able to move around, had calmed down and was breathing normally. [Waggoner Dep. 92:10-11; 93:5-7; Monday Dep. 19:19; 21:9-11; Wooten Dep. 49:20-25; 96:17-19; 101:2-5; 104:13-22; York Dep. 34:10-15; 35:3; 44:10-17; 45:4-6; 72:24; 89:25; Covington Dep. 25:13-17; Nesbitt Dep. 29:22-30:4; Ex. N at 1]

**Day's position on the pavement from the time of the first ambulance's departure to the time of the second ambulance's arrival.**

Day laid down on the pavement on his back after being evaluated by the first set of IEMS medics. [York Dep. 62:11; Wooten Dep. 67:3; 111:4-6; Denny Dep. 54:9-13; Mahoy Dep. 23:17-23] He remained there on his back and chose to lay on top of his handcuffs until the second ambulance arrived. [Denny Dep. 40:24-41:11; 54:9-13; 111:17-20; 123:4-11; Wooten Dep. 50:7-13; Mahoy Dep. 23:17-23] Wooten did not believe that an overweight suspect laying on his back

on top of handcuffs would cause any breathing issues or difficulty—although it could have been uncomfortable. [Wooten Dep. 64:16-65:18] In Denny's experience, it is not uncommon for a suspect to lay on their back with their hands cuffed behind them. [Denny Dep. 84:10-15] Day was never on his chest or stomach for a prolonged period of time. [Denny Dep. 82:10-13; Wooten Dep. 101:23-102:8; Mahoy Dep. 23:24-24:1]

**The reasons for Day's arrest.**

After Denny conducted his on-scene investigation, his detention of Day (a suspect who allegedly committed an unconfirmed armed felony) converted into an arrest for a felony. [Denny Dep. 80:19-81:9] During his investigation, Denny decided to arrest Day for pointing a loaded firearm – a felony, as well as a misdemeanor or felony theft charge. [Denny Dep. 95:11-14] Denny was also looking at the possibility of carjacking charges. [Denny Dep. 95:15-96:7] Day was arrested and handcuffed consistent with standard IMPD policy. [Wooten Dep. 112:1-7; Ex. Q at 2-3]

**IMPD's positional asphyxia training.**

Before September 2015, IMPD officers received training on the dangers of positional asphyxiation, discussed in General Order 8.1. [Denny Dep. 45:5-7; 81:19-24; 82:1-9; Ex. P at 1, 4-5] G.O. 8.1 defines positional asphyxia as "a condition in which an extreme decrease in the amount of oxygen in the body is accompanied by an increase of carbon dioxide which may lead to loss of consciousness or death." [Ex. P at 1] Death by positional asphyxia can occur when a suspect, especially a larger one, is placed on their chest or stomach, with the suspect's arms and legs restrained behind the back. [Ex. P at 4, 5] Being placed in this prone position may cause the suspect difficulty breathing, which can lead to serious injury or death. [Ex. P at 4] Consequently, IMPD officers are trained to prevent suspects from being in a prone position for prolonged periods

18

of time. [Denny Dep. 98:8-15; Wooten Dep. 101:23-102:8] Denny and Wooten did not believe

that positional asphyxia could occur if a suspect laid on his back on top of handcuffs. [Denny Dep.

32:17-33:1; 45:21-46:17; 115:9-13; 116:5-12; Wooten Dep. 102:9-11] Nor did Wooten think that

the handcuffs restricted Day's ability to breathe. [Wooten Dep. 115:4-10]

**The timeline of the incident on September 26, 2015.**

The unrebutted evidence reveals the following timeline of events where Wooten requested

an ambulance within minutes of arriving on scene himself (and fewer than six minutes after Denny

arrived on scene and detained Day):

> At 12:54:44 a call went out over dispatch of an armed shoplifter who brandished a gun at Burlington Coat Factory. [Denny Dep. 9:11-17; Ex. M at 3]
>
> Covington was the first officer to arrive on scene at 12:57:18. [Covington Dep. 10:23-24; Ex. M at 3]
>
> By 12:57:31, Covington had the suspect at gunpoint. [Ex. M at 3]
>
> By 12:58:19, Denny had Day in custody and located the gun that Day brandished at Nesbitt. [Ex. M at 3; Nesbitt Dep. 27:9-11]
>
> By 12:59:17, Wooten arrived on scene. [Ex. M at 3; Denny Dep. 104:10-17]
>
> At 1:02:22, Waggoner arrived on scene. [Ex. M at 3]
>
> At 1:02:57, Wooten requested a medic to evaluate Day. [Ex. M at 3]
>
> At 1:03:18, an IEMS ambulance was dispatched to the scene. [Ex. N at 3]
>
> At 1:09:09, York and Brown arrived to treat Day—approximately seven minutes after Wooten requested their assistance and thirteen minutes after Denny arrived on scene. [Ex. N at 3; Ex. M at 3; Denny Dep. 105:3-22]
>
> Denny requested a wagon over the radio at 1:28:31. [Denny Dep. 16:16-17; 38:24-39:16; 106:2; Ex. M at 2]
>
> MCSO Deputy Steve Monday was dispatched at 1:29:17 to transport Day via jail wagon to the APC. [Ex. M at 2]
>
> At 1:43:21, Monday arrived on scene to transport Day. [Ex. M at 2; Monday Dep. 33:15-18]

Wooten called for a second ambulance and a different IEMS ambulance was dispatched to the scene at 1:48:54. [Monday Dep. 19:24-25; Wooten Dep. 100:2-8; Denny Dep. 57:10-13; Ex. O at 5]

The second IEMS ambulance arrived to the scene at 1:52:47. [Ex. O at 5]

At approximately 2:30, medics notified the officers that Day was deceased, after having attempted CPR on him for thirty minutes. [Wooten Dep. 137:13-24; 142:11-19; 143:3-4; Denny Dep. 18:1-3; Ex. O at 1, 3]

## ARGUMENT

### I.   Federal claims

#### A.   The Defendants are entitled to judgment as a matter of law on the claims against Officer Denny and Sergeant Wooten in their official capacities.

The plaintiffs sued Denny and Wooten both in their individual and official capacities.[3] *See* case caption in [Ex. A at 1]. Actions against individual defendants in their official capacities are treated as suits brought against the government entity itself. *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008). And under the familiar *Monell* doctrine, "a government unit is not liable under § 1983 unless the deprivation of constitutional rights is caused by its own policy or custom." *Id* (*citing Monell v. Dep't. of Soc. Serv. Of N.Y.C.,* 436 U.S. 658, 694 (1978)). Despite suing Denny and Wooten in their official capacities, the plaintiffs later abandoned these claims. Specifically, they acknowledged in their answers to the Defendants' contention interrogatories that they are not pursuing any *Monell* claims. [Ex. L at 6] So the Defendants are entitled to judgment as a matter of law on the plaintiffs' abandoned claims against Denny and Wooten in their official capacities.

#### B.   The Defendants are also entitled to judgment as a matter of law on the individual-capacity claims.

---

[3] The plaintiffs also sued Officer Covington, Lieutenant Waggoner, and the Town of Cumberland. Following discovery, the plaintiffs settled their claims with these defendants. *See* [Dkts. 44 and 45]

The Fourth Amendment protects "…people…against unreasonable…seizures." U.S. CONST. AMEND. IV. A claim that a law-enforcement officer used excessive force in arresting or seizing an individual is "analyzed under the Fourth Amendment's 'objective reasonableness' standard." *Graham v. Connor*, 490 U.S. 386, 399 (1989); *Plumhoff v. Rickard* 572 U.S. 765, 774 (2014). "[T]he test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application." *Graham*, 490 U.S. at 396; *Abbott v. Sangamon Cnty., Ill.*, 705 F.3d 706, 724 (7th Cir. 2013). Consequently, in evaluating the reasonableness of an officer's actions, courts must look at the totality of the circumstances. *Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003).

Factors relevant to the inquiry include the severity of the crime at issue; whether the suspect posed an immediate threat to the safety of the officers or others; and whether he actively resisted arrest or attempted to evade arrest by flight. *Baird v. Renbarger*, 576 F.3d 340, 344 (7th Cir. 2009) (citing *Graham*, 490 U.S. at 396). Additional factors are whether the individual was under arrest or suspected of committing a crime, was armed, or was interfering or attempting to interfere with the officer's execution of his duties. *Jacobs v. City of Chi.*, 215 F.3d 758, 773 (7th Cir. 2000).

### 1. Officer Denny's and Sergeant Wooten's use of handcuffs (the only force used on Day) was objectively reasonable.

It is important to keep in mind that the *only* force used here was the most *de minimis* force used in making an arrest—the placing of handcuffs on a detainee. The factors in *Baird* and *Jacobs* leave no doubt that Denny and Wooten were permitted to handcuff a detainee who had just completed an armed robbery, threatened an individual with a gun, and attempted two carjackings at gunpoint, and keep him detained after the medics evaluated him and concluded that he could be transported to jail.

With respect to the severity of the crime(s) at issue, this is not a case where a kid swiped a pack of gum from a gas station on a dare from friends. While Day's initial crime started out as absconding with a wristwatch from a department store (his third bout of thievery from the same store in a two-week period), his actions and crimes that day escalated in their danger to others and potential for violence. The theft of the watch would form the basis for Denny's decision to charge Day with theft – either as a misdemeanor or a felony.

After refusing Nesbitt's invitation to return to the store to simply discuss the stolen watch, Day pulled out a gun in a shopping mall, and with gun in hand, fled from Nesbitt. Shortly after Day began to flee, he pointed his gun at Nesbitt. This act would soon form the basis of Denny's decision to charge Day with a felony for pointing a loaded firearm. During Day's flight, he also unsuccessfully attempted to carjack two different people. Denny would also consider carjacking charges. These crimes lend themselves decisively to the use of handcuffs during the short initial investigation leading Denny to determine that Day would be arrested.

As to the second and third *Baird* factors, Day posed an immediate threat to the safety of the officers and others up until the time that Denny placed his first set of handcuffs on him. This is because the loaded gun was just inches from Day's hands as Covington had him at gunpoint. And he had already brandished that gun at a loss-prevention officer before a flight that included two attempted carjackings. Wooten also believed Day posed a threat to officers and the community if that detention did not continue. He had already threatened Nesbitt with a gun and fled; suggesting he was someone willing to go to great lengths to get away. Denny also testified that, in his experience, detained individuals who have already fled once present continued flight risks.

Looking at the *Jacobs* factors, Day was initially suspected of committing a number of crimes. But once Denny completed his investigation, Day's detention converted into an actual

arrest for a felony (pointing a loaded firearm) and another felony or a misdemeanor (theft). Additionally, Day's noncompliance with Denny's instructions to remain seated on his butt and his protestations to Wooten to "let [him] go" and that "[he] didn't do anything wrong" gave the officers further cause to believe the handcuffs—which are part of virtually every detention—were likewise appropriate here. And although it needs no repeating, Day was armed too. The totality of the circumstances and "a careful balancing of the nature and quality of the intrusion on [Day's] Fourth Amendment interests against the countervailing governmental interests at stake" dictate that Denny's and Wooten's use of the minimal force represented by (an initial set and a subsequent second set of) handcuffs was objectively reasonable. *Phillips v. Cmty. Ins. Corp*, 678 F.3d 513, 519 (7th Cir. 2012); *see also Howell v. Smith*, 853 F.3d 892 (7th Cir. 2017).

### 2. Analysis of the uses of force the plaintiffs are challenging.

Consistent with this Court's teachings in *Lynn v. City of Indianapolis*, Case No. 1:13-cv-00179-JMS-TAB (S.D. Ind. 2014), the Defendants served contention interrogatories on the plaintiffs to determine the specific uses of force they are challenging. *See id.* at *6; [Ex. L at 4-5]. Analyzing each use of force allows the Court to determine "the reasonableness of the force used…at the time the force [was] applied." *Id.* The first use of force the plaintiffs challenge is Denny's decision to place Day in a single pair of handcuffs when he was initially detained—even though Denny saw that Day was overweight and winded from running. [Ex. L at 4] Under the totality of the circumstances, Denny's initial placement of a single pair of handcuffs on Day was objectively reasonable. *Plumhoff*, 572 U.S. at 774.

Denny arrived to the scene knowing that an armed shoplifter had fled on foot and brandished a gun at a loss-prevention officer. It is true that Denny observed Day to be overweight and winded from running. The fact that Day complained of having difficulty breathing was not a

surprise to Denny—Day had substantially exerted himself by fleeing full speed from Nesbitt. Although Denny never observed any signs of distress, when Day said he was having trouble breathing, Denny instructed him to take deep breaths in and breathe out to slow his heart rate down. Day never gasped for air and Denny never saw him exhibit any difficulty breathing. Denny had no reason to believe that Day was out of breath for any reason other than physical exertion. The Defendants are aware of no authority suggesting police officers cannot handcuff a winded suspect who robbed a store, brandished a gun at a loss-prevention officer, attempted two carjackings, and fled on foot. It goes without saying that such a rule would present enormous risks to officers and the public alike.

Denny detained Day with handcuffs initially because he was a suspect who had fled and committed an unconfirmed armed felony. *See Rooni v. Biser*, 742 F.3d 737, 742-43 (7th Cir. 2014). His primary concern in that moment was detaining Day and securing the nearby gun. Denny had no difficulty in cuffing Day – his hands came together behind his back very easily, and he double locked the cuffs to prevent them from tightening on Day's wrists. Notably, Day never once complained to Denny or any officer that the handcuffs were causing him any discomfort. *Compare Payne v. Pauley*, 337 F.3d 767 (7th Cir. 2003). Absent complaints from a suspect of pain or discomfort or other obvious signs that the handcuffs are problematic, there is simply no constitutional requirement that an officer use two sets of handcuffs in detaining or arresting obese and/or tired suspects. *See Edwards v. Matthews*, 2018 WL 3462506, at * 9 (S.D. Ohio 2018) ("[C]ourts have not clearly established a right to the use of two sets of handcuffs.").

Officers have discretion to put two sets of handcuffs on larger suspects when the officers believe it appropriate to do so. Adding a second set of handcuffs is done for the comfort of the suspect. Denny exercised this discretion later on in the investigation when he placed a second set

of handcuffs on Day in preparation for the second ambulance's arrival at the suggestion of another officer. Denny had no problem doing so—especially after hearing that medics were being called back to the scene. Ultimately, the plaintiffs' challenge to Denny's decision erroneously views the incident through the beneficial lens of 20/20 hindsight and not in light of the facts and circumstances Denny confronted on September 26, 2015. *Padula v. Leimbach*, 656 F.3d 595, 602 (7th Cir. 2011). This they may not do.

The next use of force the plaintiffs challenge is Denny's and Wooten's "plac[ment][of] [Day] on his back with his hands still cuffed behind him…for an extended period of time even though he was winded from running, not resisting arrest, and not posing a threat to officers or the public." [Ex. L at 4] To the extent the plaintiffs blame Denny for Day's decision to lay on the pavement on his back with his hands cuffed behind him, Denny exerted no such force. Denny's only contact with Day occurred when he initially detained him, and attempted to keep him seated on his buttocks on the hill. Denny then placed Day on his side, and Sergeant Wooten took over watching him. The fact that Wooten permitted Day to lay with his back on the pavement and his hands cuffed behind him was not objectively unreasonable—assuming arguendo that allowing someone to do something of their own volition somehow constitutes a use of force.

As an initial matter, the designated evidence demonstrates that Day was *not* winded from running at the time he laid down on his back on the pavement. Day laid down on the pavement after IEMS evaluated him the first time, cleared him, then left. They determined he was breathing normally and had no medical issues which necessitated transportation to the hospital. Moreover, shortly after Wooten started watching Day (which was before the first ambulance arrived), he had calmed down and began breathing normally.

Second, Wooten did not require Day to lay on his back on the pavement. That is where Day chose to lay down after being evaluated the first time by IEMS while waiting for the jail wagon. Suspects can be placed in a variety of positions while detained on scene. Day's position during this time was an acceptable one. It may not have been the most comfortable, but again, Day chose to lay that way of his own volition. In fact, he had refused multiple times to sit on his butt or stay on his side—the only positions the officers ever put him in.

Wooten did not believe that an overweight suspect laying on his back on top of handcuffs would cause any breathing issues or difficulty. And in Denny's experience, it is not uncommon for a suspect to lay on their back with their hands cuffed behind them. The primary concern for both officers was avoiding a situation where Day was laying on his chest or stomach—a position that, as far as the officers knew, could increase the risk of positional asphyxia. In short, no officer used any force to place Day on his back. Day chose that position himself. The only force involved at that point was the presence of handcuffs. But no authority requires police officers to free a suspect from handcuffs if he chooses to lie on his back—especially after the suspect has been cleared by medical personnel. Such a rule would present obvious problems. To the extent this second purported use of force amounts to a use of force at all, Wooten's conduct was not objectively unreasonable.

The plaintiffs next claim that Denny and Wooten "recklessly disregarded [Day's] safety by failing to take reasonable measures to minimize the risk of harm, such as changing his position on the ground, using more than one set of handcuffs, or sending him to the hospital." [Ex. L at 5] There is much to unpack here. As to Denny, during his initial contact with Day, he attempted to position him and reposition him at least three times. Denny did this because he realized Day was winded from running and he believed that if he sat on his butt on the hill, this would be the best

and most comfortable position for Day to be in while he regained his breath, the adrenaline rush subsided, and Denny began his investigation.

Additionally, the designated evidence demonstrates Denny *did* use a second set of handcuffs on Day after another officer suggested it prior to the second ambulance's arrival. Finally, the plaintiffs' blame Denny for not sending Day to the hospital. But the undisputed evidence confirms that the medical personnel and suspect have complete autonomy and control over the medical treatment provided. Had IEMS determined that Day needed to go to the hospital—or had Day himself requested to go—they would have taken him.

The same goes for Wooten. He did not "recklessly disregard" anything about Day. Like Denny, Wooten (and the CPD officers) repositioned Day several times throughout the incident to prevent him from laying on his stomach—recognizing the concerns for positional asphyxia. Day was again placed in a seated position on his butt and refused to stay there. When Day complained to Wooten of difficulty breathing, he called an ambulance so Day could receive medical care. Nobody forced Day to lay on the pavement on his back and on top of his handcuffs.[4] And after the first medics cleared Day, Wooten called a second ambulance for Day when he became unresponsive during Deputy Monday's search. That Wooten himself did not place a second set of handcuffs on Day is of no moment. Such a decision is, after all, discretionary. And it never appeared to Denny or Wooten that Day was in any discomfort from the single set of handcuffs that Day was placed in initially. *Cf. Stainback v. Dixon*, 569 F.3d 767, 772-74 (7th Cir. 2009). No officer had any authority or legal right to force IEMS to take Day to the hospital any more than a medic could tell an officer when to use pepper spray or a Taser on a suspect.

---

[4] And even if the evidence showed Day was *forced* to remain in this position, it cannot be readily concluded that it would constitute excessive force.

The plaintiffs next challenge Sergeant Wooten's signing of the SOR after IEMS evaluated Day and determined that he did not need to be transported to the hospital for further treatment. [Ex. L at 5] Throughout this litigation, the plaintiffs have fallaciously asserted that Wooten "forged" Day's signature and/or intentionally waived Day's ability to receive medical care. The undisputed evidence squarely contradicts such hyperbole.

When IEMS determines after an evaluation that a suspect in custody does not need to be transported to the hospital for further medical treatment, and the individual does not indicate to IEMS a desire to be transported to the hospital, the custody of the suspect must be transferred back to IMPD. To effectuate and memorialize this transfer of custody, IEMS has police sign an SOR form in a witness capacity. The officer does not sign the SOR on behalf of the suspect, but simply as a witness to the transfer.

Out of concern for officers' safety, the suspect's handcuffs are not removed for them to sign the SOR. IMPD does not actually sign a physical paper form, but rather a completely blank screen on the IEMS tablet (Toughbook) with no words or language on it. The SOR-signature process is very common and—according to the unrebutted testimony of both police officers and the IEMS personnel—simply memorializes the return of custody from IEMS to law enforcement.

After IEMS evaluated Day, the medics asked Wooten to sign the SOR for Day to be released or transferred back into IMPD's custody. Wooten signed the same SOR that officers sign all the time. When Wooten signed the SOR on the IEMS tablet, he just signed his name in a box showing no accompanying words or instructions on the screen. Although Wooten's signature for the SOR ended up being engrafted onto another IEMS standard form called "Treatment/Transport Refusal" that a patient generally signs when he refuses to be transported to the hospital after being evaluated by IEMS, every witness—including the IEMS personnel—confirmed that this does not

mean Wooten somehow denied Day medical care or waived any rights he may have had. Wooten's understanding of what he signed on September 26, 2015 was an SOR for Day to be released back into IMPD's custody from IEMS, not to refuse Day medical treatment or the ability to be transported to the hospital.[5]

Given the plaintiffs' allegation, it must be reemphasized that the Fourth Amendment addresses intentional misuses of power and proscribes unreasonable seizures. *Brower v. Cnty. Of Inyo*, 489 U.S. 593, 596 (1989). It has never been interpreted to prohibit an officer from signing a document (electronic or otherwise)—especially when that signature merely memorializes a suspect's transfer of custody after a medical evaluation. Nor does the Constitution displace state and local governments as the source of wise police practices. *McNair v. Coffey*, 279 F.3d 463, 467 (7th Cir. 2002). Assuming Wooten's act of signing the SOR somehow constituted a use of force, it was objectively reasonable in light of the designated evidence.

The plaintiffs' penultimate challenge to Denny and Wooten's use of force is that they "stood by and took no action when they saw that [Day] was not going to the hospital even though he was not able to stand." [Ex. L at 5] Based on the plaintiffs' line of questioning in the various depositions in this action, they may designate a cell phone video taken by a bystander during the incident. The plaintiffs contend this video shows Day being unable to stand when IEMS and Sergeant Wooten helped Day to stand up from the ground due to being in handcuffs during his medical evaluation. The plaintiffs might also designate IMPD General Order 8.1, which, in part, states that sick, injured, or disabled detainees must be transported to the hospital when the detainee cannot stand unassisted.

---

[5] As the testimony from the IEMS personnel confirms, they did in fact evaluate Day and they—the medical professionals—determined that he did not require further treatment. That testimony likewise confirms that Day never requested to go to the hospital.

This contention, even if true, is immaterial to the question at issue here: whether Denny's and Wooten's conduct was violative of Day's constitutional rights. The excessive force inquiry is governed by constitutional principles, not police department regulations. *Scott v. Edinburg*, 346 F.3d 752, 760-61 (7th Cir. 2003). An officer's compliance with or deviation from departmental policy does not determine whether he used excessive force. *U.S. v. Brown*, 851 F.3d 532, 537 (7th Cir. 2017). Indeed, IMPD's policies are not even admissible evidence for purposes of showing a constitutional violation. *Thompson v. City of Chi.*, 472 F.3d 444 (7th Cir. 2006) (in § 1983 excessive force action, Seventh Circuit affirmed exclusion of police department's use of force orders and affirmed exclusion of expert testimony from a police sergeant who would have opined about reasonableness of officers' conduct based in part on the use of force orders).

It bears repeating that IMPD officers are not medical professionals. Accordingly, they reasonably rely on IEMS and other medical personnel's expertise when it comes to making a determination of whether a suspect needs further treatment at a hospital, or if the suspect can be released back into police custody for transport. The plaintiffs can designate no evidence to demonstrate that these officers' reliance on the judgment of IEMS was so patently unreasonable as to rise to the level of the constitutional violation of excessive force. The officers simply called a jail wagon after medical professionals came, examined Day, and cleared him to go to jail.

The plaintiffs' final challenge to Denny's and Wooten's use of force is that the officers "unlawfully and unnecessarily punished [Day] by depriving him of oxygen until he died." [Ex. L at 5] The overwhelming and undisputed evidence compels a contrary conclusion. Neither Denny nor Wooten punished Day by depriving him of oxygen. Quite the opposite. From the moment Day told Denny that he was having difficulty breathing, Denny attempted to instruct him on how to regain his breath in light of his then-winded condition. And then he placed him in an upright,

seated position which, in Denny's experience, provided the best and most comfortable opportunity for Day to catch his breath and calm down. Further, shortly after Day complained to Wooten of having difficulty breathing, Wooten called an ambulance to check him out. Wooten was entitled to rely on the advice and conclusion of the IEMS medical professionals that Day did not need additional treatment at a hospital and could be transported to jail. Denny's and Wooten's actions were objectively reasonable in light of the designated evidence.

In short, the officers not only acted reasonably—they did what they were supposed to do. They arrived on scene, detained the suspect, recovered his gun, and conducted an investigation. They sat him up upright and had him breathe deeply so he could catch his breath after running. When Day continued complaining that he was having difficulty breathing—fewer than six minutes after Denny arrived on scene—they called for medical help. When the medical experts cleared Day to go to jail, they called for a jail wagon to take him. And when Day became unresponsive during Deputy Monday's search, they immediately summoned medical professionals back to the scene. Day's death is tragic. But it was not the result of any constitutional violations.

### 3.      The plaintiffs' failure to intervene claims fail as a matter of law.

Although the plaintiffs' Amended Complaint does not actually allege them, they also apparently bringing 'failure to intervene' claims against Officer Denny and Sergeant Wooten. [Ex. L at 1-2] An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to prevent the harm from occurring." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (emphasis in original).

The plaintiffs' failure to intervene claim against Officer Denny simply cannot stand. After all, Denny was the arresting officer. He was responsible for identifying Day as the suspect, speaking with witnesses, collecting evidence, handling the overall investigation, completing paperwork, and other administrative duties that day. Was Denny going to intervene in his own arrest? Likewise, there was no constitutional violation in which he could have possibly intervened. The claim against Denny fails accordingly.

The failure to intervene claim against Wooten can also be disposed of quickly. To begin with, the claim itself presumes that Denny used excessive force against Day. But the designated evidence confirms the opposite. The only force Denny used on Day was handcuffs. Day was handcuffed consistent with IMPD protocol for detaining a suspect who was alleged to have committed a number of violent crimes to ensure officer and public safety while Denny conducted an investigation to determine whether Day should be arrested. Further, the claim against Wooten also presupposes that Wooten himself had reason to know that Denny used excessive force on Day in handcuffing him. *See Leaf v. Shelnutt*, 400 F.3d 1070, 1093 (7th Cir. 2005). No evidence exists which could lend itself to any inference that Wooten had any concern regarding Denny's decision to handcuff Day.

Day died of an underlying cardiac condition which neither he nor even his family was aware of. *Cf. Estate of Phillips v. City of Milwaukee*, 123 F.3d 586 (7th Cir. 1997), *reh'g denied, cert. denied*. IMPD officers are not medical professionals, nor are they trained to recognize or treat heart attacks. So when Day complained to Wooten of having difficulty breathing, Wooten called IEMS for Day to be evaluated. Twice. In this vein, Wooten had no realistic opportunity to prevent Day's heart attack from occurring because Wooten was unaware he was having one. *Abdullahi,*

423 F.3d at 774; *Estate of Phillips*, 123 F.3d at 594. For these reasons, the failure to intervene claim against Wooten fails. Denny and Wooten are entitled to judgment as a matter of law.

### C.      Denny and Wooten are entitled to qualified immunity.

Even if Denny's or Wooten's use of force was not reasonable as a matter of law, or they committed some other constitutional violation, the plaintiffs cannot overcome the officers' entitlement to qualified immunity. Qualified immunity gives "government officials 'the benefit of legal doubts.'" *Rooni*, 742 F.3d at 743; *see also Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) ("Qualified immunity protects public servants from liability for reasonable mistakes made while performing their duties."). In fact, it protects "all but the plainly incompetent or those who knowingly violate the law." *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015).

Therefore, "because qualified immunity shields government actors in all but exceptional cases, courts should think long and hard before stripping defendants of immunity." *GJR Investments, Inc. v. Cnty. of Escambia*, 132 F.3d 1359, 1366 (11th Cir. 1998). In the excessive force context, qualified immunity "in effect, affords enhanced deference to officers' on-scene judgment about the level of necessary force." *Abbott*, 705 F.3d at 725. Once the defense of qualified immunity is raised, it becomes the plaintiff's burden to defeat it. *Estate of Escobedo v. Martin*, 702 F.3d at 388, 404 (7th Cir. 2012).

To determine whether a defendant is entitled to qualified immunity, courts must address a two-step inquiry: (1) whether the defendant violated the plaintiff's constitutional rights and (2) whether the right at issue was clearly established at the time of the violation. *Rooni*, 742 F.3d at 742. Courts are not required to follow these steps rigidly. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). If the answer to either question is no, the defendant is entitled to qualified immunity. *Muhammed v. Pearson*, 900 F.3d 898, 904 (7th Cir. 2018).

In determining whether a right was clearly established, courts must define the right in a particularized, rather than general, sense. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987). The Supreme Court and the Seventh Circuit have repeatedly cautioned lower courts "not to define clearly established law at a high level of generality." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011)); *D.C. v. Wesby*, 138 S. Ct. 577, 590 (2018); *Sanzone v. Gray*, 884 F.3d 736, 741 (7th Cir. 2018) *reh'g. denied*.[6]

As such, "[s]pecificity is important in the Fourth Amendment context, where the [Supreme] Court has recognized that it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts." *Kisela v. Hughes*, 138 S. Ct 1148, 1152 (2018). Excessive force cases always depend on the particular facts at hand, and accordingly, "police officers are entitled to qualified immunity unless existing precedent *squarely governs the specific facts at issue*." *Id.* at 1153 (emphasis added). The right's contours must be "sufficiently clear that every reasonable official would have understood that what he is doing violates that right, and existing precedent must have placed the statutory or constitutional question beyond debate." *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013).

The plaintiffs will be unable to meet their burden of overcoming qualified immunity. *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). As to the first prong of the analysis, the

---

[6] For example, in a recent use of force case, the Seventh Circuit said the following when discussing a clearly established right:

> [I]n this case, the scope of the right in issue must be drawn more narrowly than the right of a pretrial detainee to be free from excessive force during his detention; instead, we must examine whether the law clearly established that the use of a Taser on a non-resisting detainee, lying prone on his back, was constitutionally excessive.

*Kingsley v. Hendrickson*, 801 F.3d 828, 832 (7th Cir. 2015).

Defendants have already demonstrated that neither Denny nor Wooten used excessive force on Day; their actions were objectively reasonable in light of the facts and circumstances they confronted. Nor can Wooten be liable for "failing to intervene" since Denny used no excessive force to prompt him to intervene to begin with. *Abdullahi,* 423 F.3d at 774. Consequently, no constitutional violations occurred. *See Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (If the facts reveal no constitutional violation, the inquiry ends and the officer prevails on the merits of the case.).

Turning to the second prong, there is no "closely analogous case" that clearly established a right which prohibited a non-resisting obese detainee from laying on his back and on top of his handcuffs on pavement after medical personnel informed the officers that he had no medical issues and could be transported to jail. *Findlay*, 722 F.3d at 899; *Kingsley*, 801 F.3d at 832. Nor is there any clearly established right for a suspect to be taken to a hospital despite being examined by medical professionals, being cleared for transport to jail, and never having requested to go to the hospital. On the contrary, a substantial number of positional asphyxia and in-custody death cases point to the conclusion that qualified immunity applies here.

Moreover, lest the plaintiffs attempt to argue as much, this is not a case where the force used was so plainly excessive that Denny or Wooten should have been on notice that they were violating the Fourth Amendment. *Id.* They simply handcuffed a violent suspect and followed the instructions of medical professionals. Since the qualified immunity doctrine "operates 'to ensure that before they are subjected to suit, officers are on notice that their conduct is unlawful,'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001)), and no caselaw existed in September 2015 which would have placed Denny and Wooten on notice of the

illegality of the force they used in the specific circumstances they confronted, they are entitled to qualified immunity on all federal claims brought.

## II.     The plaintiffs' state-law claims

The plaintiffs also sued the City of Indianapolis for "negligence/wrongful death" (Count II) and "loss of child's services" (Count III) [Ex. A at 7-9] Both claims fail for various reasons.

### A.      Officer Denny's and Sergeant Wooten's conduct was intentional, not negligent; so the plaintiffs' negligence claim fails.

A cause of action for negligence cannot stand when the plaintiff's claim alleges intentional conduct on the part of the defendant. *See United Nat. Ins. Co. v. Tunnel, Inc.*, 988 F.2d 351, 353 (2nd Cir. 1993) (citing *Martin v. Yeoham*, 419 S.W.2d 937, 944 (Mo. Ct. App. 1967) ("It is elementary that the words 'negligence' and 'intentional' are contradictory and that 'negligence' is not synonymous with 'intentional action.'") By every account, the IMPD officers' actions on September 26, 2015 were not negligent; they were intentional. Denny did not negligently detain or arrest Day, or negligently conduct an investigation. He did not negligently request a jail wagon to transport Day or negligently add a second set of handcuffs at the suggestion of another officer. Likewise, Wooten did not negligently monitor Day or negligently call an ambulance twice. Neither officer was *negligent*. Their actions were purpose-driven and intentional (and objectively reasonable).

The plaintiffs' excessive force claim relies on the same set of facts they use for their negligence claim. *Kenley v. District of Columbia*, 83 F.Supp.3d 20, 46 (D.D.C. 2015) (discussing cases where actions for negligence and intentional torts cannot be maintained where the claims rely on same set of facts). This is problematic since intent and negligence are regarded as mutually exclusive grounds for liability. *District of Columbia v. Chinn*, 839 A.2d 701, 706 (D.C. 2003). As the saying goes, there is no such thing as a negligent battery. *Id*. Thus, the plaintiffs' negligence

claim is nothing more than an attempt to shoehorn an intentional tort (excessive force) into a negligent tort. *Kenley*, 83 F.Supp.3d at 46. A cause of action for negligence cannot be maintained against the City because neither Denny nor Wooten acted negligently.

**B.      Even if the Court determines that the IMPD officers' conduct could be negligent, the City is still immune.**

Should the Court conclude that claims for excessive force and negligence can be pursued in tandem against the Defendants, they still win by virtue of immunity. Governmental employees or entities may not be subject to liability for tortious conduct if the conduct falls within an immunity granted by the Indiana Tort Claims Act ("ITCA"). *Veolia Water Indianapolis, LLC v. Nat'l Trust Ins. Co.,* 3 N.E.3d 1, 5 (Ind. 2014). Among the various ITCA immunities is the law-enforcement immunity provision, which provides immunity when a loss results from "the adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations), unless the act of enforcement constitutes false arrest or imprisonment." IND. CODE § 34-13-3-3(8).

In determining whether law-enforcement immunity applies, the first inquiry is whether the officer was acting within the course of his employment when the injury to the plaintiff occurred, and second, whether the officer was engaged in the enforcement of a law at that time. *Harness v. Schmitt*, 924 N.E.2d 162, 165 (Ind. Ct. App. 2010). As to the second inquiry, "enforcement" activities under the law enforcement immunity provision include "compelling or attempting to compel the obedience of another to laws, rules, or regulations, and the sanctioning or attempt to sanction a violation thereof." *Johnson ex rel. Ind. Dep't. of Child Servs. v. Marion Cnty. Coroner's Office*, 971 N.E.2d 151, 158 (Ind. Ct. App. 2012). Both inquiries are satisfied here.

The plaintiffs allege that Denny and Wooten were acting within the course and scope of their employment with the City. [Ex. A at 2] The Defendants do not dispute this.[7] [Ex. U at 2] Denny and Wooten were also engaged in the "enforcement" of a law. *Harness,* 924 N.E.2d at 165. Police officers are required by statute to, among other things, prevent offenses, detect and arrest criminals, and enforce and prevent the violation of laws. IND. CODE §§ 36-8-3-10(a)(1), (3), and (14). This is exactly what Denny and Wooten were doing with Day: "compelling or attempting to compel [his]…obedience…to laws…and the sanctioning or attempt to sanction a violation thereof" since he stole a watch and fled, brandished a gun at Nesbitt, attempted to carjack two people, and evade arrest. *Johnson*, 971 N.E.2d at 158. Accordingly, the City is immune under the law-enforcement immunity provision in the ITCA.[8]

### C.   Day was also contributorily negligent as a matter of law.

Contributory negligence is the failure of a plaintiff to exercise the reasonable care an ordinary person would for his own protection and safety. *Penn Harris Madison Sch. Corp. v. Howard*, 861 N.E.2d 1190, 1193 (Ind. 2007). Lack of reasonable care that an ordinary person would exercise in like or similar circumstances is the factor upon which the presence or absence of negligence depends. *Funston v. Sch. Town of Munster*, 849 N.E.2d 595, 598 (Ind. 2006). Since the common-law defense of contributory negligence applies to governmental entities, *even a slight*

---

[7] Indeed, if Denny and Wooten were not on the clock, there could be no vicarious liability against the City. *See* IND. CODE §§ 34-13-3-3, 5.

[8] The language in Count II of the plaintiffs' Amended Complaint could also be construed as a claim against Officer Denny and Sergeant Wooten individually or personally. However, the plain language of the ITCA, the caselaw interpreting it, and the designated evidence squarely forecloses any state-law claim against them individually since they were within the course and scope of their employment with City. *See generally,* IND. CODE § 34-13-3-5; *Mayes v. City of Hammond*, 442 F.Supp.2d 587, 629 (N.D. Ind. 2006); *City of Gary v. Conat*, 810 N.E.2d 1112, 1118 (Ind. Ct. App. 2004).

*degree* of negligence on Day's part, if it proximately contributed to his injuries, will operate as a total bar of the plaintiffs' claim, regardless of any negligence on the officers' parts. *Id.*

Day stole a watch from Burlington Coat Factory on September 26, 2015. This was the third instance of Day's theft from the store within a two-week period. When Nesbitt confronted him about the stolen merchandise, he decided to pull out his gun and run through a public space to attempt to evade Nesbitt. During the course of Day's flight, he attempted to carjack not one but two random individuals. Once detained by law enforcement, Day did not follow Denny's commands and was non-compliant when instructed to remain in a seated position. If Day had done so, he would have been in the best position to regain his breath and calm down.

Day failed to exercise the reasonable care an ordinary person would for his own protection and safety. *Howard*, 861 N.E.2d at 1193. "It certainly is understandable that [Day] would [try to avoid getting caught or arrested after stealing and not want to comply with Denny's commands]. But being understandable does not equate with being completely free of all negligence." *Funston*, 849 N.E.2d at 600. No one forced Day to steal from the store, brandish a gun and flee from security personnel despite his obesity, or ignore Officer Denny's commands to remain seated on the grassy hill. Given those actions, he unquestionably "was negligent *to some degree* [in causing his death], and this is enough to establish…contributory negligence as a matter of law." *Id* (emphasis added); *see also Carter v. Indianapolis Power & Light*, 837 N.E.2d 509 (Ind. Ct. App. 2005), *reh'g. denied*, *trans. denied.* The plaintiffs' negligence claim is barred.

### D.      The plaintiffs' wrongful-death and loss of child's services claims fail.

The plaintiffs appear to have brought their "loss of child's services" claim under the Child Wrongful Death Statute ("CWDS") – IND. CODE § 34-23-2-1. [Ex. A at 8-9] The CWDS does not define or create a separate tort, but is merely a mechanism or vehicle by which Day's estate can

recover damages that Day could have recovered personally if he survived. *See* IND. CODE § 34-23-2-1; *Thompson v. City of Indianapolis*, 2017 WL 4155224, Case No. 1:15-cv-01712-TWP-DML, at * 5 (S.D. Ind. 2017) (where this Court concluded that Indiana's wrongful death statutes do not create separate torts independent of other state-law claims). Accordingly, the wrongful-death claim in Count II, and the Count III "loss of child's services" claim require no separate analysis because neither is an actual stand-alone claim under Indiana law—just categories of damages.

## CONCLUSION

The Defendants, City of Indianapolis, Officer Randall Denny, and Sergeant Franklin Wooten respectfully request the Court enter summary judgment on all the plaintiffs' claims as there are no genuine issues of material fact and the Defendants are entitled to judgment as a matter of law.

Respectfully submitted,

OFFICE OF CORPORATION COUNSEL

 */s/ Adam S. Willfond*
Adam S. Willfond (31565-49)
Assistant Corporation Counsel
200 E. Washington Street, Suite 1601
Indianapolis, IN 46204
317.327.4055 (T)
317.327.3698 (F)
adam.willfond@indy.gov