UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

SHANIKA DAY, Individually, and as
Administrator
for the Estate of TERRELL DAY;
and HARVEY MORGAN,
     Plaintiffs,
v.

THE CITY OF INDIANAPOLIS;
SERGEANT FRANKLIN WOOTEN,
Individually,
and as an IMPD Officer; and
OFFICER RANDALL DENNY, Individually,
and
as an IMPD Officer,
     Defendants.

Case No. 1:17-cv-04612-TWP-TAB

## <u>PLAINTIFFS' RESPONSE TO</u>
## <u>DEFENDANTS' MOTION FOR SUMMARY JUDGMENT</u>

# Table of Contents

Table of Contents ........................................................................................................ 2

Table of Authorities .................................................................................................. 4

I.     INTRODUCTION ............................................................................................ 6

II.    STATEMENT OF MATERIAL FACTS NOT IN DISPUTE ......................... 6

III.   STATEMENT OF MATERIAL FACTS IN DISPUTE ................................. 10

   A.   Burlington Coat Factory ...................................................................... 12

   B.   Law Enforcement Dispatch .................................................................. 12

   C.   Cumberland Police Arrive .................................................................... 12

   D.   Indianapolis Metropolitan Police Arrive ............................................. 12

   E.   Officers Wooten and Waggoner Arrive ............................................... 13

   F.   Sgt. Wooten Calls the First Ambulance ............................................... 13

   G.   The First Ambulance Arrives ................................................................ 14

   H.   Sgt. Wooten Signs Day's Medical Treatment Refusal ......................... 15

   I.   Officers' Actions Following the First Ambulance ................................ 15

   J.   Officer Denny Requests a Wagon ........................................................ 16

   K.   Deputy Monday Arrives for Transport ................................................. 16

   L.   Officer Denny Added a Second Set of Handcuffs? .............................. 16

   M.   The Second Ambulance Arrives ........................................................... 17

   N.   Day Passes Away .................................................................................. 17

   O.   Day's Position Between Ambulances .................................................... 18

   P.   The Reason for Day's Arrest ................................................................. 18

   Q.   IMPD's Positional Asphyxia Training .................................................. 18

   R.   Timeline ................................................................................................ 19

IV.    STANDARD OF REVIEW ............................................................................ 19

V.     FEDERAL CLAIMS ...................................................................................... 19

   B.   Claims against Officer Denny and Sargent Wooten in their individual capacities as a matter of law ....................................................................................... 21

      1.   Excessively tightened handcuff Analysis ....................................... 21

      2.   Factual Analysis .............................................................................. 26

      3.   Failure to intervene as a matter of law .......................................... 31

   C.   Officer Denny and Sargent Wooten's qualified immunity ................... 31

      *1.      The facts, taken in the light most favorable to Plaintiffs, show that Defendants acted objectively unreasonable* ................................................................................ 31

      *2.      The constitutional right for non-violent suspects to be free from excessively tightened handcuffed was clearly established at that time* .................................................. 32

**VI.**    **State Law Claims** ............................................................................................... 35

  **A.**    **Negligence** ...................................................................................................... 35

  **B.**    **Immunity** ....................................................................................................... 37

  **C.**    **Contributory negligence** ............................................................................... 39

  **D.**    **Wrongful death and loss of child services** ................................................... 39

**VII.**   **CONCLUSION** ................................................................................................... 40

# Table of Authorities

Cases

. *Burreson v. Barneveld Sch. Dist.*, 434 F.Supp.2d 588, 593 (W.D. Wis. 2006)........................ 20

*Burreson v. Barneveld Sch. Dist.*, 434 F.Supp.2d 588, 593 (W.D. Wis. 2006)........................... 20

*Caldwell v. Klemz*, No. 2:14-CV-455, 2017 WL 4620693, at *6 (N.D. Ind. Oct. 12, 2017) ....... 31

*City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)........................................................ 20

*Coleman v. City of Chicago*, 2011 WL 1542129, at *5 (N.D. Ill. Apr. 22, 2011)...................... 33

*Cyrus v. Town of Mukwonago*, 624 F.3d 856, 861-62 (7th Cir. 2010)........................................ 31

*Davis v. Animal Control–City of Evansville*, 948 N.E.2d 1161 (2011) ...................................... 38

*Freeman v. Brown*, 2015 WL 2399353, at *5–6 (N.D. Ill May 18, 2015) .................................. 33

*Hemsworth v. Quotesmith Com, Inc.*, 476 F.3d 487, 490 (7th Cir. 2007) ................................... 19

*Howard v. Ealing*, 876 F. Supp. 2d 1056, 1068 (N.D. Ind. 2012)............................................. 34

*Johnson ex rel. Indiana Dep't of Child Servs. v. Marion Cty. Coroner's Office*, 971 N.E.2d 151, 158 (Ind. Ct. App. 2012).......................................................................................................... 38

*Lynn v. City of Indianapolis*, No. 1:13-CV-00179-JMS, 2015 WL 179765, at *4 (S.D. Ind. Jan. 14, 2015) ................................................................................................................................... 30

*Mullin v. Mun. City of S. Bend*, 639 N.E.2d 278, 284 (Ind. 1994) ............................................. 36

*Outlaw v. Newkirk*, 259 F.3d 833, 838 (7th Cir. 2001).............................................................. 21

*Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003)................................................................. 31

*Poullard v. McDonald*, 829 F.3d 844, 852 (7th Cir. 2016) ...................................................... 19

*Reimer v. Sanders*, 2010 WL 4736260, at *2 (C.D. Ill. Nov. 16, 2010)..................................... 33

*Rex v. City of Milwaukee*, 321 F. Supp. 2d 1008, 1014 (E.D. Wis. 2004).................................... 33

*Rooni v. Biser*, 742 F.3d 737, 742 (7th Cir. 2014)................................................................... 33

*Salyers v. Alexandria Police Dep't*, No. 115CV00265SEBDKL, 2016 WL 2894438, at *3 (S.D. Ind. May 18, 2016)................................................................................................................... 31

*Salyers v. Alexandria Police Dep't*, No. 115CV00265SEBDKL, 2016 WL 2894438, at *4 (S.D. Ind. May 18, 2016)................................................................................................................... 33

*Smith v. Walsh Constr. Co. II, LLC*, 95 N.E.3d 78, 84 (Ind. Ct. App. 2018) .............................. 36

*Stainback v. Dixon*, 569 F.3d 767, 773 (7th Cir. 2009) ............................................................ 33

*Thompson v. Cope*, 900 F.3d 414, 420 (7th Cir. 2018).............................................................. 31

*Thompson v. Cope*, 900 F.3d 414, 422 (7th Cir. 2018).............................................................. 33

*Tibbs v. City of Chicago*, 469 F.3d 661, 665 (7th Cir. 2006) .................................................... 31

*Tibbs v. City of Chicago*, 469 F.3d 661, 666 (7th Cir. 2006) .................................................... 33

*Tibbs v. City of Chicago*, 469 F.3d 661, 666 (7th Cir.2006) ..................................................... 21

*Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008) ............................................................ 20

*Watts v. McSherry*, 2013 WL 5498254, at *4 (N.D. Ind. Oct. 2, 2013) ..................................... 33

*Watts v. McSherry*, No. 1:12-CV-137, 2013 WL 5498254, at *4 (N.D. Ind. Oct. 2, 2013)......... 21

*Wesbrook v. Ulrich*, 840 F.3d 388, 391 (7th Cir. 2016) ............................................................ 19

*Woods v. City of Berwyn*, 803 F.3d 865, 869 (7th Cir. 2015)..................................................... 19

Rules

Fed. R. Civ. P. 56.................................................................................................................... 19

Statutes

Ind. Code § 35-42-5-1 ............................................................................................................ 23
Ind. Code § 35-42-5-2 ............................................................................................................ 24
Ind. Code § 35-43-4-2 ...................................................................................................... 22, 23
Ind. Code § 35-43-5-2 ............................................................................................................ 30

# I.    INTRODUCTION

Defendants paint a misleading picture of the events leading to Day's death.  Below, Plaintiffs diligently unpack Defendants' crate full of factual claims and straighten the legal frame to properly view the disputed facts and material issues of this case.  For all the reasons below, Defendants are not entitled to summary judgment on any issue.

# II.    STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

On September 26, 2015, Terrell Day was eighteen years old and had a medical history of obesity.  [Filing No. 52-18, at ECF p. 4.]  After Day exited Burlington, Nesbitt confronted him to ask if he picked up a watch and put it in his front pocket. [Filing No. 52-8, at ECF p. 11:1-2.] Nesbitt followed Day into the mall area.  [*Id.* at p. 10:15-18.]

Mall security agent Ana Mahoy assisted Nesbitt.  [Filing No. 52-9, at ECF p. 9:8-11.] Day returned the watch to Nesbitt inside the mall.  [*Id.* at p. 11:13.]  Then, Nesbitt chased Day and Day ran away from Nesbitt.  [*Id.* at p. 11:23-24, 14:23-24.]

Nesbitt called 911.  [Filing No. 52-13, at ECF p. 3.]  Officer Randall Denny and Sergeant Franklin Wooten of the Indianapolis Metropolitan Police Department (IMPD), and Officer John Covington and Lieutenant Roger Waggoner, both of the Cumberland Police Department (CPD), responded to the call.  [*Id.*]

Officer John Covington arrived on scene first. [Filing No. 52-5, at ECF p. 8:23-24] Nesbitt showed Covington where Day was located—laying on his back at the top of the grassy hill behind Speedway.  [*Id.* at p. 8:15-18; 9:7-10.]  Covington drew his weapon and used his car door for cover because Nesbitt alleged Day had a gun. [*Id.* at p. 12:5-21.]  Covington asked Day to show his hands and point to the gun, and Day complied. [*Id.* at p. 14:16-19]

Officer Randall Denny arrived next. [*Id.* at p. 13:24-25, 14:1-2; Filing No. 52-2, at ECF p. 7:4-7.] While Officer Covington had Day at gunpoint, Officer Denny approached Day and placed him in a single set of chained handcuffs. [Filing No. 52-2, at ECF p. 9:3-4.] IMPD officers have discretion to place a second set of handcuffs on larger suspects, but Officer Denny placed a single set of handcuffs on Day. [*Id.* at p. 9:3-4, 16:13-16, 39:1-8.] From this point on, Day was Officer Denny's prisoner. [*Id.* at p. 82:21; Filing No. 52-4, at ECF p. 76:10-11; Filing No. 52-5, at ECF p. 21:12-13.]

Officer Denny observed that Day was overweight, sweating, and winded from running. [Filing No. 52-2, at ECF p. 16:21; 18:16-20.] Officer Denny positioned Day so he was sitting on his buttocks near the top of the hill with his feet facing down in front of him at an angle and his hands handcuffed behind his back. [*Id.* at p. 10:2-7, 92:16-20; Filing No. 52-5, at ECF p. 15:16-20, 16:6-14.] Day told Officer Denny he was having trouble breathing. [Filing No. 52-2, at ECF p. 13:4-9, 114:13-15.] Officer Denny instructed Day to take deep breaths in and breathe out to slow his heart rate down. [*Id.* at p. 13:13-14.] Officer Denny told Day to stay seated and take deep breaths. [*Id.* at p. 93:18-23.] Officer Denny noticed Day defecated on himself and took it as a sign of over exertion. [*Id.* at p. 19:11-12.]

Sgt. Wooten went to the scene to assist and supervise Officer Denny. [Filing No. 52-3, at ECF p. 17:6-9.] Lt. Waggoner arrived on scene shortly after Sgt. Wooten. [Filing No. 52-13, at ECF p. 3.] Officer Denny asked Sgt. Wooten and Lt. Waggoner to monitor Day and then he started an investigation. [Filing No. 52-3, at ECF p. 11:15-24.]

Day complained to Sgt. Wooten that he could not breathe. [*Id.* at p. 31:7-9.] Sgt. Wooten called for an ambulance to evaluate Day about three minutes after Wooten arrived on scene. [*Id.* at p. 31:10.]

At 1:07:04 PM, paramedic Douglas York and EMT James Brown arrived. [Filing No. 52-14, at ECF p. 1.] Brown noted that Day was lying on his back with his hands cuffed behind him on the grassy hill. [*Id.* at p. 1.] Day complained of difficulty breathing. [*Id.* at p. 1.] Day was in handcuffs the entire time. [Filing No. 52-6, at ECF p. 51:10-11.] During the medical evaluation, at least York, Brown, and Sgt. Wooten, helped Day to stand up on the pavement, but Day went back down. [Filing No. 76-4.]

Sgt. Wooten's signature appears on Day's "Treatment/Transport Refusal," which is written in the first person and states, "TO BE READ TO THE PATIENT/GUARDIAN." [Filing No. 52-14, at ECF p. 5.] The "Treatment/Transport Refusal" states, "Emergency personnel have offered to transport me to the hospital for further evaluation and care. I refuse this service." [*Id.*] It also states, "I understand that I have not been evaluated by a physician, and that serious medical problems may still exist which may result in disability or death." [*Id.*] No one read the Treatment/Transport Refusal to Day. [Filing No. 52-2, at ECF p. 33:18-21; Filing No. 52-5, at ECF p. 28:24-25, 29:1.] No one heard Day refuse medical care. [Filing No. 52-6, at ECF p. 66:10-12; Filing No. 76-5, at ECF p. 3:1-9.]

In the City of Indianapolis, it is a common practice, policy, or custom for IMPD officers to sign a prisoner's refusal of medical treatment as a witness. [Filing No. 76-6, at ECF p. 4.] The City approves if Sgt. Wooten gave the ambulance his signature on a blank screen. [*Id.*]

Sgt. Wooten and Officer Denny wanted Day transported to jail. [Filing No. 52-3, at ECF p. 60:3-7.] Officer Denny requested a wagon. [Filing No. 52-2, at ECF p. 35:24-39:16.] Deputy Steve Monday was the wagon driver who arrived. [Filing No. 52-10, at ECF p. 5:10-20.]

Deputy Monday found Day lying on his back with his hands cuffed behind him. [*Id.* at p. 15:4-8; 17:5-8.] He raised each of Day's legs, but Day's feet just dropped to the ground. [*Id.* at

p. 15:19-22; 16:1-3.]  He asked Day a couple of times if he was okay, but Day did not say or do anything in response.  [*Id.* at p. 15:23-25; 16:4-5.]

Deputy Monday and Sgt. Wooten attempted to stand Day up, but Day did not assist in standing, so they laid him back down.  [*Id.* at p. 16:7-10.]  Deputy Monday asked Day again if he was okay, but Day did not respond.  [*Id.* at p. 16:10-12.]

Deputy Monday conducted a sternum rub on Day's chest, but he did not move or complain; he said and did nothing.  [*Id.* at p. 16:13-15.]  Deputy Monday conducted a second sternum rub, a little harder with Day's shirt up, but he had no response of any kind.  [*Id.* at p. 16:17-20.]

After the second sternum rub, Deputy Monday told Sgt. Wooten that something was wrong with Day, he would not transport him, and they should call a medic.  [*Id.* at p. 16:21-23.] Deputy Monday decided not to transport Day because he was non-responsive, both physically and verbally, and possibly having a medical emergency.  [*Id.* at p. 26:10-14; 29:15-17.]  Sgt. Wooten called for a medic.  [*Id.* at p. 16:21-25.]

The second ambulance arrived within two to four minutes.  [Filing No. 52-15, at ECF p. 6.]  They began CPR, treated Day for thirty minutes, then stopped.  [*Id.* at p. 3-4.]  Day was pronounced dead at 2:29 PM.  [Filing No. 52-19, at ECF p. 5.]

The Marion County Coroner's autopsy determined Day's cause of death was "Sudden Cardiac Death due to Acute Ischemic Change."  [Filing No. 52-18, at ECF p. 2.] Contributory factors were that he "[s]ustained respiratory compromise due to hands cuffed behind the back, obesity, underlying cardiomyopathy."  [*Id.*]

Day was on his back on his handcuffs from the first ambulance to the second ambulance. [Filing No. 52-2, at ECF p. 12:8-11.]

Before September 2015, IMPD officers received training on the dangers of positional asphyxiation, discussed in General Order 8.1. [Filing No. 52-2, at ECF p. 42:5-7; 81:19-24; 82:1-9.] General Order 8.1 defines positional asphyxia as "a condition in which an extreme decrease in the amount of oxygen in the body is accompanied by an increase of carbon dioxide which may lead to loss of consciousness or death." [Filing No. 52-16, at ECF p. 1.]

## III. STATEMENT OF MATERIAL FACTS IN DISPUTE

As an initial matter, the majority of Nesbitt's testimony is demonstrably false and subject to impeachment under Rules 607 and 608. He testified to events that witness and video evidence contradict. Either Nesbitt is not a credible witness or he lacks personal knowledge. Therefore, Plaintiffs maintain a continuing objection to the relevance and admissibility of any facts based on Nesbitt's statements under Rules 401, 402, and 403.[1]

Nesbitt's statements to officers, report to Burlington, sworn statement to IMPD, and deposition testimony are both internally inconsistent and conflicting with the evidence as a whole. For example, Officer Denny testified that "Mr. Nesbitt was quite adamant that Mr. Day had told him that he had shot himself." [Filing No. 52-2, at ECF p. 9:17-19.] Not only did Officer Denny quickly find this untrue, but it is scientifically disproved by the autopsy. [Filing No. 52-18, at ECF p. 3.] Nesbitt also testified that Day pointed a gun at Officer Covington and cussed him out. [Filing No. 52-8, at ECF p. 22:16-24.] However, Officer Covington testified that when he arrived on scene, Day showed him his hands, complied with his orders, and allowed Officer Denny to take him into custody. [Filing No. 52-5, at ECF p. 14:15-21.] Officer Denny agreed that Day was not belligerent. [Filing No. 52-2, at ECF p. 17:5.]

---

[1] Plaintiffs intend to file a motion for an evidentiary haring under Rule 104 upon receipt of Nesbitt's deposition transcript, unless he is withdrawn by Defendants.

Overall, Nesbitt's characterization of his own heroism and Day's violence became more dramatic with time. In the Burlington report, Nesbitt described following Day at a distance. [Filing No. 76-1, at ECF p. 2.] In the IMPD interview, Nesbitt described giving detailed information to dispatch while Day pointed a gun at him, guests, and a motorist. [Filing No. 76-2, at ECF p. 3-4.] By the time of his deposition, Nesbitt described himself pursuing Day, ducking for cover at bodegas, while Day was waving his gun at everyone "Guns Akimbo," carjacking a person in the parking lot, and carjacking another person on 10th Street. [Filing No. 52-8, at ECF p. 14:2-12, 16:18-20, 17:24-25, 18:1, 20:6-10.]

Not only are Nesbitt's increasingly dramatic versions of his loss prevention efforts easily disproved by the video surveillance, they do not square with the testimony of any other eye witness. For example, mall security guard Anna Mahoy walked alongside Nesbitt as they followed Day. [Filing No. 76-8, at 11:40:48 PM (actual time inaccurate).] Mahoy testified that she watched Nesbitt chase Day to the gas station and that she never observed Day with a handgun. [Filing No. 52-9, at ECF p. 12.] She testified that Day "just gave the watch back and disagreed that he had to go back and he ran." [*Id.*]

In another example, Nesbitt testified that he was absolutely sure that Day was talking himself and officers when the second ambulance arrived. [Filing No. 76-7, at ECF p. 1.] However, the second ambulance found Day unconscious, pulseless, and not breathing. [Filing No. 52-15, at ECF p. 2.] When confronted with this information, Nesbitt became argumentative and suggested Day was instead making "like a talking noise, rah (indicating) or whatever, he was spittin' words out, and then after that there was nothing." [Filing No. 76-7, at ECF p. 2-3.]

The list of Nesbitt's impeachable statements could go on, but to conserve space, Plaintiffs only address his statements regarding material facts as needed throughout this brief. In

maintaining their objection, Plaintiffs have avoided utilizing any of Nesbitt's statement, to the extent possible.

### A. Burlington Coat Factory

On September 26, 2015, eighteen-year-old Terrell Day did not have a medical history of congestive heart failure. [Filing No. 52-18, at ECF p. 4.] Day was never reported in connection with any other suspected theft at Burlington. [Filing No. 52-8, at ECF p. 38:5-7.] Nesbitt gave Day a trespass order from Burlington after he was dead. [*Id.* at p. 40:24-25; 41:1-2; Filing No. 76-1, at ECF p. 4.] Day was not cursing at Nesbitt, did not attempt a carjack, and did not have his finger on the trigger of a gun. [Filing No. 52-9, at ECF p. 12.] Day was never holding a gun in his hand; Nesbitt only yelled "gun" because he believed he saw one in Day's pocket. [*Id.* at p. 12:5-9, 24-25.]

### B. Law Enforcement Dispatch

The dispatch call was not for an armed shoplifter. [Filing No. 76-3.]

### C. Cumberland Police Arrive

The undersigned asserts a Rule 403 objection to Officer Denny's ability to testify whether or not Day was licensed to carry a gun. [Filing No. 52-2, at ECF p. 81:19-25, 82:1-5.]

### D. Indianapolis Metropolitan Police Arrive

Officer Denny did not have probable cause that Day committed an armed felony, he testified that an "unconfirmed armed felony is what I was investigating." [Filing No. 52-2, at ECF p. 76:19-24.] Officer Denny observed signs of distress, because he testified that he observed that Day was sweating, winded, claiming he could not breathe, and "on the verge of hyperventilating." [Filing No. 52-2, at ECF p. 13:15, 16:21, 18:16-20.]

The officers did not testify as to an "ideal position," generally. Officer Denny testified that his ideal position for a suspect is sitting on his butt with his legs straight out in front of him,

and the next best position is for him to be on his side or back. [Filing No. 52-2, at ECF p. 80:8-23.] Lt. Waggoner testified that Day was not in an inappropriate position. [Filing No. 52-4, at ECF p. 67:3-5.] Furthermore, Officer Denny's deposition testimony did not connect a fleeing suspect to Day, plus it drew an objection. [Filing No. 52-2, at ECF p. 89:2-7.]

When Day rolled down the hill, he was not "non-compliant" and unwilling to sit, he was unable to sit or stand, so officers laid him on the asphalt. Sgt. Wooten testified that Day could not stand, so they laid him down on the asphalt. [Filing No. 52-10, at ECF p. 16:7-10.] Officer Denny testified that Day "kept either falling backwards or to his side and then rolling onto his stomach." [Filing No. 52-2, at ECF p. 17:6-8.] Officer Covington testified that Day rolled down the hill and Officers set him back up several times. [Filing No. 52-5, at ECF p. 33.] Sgt. Wooten testified that Day rolled over and was repositioned twice before they "brought him to the bottom part of the hill so he could use the hill as leverage to lean back against." [Filing No. 52-3, at ECF p. 30:10-19.]

### E.     Officers Wooten and Waggoner Arrive

Officer Covington was not monitoring Day; he testified that he "didn't spend a whole lot of time with Terrell Day." [Filing No. 52-5, at ECF p. 23:7-8.] Lt. Waggoner saw signs Day was experiencing a medical emergency—he testified that Day had white on his lips and was afraid he was dehydrated, so he purchased a bottled water for Day. [Filing No. 52-5, at ECF p. 35:6-12.] Lt. Waggoner tried to sit Day up and give him some water, but it just came back out. [Filing No. 52-5, at ECF p. 35: 21-23.]

### F.     Sgt. Wooten Calls the First Ambulance

It is unfair to factually assert that Day was feigning an inability to breathe for a tactical advantage. Sgt. Wooten's discussion about his experience with other suspects portraying themselves as vulnerable to gain a tactical advantage over police was in the context of

handcuffing, and in no way referred to whether Day could breathe.  [Filing No. 52-3, at ECF p. 34:18-25, 35:1-2.]  Officer Denny discussed his general law enforcement experience with suspects feigning illness, but testified that he took it seriously that Day could not breathe.  [Filing No. 52-2, at ECF p. 90:2-22.]

Sgt. Wooten was concerned about positional asphyxia because Day complained he couldn't breathe.  [Filing No. 52-3, at ECF p. 33:8-21.]  Before the first ambulance arrived, Day was not necessarily talking to the officers on scene, but Officer Covington recalled that Day was able to talk at one point.  [Filing No. 52-5, at ECF p. 23:13-17.]  Sgt. Wooten did not testify that Day began breathing normally, rather that he calmed down and he was taking slower deeper breaths.  [Filing No. 52-3, at ECF p. 31:20-23.]

The citation of [Wooten Dep. 99:19-22; 100:22-24; 102:24-103:4][2] does not support the assertion that Day fled an armed robbery and attempted two armed carjackings.  [Filing No. 53, at ECF p. 15.]  Sgt. Wooten does not make any factual assertions about carjackings, and Sgt. Wooten's characterization of Day as an armed felon is a misguided legal conclusion.  [Filing No. 52-3, at ECF p. 81:19.]  Factually, Day is not an "armed felon" because he was never charged with or convicted of an armed felony.

### G.    The First Ambulance Arrives

York and Brown did not conduct a thorough medical evaluation.[3]  For example, they noted he weighed 260 lbs., but he actually weighed 312 lbs.  [Filing No. 52-14, at ECF p. 1; Filing No. 52-18, at ECF p. 5.]  York testified that part of his report was false.  [Filing No. 52-6, at ECF p. 68:17-25, 69:1-7.]  York also testified that Day spoke to him clearly, then reversed and

---

[2] Filing No. 52-3, at ECF p. 81-85.
[3] It is unclear how or why the opposite is asserted as an undisputed fact on page 10 of the summary judgment brief with a footnote pointing to Plaintiffs' medical malpractice case.  The malpractice case completely undermines all assertions that the medical exam was thorough.

testified that Day was sometimes not responsive, while the video shows Day was not talking and could not stand.  [Filing No. 52-6, at ECF p. 26:1-3, 16:2-3; Filing No. 76-4.]  Day was unable to provide a blood pressure test, he was not totally responsive, and he was in handcuffs.  [Filing No. 52-6, at ECF p. 16:1-2; 40:10-12; 51:10-11.]  York would only have removed Day's handcuffs if he were transporting him.  [Filing No. 52-6, at ECF p. 41:14-16.]  York agreed Day should have scored a six on the Glasgow Coma Scale.  [*Id.* at p. 37:20-21, 38:1-2.]

It is standard for police officers refuse emergency medical attention for prisoners in their custody.  [*Id.* at p. 66:1-3.]  Day neither asked nor refused to go to the hospital.  [*Id.* at p. 66:10-12.]  York was assessing Day for injuries but was not aware Day had said he could not breathe.  [*Id.* at p. 66:13-18.]

### H. Sgt. Wooten Signs Day's Medical Treatment Refusal

Day did not sign and the "Treatment / Transport Refusal" and Sgt. Wooten did not sign as a witness; "impd signed."  [Filing No. 52-14, at ECF p. 5.]  Sgt. Wooten signed the "Treatment / Transport Refusal" for Day to not go to the hospital.  [Filing No. 52-6, at ECF p. 51:24-25.]  Defendants fail to designate any evidence that Day was ever transferred into the ambulance's custody.  Sgt. Wooten knew he was signing away Day's right to medical treatment because his signature was the reason that the ambulance left.  [Filing No. 52-3, at ECF p. 50.]  Sgt. Wooten testified that he did not sign it as a blank page, but signed on a laptop with all the information on it.  [Filing No. 52-3, at ECF p. 76:22-25.]  Alternately, Sgt. Wooten "utilized an electronic laptop/notebook/Toughbook with a blank screen that only had a signature line and did not have any of the language of [the refusal of transportation/refusal of treatment] on it."  [Filing No. 76-6, at ECF p. 4; Filing No. 76-9, at ECF p. 3.]

### I. Officers' Actions Following the First Ambulance

The first ambulance did not fully evaluate Day, they did not take Day's temperature, blood pressure, or use a stethoscope to check Day's lungs. [Filing No. 52-6, at ECF p. 16:1-2, 26:11-13, 20-22]

### J.      Officer Denny Requests a Wagon

The ambulance did not determine that Day did not need to be transported to the hospital; Sgt. Wooten made this determination with his signature. [Filing No. 52-14, at ECF p. 5.] Defendants fail to designate any evidence that Officers transferred Day's custody to the ambulance, or that Day refused his own medical treatment. Officer Denny requested a wagon before the ambulance left. [Filing No. 52-2, at ECF p. 36:1-4.]

### K.      Deputy Monday Arrives for Transport

When Deputy Monday first made contact with Day, he was laying on the ground with his eyes open, not moving, not talking, but breathing. [Filing No. 52-10, at ECF p. 15:12-14.] Day was not uncooperative when Deputy Monday and Sgt. Wooten attempted to stand him up, Day was not responsive. [*Id.* at p. 16:7-12.]

### L.      Officer Denny Added a Second Set of Handcuffs?

The most disputed material fact in this case, which the jury will have to determine, is whether Officer Denny added a second pair of handcuffs. Evidence supports a finding that he did not. When the first ambulance examined Day, he wearing only one set of handcuffs.[4] [Filing No. 76-10.] Officers observed Day had only one set of handcuffs. [Filing No. 76-11, at ECF p. 8-10; Filing No. 52-3, at ECF p. 97:17-18.] Deputy Monday observed only one set of handcuffs on Day when he arrived. [Filing No. 76-12, at ECF p. 11.]

---

[4] Defendants fail to designate any photographic evidence of Day wearing two handcuffs. It does not exist.

Evidence also supports that he may have had two sets, but at various times. Officer Denny added a second pair of handcuffs: (1) before the first ambulance arrived [Filing No. 76-13, at ECF p. 5], (2) before the second ambulance arrived [Filing No. 76-14, at ECF p. 1], (3) between when the first ambulance left and the second ambulance arrived [Filing No. 52-2, at ECF p. 38:17-19.], and (4) about the time officers called the second ambulance. [*Id.*]

Alternately, Lt. Waggoner or Sgt. Wooten added a second pair of handcuffs before the first ambulance arrived. [Filing No. 76-13, at ECF p. 5.] Officer Covington expanded: "Could a second pair be put on him by the arresting officer or the sergeant in charge? Yes." [Filing No. 52-5, at ECF p. 25:20-21.] "Could I have done it? Yes. But at that point, he wasn't in my custody and/or care, but yes, I could have done it." [*Id.* at p. 25:23-25.]

If a second pair was added, it was not to help Day breathe, but "mostly just for comfort." [Filing No. 52-2, at ECF p. 39:1-8.] Alternately, it was added in preparation of the ambulance because officers believed Day had a medical condition. [Filing No. 52-2, at ECF p. 40:5-13]

**M.    The Second Ambulance Arrives**

Day was not still breathing, the second ambulance found Day not breathing, unconscious, and pulseless. [Filing No. 52-15, at ECF p. 2.] This was not Officer Denny's first indication Day had a serious health issue because he recognized that Day was on the verge of hyperventilating when he first made contact with him. [Filing No. 52-2, at ECF p. 13:15-16.]

**N.    Day Passes Away**

Day did not have a family history of heart disease. Defendant fails to designate any medical evidence for support and the coroner's office did not perform any genetic testing. [Filing No. 52-18.] More importantly, the field coroner mistakenly reported that Day's maternal grandfather died from a heart attack at the age of 54. [Filing No. 52-19, at ECF p. 4.] Day's

maternal grandfather died from kidney failure—sepsis and end stage renal disorder. [Filing No. 76-15.] Neither Day's family nor officers had an underlying condition to be aware of.

Day's shoulders were remarkable for stria, red linear streaks, and he had superficial abrasions on his elbows. [Filing No. 52-19, at ECF p. 5.] Day did not have a heart attack, his heart stopped functioning due to insufficient blood flow—sudden cardiac death due to acute ischemic change. [Filing No. 52-19, at ECF p. 2.]

Day did not become unresponsive the moment Deputy Monday arrived. For at least fifteen minutes prior to his arrival, Day was laying on his handcuffs barely moving. [Filing No. 76-16, at 13:29:17 to 13:46:51.]

### O.    Day's Position Between Ambulances

When Day collapsed in front of the first ambulance, Officers "lowered him down to the ground." [Filing No. 52-2, at ECF p. 29:10-16.] Defendants fail to designate any evidence that Day "chose" to be in this position. Day simply remained where Officers placed him. [Filing No. 76-16, at 13:19:36.]

### P.    The Reason for Day's Arrest

Officer Denny was investigating whether Day committed theft and brandished a weapon. [Filing No. 76-11, at ECF p. 11.] To the extent Officer Denny was investigating a felony, he testified it was "unconfirmed." [Filing No. 52-2, at ECF p. 76:21.] Officer Denny did not have any witnesses to investigate whether there was a carjacking, so he was only investigating the two. [Denny 95:15-20.]

### Q.    IMPD's Positional Asphyxia Training

Officers did not believed that handcuffs restricted Day's breathing, just that they made him uncomfortable. [Filing No. 52-2, at ECF p. 39:1-8.] Officers believed that Day's handcuffs restricted the second ambulance's ability to assess Day's medical condition. [*Id.* at p. 40:5-13.]

**R.     Timeline**

Officer Denny took Day into IMPD custody and secured a firearm, but Day never brandished a firearm at Nesbitt.  [Filing No. 52-9, at ECF p. 12:5-7; p. 17]

Sgt. Wooten did not radio his arrival, but his car comes in to view at 13:00:39 PM. [Filing No. 76-16.]  The second ambulance was dispatched before the report was created at 13:48:45 PM.  [Filing No. 52-15, at ECF p. 1.]

**IV.     STANDARD OF REVIEW**

To prevail on their motion for summary judgment, Defendants must show that there is no "genuine dispute as to any material fact" and that they are entitled to judgment as a matter of law.  *Wesbrook v. Ulrich*, 840 F.3d 388, 391 (7th Cir. 2016) (citing Fed. R. Civ. P. 56(a)).  The Court must view all evidence and draw all reasonable inferences in a light most favorable to Plaintiffs, the non-moving party.  *Woods v. City of Berwyn*, 803 F.3d 865, 869 (7th Cir. 2015). "A party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial."  *Hemsworth v. Quotesmith Com, Inc*., 476 F.3d 487, 490 (7th Cir. 2007).  If Defendants demonstrate the absence of a material fact in issue and Plaintiffs fail to present evidence of a material question, the Court must enter summary judgment.  *Poullard v. McDonald*, 829 F.3d 844, 852 (7th Cir. 2016).

**V.     FEDERAL CLAIMS**

**A.     Claims against Officer Denny and Sargent Wooten in their official capacities**

Defendants argue that Denny and Wooten are entitled to judgment in their favor as a matter of law on all federal claims against them in their official capacities.  Defendants assert that Plaintiffs "abandoned these claims" because they are not pursuing a *Monell* claim.  [Filing No. 53, at ECF p. 26.]

Plaintiffs filed suit against the officers in their official capacity and the municipality. "Actions against individual defendants in their official capacities are treated as suits brought against the government entity itself." *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008). When the municipal entity is named, the official capacity claim is redundant and subject to dismissal. *Burreson v. Barneveld Sch. Dist.*, 434 F.Supp.2d 588, 593 (W.D. Wis. 2006). To avoid redundancy, Plaintiffs would agree that these claims merge into one claim against Indianapolis.

However, Plaintiff does not agree that Indianapolis is entitled to judgment on the merged claim in its favor as a matter of law because Plaintiffs interrogatory response states they do not assert a *Monell* claim, not that they abandon all municipal claims. In *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988), the court relied on the language of § 1983 to recognize "that a plaintiff may be able to prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage with the force of law.'" The *Praprotnik* court found that the principle of holding municipalities liable for their widespread practices is long-standing and "has not been affected by *Monell* or subsequent cases." *Id.*

Here, Indianapolis has a widespread practice of signing away prisoners' rights to medical treatment. Sgt. Wooten testified that while there is no IMPD policy that allows it, he and all other IMPD officers "routinely sign medical releases for a suspect." [Filing No. 52-3, at ECF p. 67:15 to 85:20; 89:18-20; Filing No. 76-6, at ECF p. 4.] Additionally, Indianapolis has a practice of placing a single set of handcuffs on overweight prisoners and allowing them to have handcuffs on and lay on their backs for extended periods of time. [Filing No. 52-3, at ECF p. 92:1-5; 94:1-14.]

In summary, all federal claims against Denny and Wooten in their official capacities should be merged into all federal claims against Indianapolis. However, Indianapolis is not entitled to judgment as a matter of law on any federal claims against it.

**B.    Claims against Officer Denny and Sargent Wooten in their individual capacities as a matter of law**

*1.    Excessively tightened handcuff Analysis*

As an initial matter, whether a force is *de minimis* is a question for eighth amendment prisoner claims. *E.g., Outlaw v. Newkirk*, 259 F.3d 833, 838 (7th Cir. 2001). This is a fourth amendment excessive force claim. Even so, the overly tight handcuffs were not *de minimis* force because the coroner determined that the handcuffs restricted Day's airway and resulted in his death. [Filing No. 52-18, at ECF p. 1.] Officer Denny agrees that the handcuff application was a use of force. [Filing No. 52-2, at ECF p. 84:3-5.] According to the autopsy, his lungs were blocked with "[l]arge globs of mucus, "dark red to purple in color," and "poorly aerated." [Filing No. 52-18, at ECF p. 7.] Day died a slow and torturous death as he suffocated to death in restrictive handcuffs under his own weight, right at the feet of law enforcement officers.

The Seventh Circuit recognizes that unnecessarily handcuffing non-violent suspects too tightly gives rise to excessive force. *Tibbs v. City of Chicago*, 469 F.3d 661, 666 (7th Cir.2006). "A series of factors are commonly considered to determine if an officer's use of overly tight handcuffs constitutes excessive force: (1) the specificity of the complaint of pain or discomfort; (2) the number of complaints made during the course of the arrest; (3) the reason for the arrest and type of crime allegedly committed; (4) whether the arrestee presented a risk of danger or flight; (5) the injuries sustained; and (6) the medical treatment, if any, sought by the arrestee, from the handcuffing. *Watts v. McSherry*, No. 1:12-CV-137, 2013 WL 5498254, at *4 (N.D. Ind. Oct. 2, 2013) (citing cases).

Applying these factors to the evidence viewed in a light most favorable to Day, shows that the force Denny used on Day was unreasonable. Day was a non-violent suspect. [Filing No. 52-2, at ECF p. 18:5-15.] Factors one and two weigh in Day's favor and are undisputed. It is undisputed that Day complained he was unable to breathe multiple times to all of the officers on the scene. It is undisputed that Sgt. Wooten called an ambulance because of Day's complaints he could not breathe.[5] While it is difficult to know the exact number of complaints that Day made to officers, the testimony of the officers was that he said it "several," "multiple," and "a couple of times." [Filing No. 52-3, at ECF p. 30:23-24; Filing No. 52-5, at ECF p. 22:19-20; Filing No. 52-4, at ECF p. 19:14-16.]

The main dispute here is the third factor. Plaintiffs contend the evidence shows that the reason for Day's arrest was his attempted shoplifting of a $19.99 watch from Burlington, which Nesbitt recovered inside the mall before chasing Day to the gas station, which Officer Denny knew. [Filing No. 76-1; Filing No. 76-13, at ECF p. 5.] In Indiana, someone shoplifts if they take items totaling under $750.00 from a store, which is a misdemeanor. Ind. Code § 35-43-4-2. Nesbitt immediately recovered the $19.99 watch inside the mall, which would make it an inchoate offense. [Filing No. 52-9, at ECF p. 11:1-4.] If Day were charged, which he was not, he could likely be charged with misdemeanor attempted shoplifting. Moreover, when Day died, Officer Denny was investigating whether Day committed theft and brandished a weapon. [Filing No. 76-11, at ECF p. 11.] To the extent Officer Denny was investigating a felony, he testified it was "unconfirmed." [Filing No. 52-2, at ECF p. 76:21.] Therefore, the weight of the evidence,

---

[5] While Nesbitt claims officers called an ambulance because Day had shot himself [Filing No. 76-2, at ECF p. 5; Filing No. 52-2, at ECF p. 9:10-19], Defendants do not assert this as a fact. That Day shot himself is demonstrably false based on the autopsy report, which shows no gunshot wounds. [Filing No. 52-18.] Therefore, this sworn statement by Nesbitt does not give a sufficient reason to dispute the reason the ambulance was called. Nesbitt is not a credible witness.

particularly in a light favorable to Day, supports the assertion that Day would be charged with is misdemeanor attempted shoplifting.

It is against the weight of the evidence and a legal fiction to assert that Day "completed an armed robbery." [Filing No. 53, at ECF p. 27.] An armed robbery occurs when someone forcefully takes property from another person with a deadly weapon. Ind. Code § 35-42-5-1. The video evidence from Burlington shows Day walked in and out of the store without using any force anyone and did not have a weapon. [Filing No. 76-18; Filing No. 76-19.] The video evidence from the mall shows Day walked through the mall peacefully without any force or weapon. [Filing No. 76-8.] Even so, Nesbitt had recovered the suspected item before following Day through the mall. Nesbitt accused Day of theft. [Filing No. 52-9, at ECF p. 11:19-22.] Denny was investigating whether Day committed theft. [Filing No. 76-11, at ECF p. 11.] In Indiana, theft is a class A misdemeanor. Ind. Code § 35-43-4-2. Therefore, the weight of the evidence, particularly in a light favorable to Day, does not support the assertion that "completed an armed robbery."

Day did not "threaten[] an individual with a gun." [Filing No. 53, at ECF p. 27.] Video evidence shows that Nesbitt and Mahoy walked together behind Day. [Filing No. 76-8, at 11:40:48 (actual time inaccurate).] Mahoy stopped at the end of the mall's sidewalk and watched Nesbitt chase Day through the parking lot to the gas station. [Filing No. 52-9, at ECF p. 12:5-7; p. 16.] At no time did Mahoy observe Day with a gun. [*Id.*] At no time did the video evidence show Day with a gun. [Filing No. 76-8, at 11:40:48 (actual time inaccurate).] Rather, the video evidence shows Day with a phone in his hand. [Filing No. 76-20, at 12:40:59.] Officer Denny testified the alleged gun crime was "unconfirmed." [Filing No. 52-2, at ECF p. 76:19-24.] The only evidence supporting an assertion that Day threatened anyone with a gun is the noncredible testimony of Nesbitt, which was discussed at length at the beginning of section III.

Therefore, the weight of the evidence, particularly in a light favorable to Day, does not support the assertion that Day was threatening anyone with a gun.

It is fundamentally false to assert that Day "attempted two car jackings at gunpoint." [Filing No. 53, at ECF p. 27.] A carjacking occurs when a person intentionally takes a motor vehicle from another person by using force. Ind. Code § 35-42-5-2. It is undisputed that Day was not in a vehicle at any time between the mall and the gas station. Mahoy observed Nesbitt chase Day from the mall to the gas station, and she did not observe any gun or attempted car jackings in the parking lot or on 10th Street. [Filing No. 52-9, at ECF p. 12:5-7; p. 16.] Officer Denny observed Nesbitt chase Day across 10th Street to the gas station, and he too did not observe a gun or attempted car jackings. [Filing No. 76-13, at ECF p. 4.] Nesbitt waved down Officer Covington in the parking lot, and Officer Covington did not see a gun in Day's hand. [Filing No. 76-14, at ECF p. 11:1-3; 13:20-23.] The only evidence supporting the multiple carjacking assertion is the noncredible testimony of Nesbitt, which was discussed at length at the beginning of section III. Therefore, the weight of the evidence, particularly in a light favorable to Day, does not support the assertion that Day attempted two carjackings.

The fourth factor also weighs in Day's favor. Day did not present a risk of danger or flight. "He seemed to be in distress and said he couldn't breathe." [Filing No. 52-4, at ECF p 19:17-18.] The officers all described Day as "compliant." [Filing No. 52-2, at ECF p. 103:20-23.] "He complied with every command that I gave and Officer Denny had given him." [Filing No. 76-14, at ECF p. 27:21-22.] "The only issue I had was I tried to put him on his butt. He kept either falling backwards or to his side and then rolling onto his stomach." [Filing No. 52-2, at ECF p. 17:5 to 19:8.] Officer Denny testified that Day never acted aggressive or tried to run away. [*Id.* at p. 18:5-15.] Day moved his body to try to get relief. Day was never able to stand by himself, independently, unassisted. [Filing No. 76-16.] The handcuffs restricted his chest, his

airway filled with mucus, and he suffocated in a slow and torturous death.  Therefore, the weight of the evidence, particularly in a light favorable to Day, does not support the assertion that Day presented a risk of danger or flight; he was in medical distress.

Finally, factors five and six weigh in Day's favor.  It is undisputed that Day sustained the ultimate injury—death.  The death certificate clearly states that Day "sustained respiratory compromise due to hands cuffed behind the back."  [Filing No. 52-18, at ECF p. 1.]  The medical treatment Day received was extremely *de minimis*.  Sgt. Wooten signed away and refused Day's right to receive medical treatment and hospital transport.  [Filing No. 52-14, at ECF p. 5.]  Specifically, Sgt. Wooten agreed that "serious medical problems may still exist which may result in disability or death."  [*Id.*]  No one read the treatment/transport refusal information to Day.  [Filing No. 52-2, at ECF p. 33:18-21; Filing No. 52-3, at ECF p. 62:1-3.]  No one asked Day how he felt or if he wanted to go to the hospital.  [Filing No. 52-3, at ECF p. 63:3-20.]  After sending the first ambulance away, Officers failed to provide any medical treatment until Day was dead.

Despite the officers' first aid and CPR medical training, they failed to assist Day in any way.  [Filing No. 52-2, at ECF p. 84:15-16; Filing No. 52-3, at ECF p. 9:6.]  The officers were aware Day was unwell and stood next to his body and checked on him as he died.  [Filing No. 76-16, at 13:33:41; 13:44:58.]  Officer Denny did not move Day off the asphalt out of the sun because Day had defecated himself and Officer Denny did not want to stain the seats in his vehicle.  [Filing No. 52-2, at ECF p. 104:24-109:3.]  The officers touched Day's body with their hand minutes before he was pronounced dead.  [Filing No. 76-16, at 13:44:58.]  The officers also tapped Day's body with their feet.  [*Id.* at p. 13:33:41.]  A few minutes before Day was pronounced dead, Lt. Waggoner tried to have Day drink some water, but the water he poured in Day's mouth just came back out.  [Filing No. 52-4, at ECF p. 35:21-23.]

It was not until Deputy Monday arrived and found Day unconscious that Day received any medical help. [Filing No. 76-12, at ECF p. 2.] Deputy Monday attempted two sternum rubs because he was concerned Day was in distress, but Day gave no verbal or physical reaction either time. [*Id.* at p. 7.] Deputy Monday told Officers that something was not right and said to call an ambulance. [*Id.* at p. 7.] The second ambulance found Day unconscious, not breathing, and pulseless. [Filing No. 52-15, at ECF p. 2.]

Throughout all of this, even after the second ambulance arrived and found Day without signs of life, Day's handcuffs were not removed. [Filing No. 76-14, at ECF p. 42:23-24.] In fact, Officers "were going to uncuff him and then handcuff him to the gurney." [Filing No. 76-12, at ECF p. 11.] Therefore, the weight of the evidence, particularly in a light favorable to Day, does not support a finding that Officers provided Day sufficient medical treatment.

In summary, all these factors demonstrate that Officers unnecessarily handcuffed Day to an extent giving rise to excessive force. Officers only called the second ambulance that pronounced Day dead because Deputy Monday refused to transport Day to jail. [Filing No. 52-3, at ECF p. 76:11-13.] Even then, they refused to remove the handcuffs. Overall, viewing all the evidence in a light most favorable to Day, the force Denny used on Day was unreasonable.

2. *Factual Analysis*

Defendants assert Officer Denny "never observed any signs of distress." [Filing No. 53, at ECF, p. 30.] This is not supported by the evidence. IMPD General Order 8.1 describes sick or injured prisoners as unconscious, unable to stand unassisted, and complaining of physical injury or illness with observable symptoms like bleeding, pale, and clammy skin. To begin, the second ambulance found Day unconscious. [Filing No. 52-15, at ECF p. 2.] Officers saw that Day was unable to stand unassisted. [Filing No. 76-4.] Day complained to officers that he could not breathe multiple times. [Filing No. 52-3, at ECF p. 30:23-24; Filing No. 52-5, at ECF p. 22:19-

20; Filing No. 52-4, at ECF p. 19:14-16.]  Day was bleeding.  [Filing No. 76-21; Filing No. 76-22.]  Day's lips were pale.  [Filing No. 52-4, at ECF p. 35:6-8.]  Day was sweating.  [Filing No. 52-2, at ECF p. 16:21.]  Day was overweight, winded, and complained of difficulty breathing.  [Filing No. 52-2, at ECF p. 104:3-9.]  Officer Denny testified that Day "was on the verge of hyperventilating a little bit."  [*Id.* at p. 13:15-16.]  Therefore, the evidence supports a finding that Officer Denny observed some signs of distress.

Defendants assert Officer Denny added a second set of handcuffs on Day between the first and second ambulance.  [Filing No. 53, at ECF, p. 21.]  However, the evidence is conflicting on whether Officer Denny—or anyone—added a second pair of handcuffs on Day.  Photographic evidence from the scene shows Day wearing only one set of handcuffs.  [Filing No. 76-10.]  Officers observed Day had only one set of handcuffs.  [Filing No. 76-11, at ECF p. 8-10; Filing No. 52-3, at ECF p. 115:17-18.]  Deputy Monday observed only one set of handcuffs on Day when he arrived.  [Filing No. 76-12, at ECF p. 11.]  However, Officer Denny also claims that he did add a second pair.  [Filing No. 76-14, at ECF p. 1; Filing No. 52-2, at ECF p. 40:13.]  Alternately, Officer Denny claims Lt. Waggoner or Sgt. Wooten added a second pair.  [Filing No. 76-13, at ECF p. 5.]

If a second pair were added, it is unclear when.  The variations are: (1) before the first ambulance arrived [*Id*], (2) before the second ambulance arrived [Filing No. 76-14, at ECF p. 1], (3) between when the first ambulance left and the second ambulance arrived [Filing No. 52-2, at ECF p. 38:17-19], and (4) right before officers called the second ambulance.  [*Id*.]  Similarly, it is also unclear why a second pair would have been added.  Either the second pair was added not to help Day breathe, but "mostly just for comfort."  [*Id.* at p. 39:1-8.]  Or, the second pair was added in preparation of the ambulance because officers believed Day had a medical condition.

[*Id.* at p. 40:5-13.] Viewing this conflicting evidence in a light most favorable to Day, it should be determined that Officers kept him in one set of handcuffs throughout the entire ordeal.

Defendants assert Day chose to lay on the asphalt with his hands cuffed behind his back. [Filing No. 53, at ECF, p. 31.] This is not supported by the evidence. The video evidence shows that Officers stood Day up for the first ambulance, walked him to the asphalt, but he collapsed on the asphalt and officers helped him lay down. [Filing No. 76-4.] Officer Denny testified that "they lowered [Day] down to the ground." [Filing No. 52-2, at ECF p. 29:10-16.] At 13:19:36 PM, Officers placed Day on the asphalt and he could not move. [Filing No. 76-16.] At 13:30:51 PM, Day attempted to turn to his side, but he flopped back. [*Id.*] At 13:37:55 PM, Officers sat Day up, but let him flop back down. [*Id.*] At 13:44:58 PM, an officer reached down and touched Day's upper body, but did not move him. [*Id.*] At 13:48:50 PM, Officers attempted to move Day, but let him flop back down. [*Id.*] At 13:50:22 PM, Officers gathered for a second attempt to move Day, but then backed away. [*Id.*] After Officers laid Day down at 13:19:36 PM, they did not move him off the asphalt until 13:54:06 PM, when the second ambulance arrived. [Filing No. 76-17.] Viewing this evidence in a light most favorable to Day, it should be determined that Officers placed Day on the asphalt on his back with his hands cuffed behind his back. This was not Day's choice.

Defendants assert Wooten signed a "SOR," or signature of release, to transfer Day from the ambulance's custody to IMPD's custody. [Filing No. 53, at ECF, p. 31.] This is not supported by the evidence. Defendants fail to designate any evidence that any Officer transferred Day's custody over to the ambulance at any time. The title of the document Sgt. Wooten signed is "refusal of transportation/refusal of treatment," and the words "signature of release" do not appear on the document at all. [Filing No. 52-14, at ECF p. 5.] Where Day should have signed as the patient, it states "frank wooten, impd." [*Id.*] The ambulance left as

soon as Sgt. Wooten signed Day's refusal. [Filing No. 76-4.] Sgt. Wooten did not sign a SOR because Day was in IMPD custody the entire time.

It is undisputed that Sgt. Wooten's signature is on the "Treatment/Transportation Refusal." The only dispute is over what degree of ignorance Sgt. Wooten had about the gravity of it is in dispute. Sgt. Wooten testified that nobody told him to sign the refusal. [Filing No. 52-3, at ECF p. 59:11-13.] Sgt. Wooten testified that he did not sign it as a blank page, but signed on a laptop with all the information on it.[6] [*Id.* at p. 76:22-25.] The document, clearly titled in bold letters, "**Treatment / Transport Refusal**," is written in first-person. [Filing No. 52-14, at ECF p. 5.] The signed document states the following:

TO BE READ TO THE PATIENT/GUARDIAN: A. Emergency personnel have offered to transport me to the hospital for further evaluation and care. I refuse this service. B. I understand that I have not been evaluated by a physician, and that serious medical problems may still exist which may result in disability or death. C. I have been instructed to seek follow-up medical care as soon as possible. D. I understand that I may call 911, or an ambulance, at any time if I change my mind and wish to be taken to a hospital. E. I understand that I am assuming full responsibility for my continuing medical care.
On-line medical control Physician has been contacted by phone or radio, has spoken with the paramedic and/or the patient/guardian and makes the following recommendations: PUT THE FOLLOWING INFORMATION IN THE COMMENTS SECTION: Physician Name Hospital Name Recommendations I have had the above read to me and agree with it.
: frank wooten, impd
**Comments:** impd signed

---

[6] Much later, Sgt. Wooten and the City claimed that he instead "utilized an electronic laptop/notebook/Toughbook with a blank screen that only had a signature line and did not have any of the language of [the refusal of transportation/refusal of treatment] on it." [Filing No. 76-6, at ECF p. 4; Filing No. 76-9, at ECF p. 3.] This evidence creates a disputed fact. Under this version, Sgt. Wooten only recklessly signed away Day's right to medical treatment.

[*Id.*]  This was not read to Day.  [Filing No. 52-2, at ECF p. 33:18-21; Filing No. 52-3, at ECF p. 62:1-3.]  Sgt. Wooten did not even ask Day how he felt or if he wanted to go to the hospital. [Filing No. 52-3, at ECF p. 63:3-20.]

This evidence, viewed in a light most favorable to Plaintiffs, shows that Sgt. Wooten intentionally signed in place of Day to refuse his right to medical treatment.  Defendants claim this is not forgery.  Forgery is knowingly or intentionally signing a document purporting to be made with the authority of someone who did not give it.  Ind. Code § 35-43-5-2(a)(1)(D).  Sgt. Wooten signed away Day's right to medical treatment in place of Day without any legal authority.  [Filing No. 52-3, at ECF p. 71:18-20.]  His actions meet the definition of forgery.

Defendants assert that the cell phone video and IMPD General Order 8.1 are "immaterial to the question" of excessive force.  [Filing No. 53, at ECF, p. 35-36.]  However, whether "Defendants complied with IMPD's policies could be relevant to whether Defendants' actions are objectively reasonable."  *Lynn v. City of Indianapolis*, No. 1:13-CV-00179-JMS, 2015 WL 179765, at *4 (S.D. Ind. Jan. 14, 2015).

IMPD General Order 8.1 mandates that prisoners who are unable to stand unassisted "must be transported to the Marion County Sheriff's Office Detention Ward at Eskenazi Hospital by ambulance or by the transporting officer."  [Filing No. 52-16, at ECF p. 6.]  The cell phone video shows that Officers had to assist Day to stand for the ambulance crew.  [Filing No. 76-4.] It also shows that despite Officers holding Day up, his legs collapsed and Officers laid him down on the asphalt.  [*Id.*]  Then, it shows Sgt. Wooten signing the "Treatment/Transportation Refusal."  [*Id.*]  Sgt. Wooten testified that he did not believe Day's complaints that he could not breathe.  [Filing No. 52-3, at ECF p. 106:14-17.]

The cell phone video is evidence that Day was unable to stand unassisted.  It is also evidence that Sgt. Wooten observed this, but rather than follow the transport mandate in Order

8.1, he did the opposite and refused transportation.  Sgt. Wooten did this to punish Day for complaining that he could not breathe.  Therefore, the evidence is material to the constitutional issue and supports a finding that Defendants' actions were objectively unreasonable.

      *3.      Failure to intervene as a matter of law*

This section is not addressed as Plaintiffs do not allege Defendants failed to intervene.

**C.      Officer Denny and Sargent Wooten's qualified immunity**

"The qualified immunity analysis at summary judgment is a two-step inquiry: (1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether the constitutional right was clearly established at that time." *Thompson v. Cope*, 900 F.3d 414, 420 (7th Cir. 2018).  "If the answer to either question is no, the defendant official is entitled to summary judgment." *Id.*

      *1.      The facts, taken in the light most favorable to Plaintiffs, show that Defendants acted objectively unreasonable*

"Claims that police officers used excessive force during an arrest are evaluated under the Fourth Amendment's objective reasonableness standard." *Tibbs v. City of Chicago*, 469 F.3d 661, 665 (7th Cir. 2006).  "[W]hether or not an officer's use of handcuffs is unreasonable depends on the particular circumstances of the arrest." *Salyers v. Alexandria Police Dep't*, No. 115CV00265SEBDKL, 2016 WL 2894438, at *3 (S.D. Ind. May 18, 2016) (citing *Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003)).  Courts evaluate the specific details of each arrest under the following factors: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Caldwell v. Klemz*, No. 2:14-CV-455, 2017 WL 4620693, at *6 (N.D. Ind. Oct. 12, 2017) (citing *Cyrus v. Town of Mukwonago*, 624 F.3d 856, 861-62 (7th Cir. 2010)).

Defendants point to their previous analysis on excessively tightened handcuffs and conclude that "Defendants have already demonstrated that neither Denny nor Wooten used excessive force on Day; their actions were objectively reasonable in light of the facts and circumstances they confronted." [Filing No. 53, at ECF, p. 41.] It is true, this issue has been analyzed at length above. Likewise, Plaintiffs point to the above analysis to conclude that Defendants' actions were not objectively reasonable.

Briefly, when viewing the facts in a light most favorable to Plaintiffs, the factors weigh against Defendants. Day was a non-violent suspect. [Filing No. 52-2, at ECF p. 18:5-15.] Day's crime was the attempted shoplifting of a $19.99 watch from Burlington, which was recovered inside the mall. [Filing No. 76-1; Filing No. 76-13, at ECF p. 5.] Officers described Day as "compliant." [Filing No. 52-2, at ECF p. 103:20-23.] Day never acted aggressive or tried to run away. [*Id.* at p. 18:5-15.]

In light of these facts, it was unreasonable to keep Day in a single set of handcuffs and lay him on the ground on his back. It was unreasonable to ignore the IMPD mandate to take Day to the hospital. It was unreasonable to sign Day's "Treatment/Transport Refusal" without reading it to him or asking him if he wanted to go to the hospital. It was unreasonable to acknowledge Day's complaints that he was unable to breathe and then send away the ambulance and fail to add a second pair of handcuffs.

It was unreasonable for Officers to surround Day and watch him die. Officers knew something was wrong, which is why the video shows that they kept checking him. Yet, it was not until Deputy Monday arrived that Day received medical help. The officers' actions were objectively unreasonable because they caused Day's death.

2. *The constitutional right for non-violent suspects to be free from excessively tightened handcuffed was clearly established at that time*

The Seventh Circuit has clearly held that under the Fourth Amendment, "[a] person has the right to be free from an officer's knowing use of handcuffs in a way that would inflict unnecessary pain or injury, if that person presents little or no risk of flight or threat of injury.". *Rooni v. Biser*, 742 F.3d 737, 742 (7th Cir. 2014); *Stainback v. Dixon*, 569 F.3d 767, 773 (7th Cir. 2009); *Tibbs v. City of Chicago*, 469 F.3d 661, 666 (7th Cir. 2006).

Defendants argue "there is no 'closely analogous case' that clearly established a right which prohibited a non-resisting obese detainee from laying on his back and on top of his handcuffs on pavement after medical personnel informed the officers that he had no medical issues and could be transported to jail." Filing No. 53, at ECF, p. 41.]

Defendants take a much too factually narrow view. "Precedent tied to particularized facts can indicate that law is clearly established, but the Supreme Court does 'not require a case directly on point.'" *Thompson v. Cope*, 900 F.3d 414, 422 (7th Cir. 2018). Many cases in this circuit clearly establish that officers act unreasonably by failing to consider an injury or condition while handcuffing an individual. *E.g., Freeman v. Brown*, 2015 WL 2399353, at *5–6 (N.D. Ill May 18, 2015); *Watts v. McSherry*, 2013 WL 5498254, at *4 (N.D. Ind. Oct. 2, 2013); *Coleman v. City of Chicago*, 2011 WL 1542129, at *5 (N.D. Ill. Apr. 22, 2011); *Reimer v. Sanders*, 2010 WL 4736260, at *2 (C.D. Ill. Nov. 16, 2010); *Rex v. City of Milwaukee*, 321 F. Supp. 2d 1008, 1014 (E.D. Wis. 2004).

In *Salyers v. Alexandria Police Dep't*, No. 115CV00265SEBDKL, 2016 WL 2894438, at *4 (S.D. Ind. May 18, 2016), the court determined that officers inflicted unnecessary pain and discomfort through handcuffing. Salyers complained of pain from a preexisting shoulder injury during or after the handcuffing. *Id.* The *Salyers* court found that officers were obligated to consider this injury, along with the relevant circumstances, in how they handcuffed him. *Id.* "Giving full credit to Salyers's version of events, a reasonable jury could conclude that the

33

officers' decision to handcuff Salyers behind his back was objectively unreasonable in violation of the Fourth Amendment." *Id.*

In *Howard v. Ealing*, 876 F. Supp. 2d 1056, 1068 (N.D. Ind. 2012), the court denied summary judgment because sufficient facts supported a handcuffing excessive force claim. Howard complained of pain from the handcuffs three or four times, explaining that his wrists hurt and his fingertips numb. *Id.* Howard also sought and received medical care for the pain from the handcuffs. *Id.* at *1069. The court only granted summary judgment to the officer who did not hear Howard's complaints of pain from the handcuffing.

Like *Salyers,* the officers were aware the handcuffs were causing pain.[7] Officers were concerned about Day's risk of positional asphyxia from the beginning. [Filing No. 52-3, at ECF p. 33:8-25.] Officer Denny stated that before the first ambulance arrived, he realized that one pair of handcuffs were too tight on Day.[8] [Filing No. 76-13, at ECF p. 5.] He stated that two pairs of handcuffs kept Day's arms still behind him, an gave him more freedom of movement. [*Id.*] However, he testified that he lowered Day on the ground on his back in a single set of handcuffs after the first ambulance. [Filing No. 52-2, at ECF p. 29:15-20.] Officer Denny recognized that Day was overweight, winded, and complained of difficulty breathing. [*Id.* at p. 104:3-9.] He even believed that Day "was on the verge of hyperventilating a little bit." [*Id.* at p. 13:15-16.]

Sgt. Wooten testified that positional asphyxia occurs when an individual's lungs are "prohibited from inhaling and exhaling," and that signs are "laying on their stomach, overweight, out of breath." [Filing No. 52-3, at ECF p. 33:17-19; 102:2-4.] It is undisputed that Day was

---

[7] Officer Covington was dismissed as a party, but he testified that he would have used two pairs of handcuffs on Day. [Filing No. 76-14, at ECF p. 48:12-13.] However, it was at the discretion of Sgt. Wooten and Officer Denny. [*Id.* at p. 19:24-25; 49:1-3.]
[8] It is disputed whether Officer Denny actually placed a second set on Day.

overweight. Sgt. Wooten testified that Day was fatigued. [*Id.* at p. 34:151-16.] He understood that a fatigued person's chest needs to expand and contract to breathe. [*Id.* at p. 13:1-4.] And he testified that tight handcuffs restrict the shoulders and arms of large people. [*Id.* at p. 12:22-24.]

Like *Howard,* Day complained he could not breathe to all Officers "several," "multiple," or "a couple of times." [*Id.* at p. 30:23-24; Covington 24:19-20; Waggoner 24:14-16, Filing No. 76-14, at ECF p. 3.] It is disputed whether and when Officer Denny in fact added a second pair of handcuffs, he testified that he added a second pair before the second ambulance because he believed Day had a medical condition. [Filing No. 76-14, at ECF p. 1; Filing No. 52-2, at ECF p. 40:13.] Unfortunately, it was too late because Day "sustained respiratory compromise due to hands cuffed behind the back." [Filing No. 52-18, at ECF p. 1.] The time of injury on the death certificate is 1:03 PM, which essentially matches the time Day was handcuffed. [Filing No. 52-13, at p. 3.] Had Sgt. Wooten not refused medical care, Day would have been treated.

For all these reasons, Defendants are not entitled to qualified immunity. The facts, taken in the light most favorable to Plaintiffs, show that the Defendants violated Day's constitutional right to be free from an officer's knowing use of handcuffs in a way that would inflict unnecessary pain or injury, which was clearly established at that time. Accordingly, summary judgment on this issue should be denied.

## VI.     State Law Claims

### A.     Negligence

Defendants skew Plaintiffs' negligence claim, arguing that Denny did not negligently arrest Day and Sgt. Wooten did not negligently call Day an ambulance twice. [Filing No. 53, at ECF p. 42.] Plaintiffs allege that they "failed to exercise the utmost reasonable due care and safety for Terrell Day after he was in police custody as required by Indiana law." [Filing No. 19, at ECF p. 7.]

"To prevail on a negligence claim, the plaintiff must show (1) a duty owed to the plaintiff by the defendant; (2) a breach of that duty by allowing conduct to fall below the applicable standard of care; and (3) compensable injury proximately caused by the breach of duty." *Smith v. Walsh Constr. Co. II, LLC*, 95 N.E.3d 78, 84 (Ind. Ct. App. 2018). "The element of duty is generally a question of law to be determined by the court." *Id.* "The elements of breach and proximate cause, however, generally present questions of fact that must be determined by a factfinder." *Id.*

Defendants fail to meet their burden as the moving party for summary judgment to prove the nonexistence of a genuine issue of material fact. Nevertheless, Plaintiffs analyze the existence of a legal duty. Defendants owed a duty to Day based on the following factors: "(1) an explicit assurance by the municipality, through promises or action, that it would act on behalf of the injured party; (2) knowledge on the part of the municipality that an action could lead to harm; and (3) justifiable and detrimental reliance by the injured party on the municipality's affirmative undertaking." *Mullin v. Mun. City of S. Bend*, 639 N.E.2d 278, 284 (Ind. 1994). When a Defendants were aware of Day's plight and lead him to believe that "governmental rescue services will be used, and the individual detrimentally relies on that promise, it would be unfair to leave that individual worse off than if the individual had not sought assistance from the governmental at all." *Id.* at 284–85.

Here, Officers called Day an ambulance based on their knowledge he was having difficulty breathing. When the ambulance arrived, Day was in distress and Officers had to assist Day to stand for the ambulance crew. [Filing No. 76-4.] Day's legs quickly collapsed and Officers laid him down on the asphalt. [*Id.*] Then, rather than following the General Order 8.1 mandate, Sgt. Wooten signed Day's "Treatment/Transportation Refusal." [*Id.*] Sgt. Wooten did not tell Day what he was doing, nor did he ask Day whether he wanted to refuse medical

36

treatment. [Filing No. 52-3, at ECF p. 63:3-20.] After sending the first ambulance away, the Officers failed to provide any more medical treatment until Deputy Monday arrived and insisted. That ambulance found Day unconscious, without a pulse, and not breathing.

Officers explicitly assured medical treatment to Day by calling an ambulance. Officers knew that denying Day access to medical treatment could lead to harm. Sgt. Wooten signed away and refused Day's right to receive medical treatment and hospital transport, agreeing that "serious medical problems may still exist which may result in disability or death." [Filing No. 52-14, at ECF p. 5.] Day had justifiable and detrimental reliance that Officers would allow him to be treated in the hospital. However, after undertaking the duty to call the first ambulance, Sgt. Wooten sent it away without Day's knowledge. Sgt. Wooten signed the refusal while Day was collapsed on the ground. [Filing No. 76-4.] No one read the treatment/transport refusal information to Day. [Filing No. 52-2, at ECF p. 33:18-21; Filing No. 52-3, at ECF p. 62:1-3.] No one asked Day how he felt or if he wanted to go to the hospital. [Filing No. 52-3, at ECF p. 63:3-20.] Officers just sent the ambulance away, then failed to provide any more medical assistance until Deputy Monday found Day unresponsive.

Defendants owed a duty to Day because they called Day an ambulance, signed that sending it away may cause death, sent it away without Day's knowledge, and he died as a result.

### B. Immunity

Without pointing to evidence, Defendants argue they are immune from negligence claims under the Indiana Tort Claims Act (ITCA) because they were compelling Day's obedience to the laws and sanctioning him because he "stole a watch and fled, brandished a gun at Nesbitt, attempted to carjack two people, and evade arrest." [Filing No. 53, at ECF p. 44.]

Plaintiffs agree that the legal issue here is whether Defendants were engaged in the enforcement of a law at that time. However, Defendants fail to meet their burden as the moving

party for summary judgment to prove the nonexistence of a genuine issue of material fact on this issue. As discussed in section V.B.1. above, there is a serious dispute over the material facts related to what crimes Day could have legally committed. Viewing the undisputed facts in a light favorable to Day, he could only be accused of attempted shoplifting. Defendants were not enforcing the law at the time of their negligence. Accordingly, summary judgment on the issue of immunity should be denied.

Defendants point to *Johnson*'s discussion of *Mullin* to take the broad position that any enforcement of the law is immune under the ITCA. *Johnson ex rel. Indiana Dep't of Child Servs. v. Marion Cty. Coroner's Office*, 971 N.E.2d 151, 158 (Ind. Ct. App. 2012). This misses the mark. The *Johnson* court discussed several cases before pointing to the holding in *Davis*. *Id.* In *Davis v. Animal Control–City of Evansville*, 948 N.E.2d 1161 (2011), the court held that "the critical determination is not whether a governmental entity or employee failed to follow procedures; it is whether a governmental entity or employee failed to enforce a law." *Id.*

The *Johnson* court found that the coroner's office was not immune because it was not engaged in enforcement within the meaning of the ITCA. *Id.* The negligence alleged in *Johnson* was emotional distress of children who observed the coroner winch their mother's remains onto the flat bed of a tow truck. *Id.* While the coroner's office was pursuing its legal directives by transporting the remains to complete its medical investigation, the act of transportation was not immune. *Id.* Rather than compelling enforcement of the law against another person, the coroner "was merely following the law to enable a more detailed investigation." *Id.* at 159. Merely following the law "does not fall within the definition of enforcement for purposes of immunity under ITCA." *Id.*

Like *Johnson*, the negligence of Defendants here is not immune. Sgt. Wooten was not enforcing the law against Day when he called an ambulance, then signed the "Treatment /

Transport Refusal." Rather, Sgt. Wooten was negligently following IMPD General Order 8.1. And while Officer Denny was enforcing the law against Day when he handcuffed him, he was merely negligently following the law when he placed Day on his back on top of his handcuffs. These facts, when viewed in a light favorable to Day, support Plaintiffs' position that Defendants breached their duty of care while not engaged in actual enforcement, which resulted in Day's death. Accordingly, Defendants are not entitled to immunity under the ITCA.

### C.        Contributory negligence

Defendants argue that "Day failed to exercise the reasonable care an ordinary person would for his own protection and safety." [Filing No. 45, at ECF p. 45.] Defendants again assert exaggerated criminal charges based on a series of disputed material facts. However, Defendants fail to meet their burden as the moving party for summary judgment to prove the nonexistence of a genuine issue of material fact related to contributory negligence. Viewing the facts in a light favorable to Day, Defendants' argument fails.

The video evidence shows that Day was unable to stand and laid on the ground during the Defendants' negligent acts. Had Sgt. Wooten consulted with Day about refusing medical treatment, he would have created an opportunity for Day to act negligently. He did not. Had Officer Denny asked Day to sit in his vehicle, he would have created an opportunity for Day to act negligently. He did not. The unfortunate reality is that Day is free of negligence because he was a prisoner, dying, incapable of acting, and afforded no opportunity to save himself. Therefore, Defendants are not entitled to summary judgment on contributory negligence.

### D.        Wrongful death and loss of child services

This section is not addressed because Defendants do not argue they are entitled to summary judgment on the issue of wrongful death and loss of child services.

## VII.    CONCLUSION

Defendants fail to prove there are no genuine issues of material fact related to Plaintiffs' federal claims.  Similarly, Defendants fail to prove the nonexistence of a genuine issue of material fact as to Plaintiffs' state law claims.  Instead, Defendants' oversized brief exaggerates and misstates many of the facts of this case.  Defendants reframe Plaintiffs' assertions and assert legal conclusions as facts.

Viewing the facts in a light most favorable to Day, summary judgment is not appropriate as a matter of law.  The material facts are in dispute as to whether the force Defendants used on Day was objectively reasonable in light of the totality of the circumstances.  The material facts are also in dispute as to whether Defendants' actions were negligent.  Therefore, Defendants are not entitled to summary judgment on Plaintiffs' claims as a matter of law.  Plaintiffs respectfully request that the Court deny Defendants' motion for summary judgment [Filing No. 51], and for all other just and proper relief.

Respectfully Submitted,

/s/ Faith E. Alvarez
Nathaniel Lee #10159-49
Faith E. Alvarez #32497-49

Nathaniel Lee, Esq.
Faith E. Alvarez, Esq.
LEE, COSSELL & CROWLEY
151 N. Delaware Street, Ste. 1500
Indianapolis, Indiana 46204
Phone: (317) 631-5151
Fax: (317) 624-4561
nlee@nleelaw.com
falvarez@nleelaw.com
Attorney for Plaintiffs

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and accurate copy of the foregoing has been served by email on March 13, 2019, upon the following:

Adam S. Willfond
adam.willfond@indy.gov

Andrew J. Upchurch
andrew.upchurch@indy.gov

Anne Celeste Harrigan
anne.harrigan@indy.gov

Andrew R. Duncan
ard@rucklaw.com

Edward J. Merchant
ejm@rucklaw.com

John F. Kautzman
jfk@rucklaw.com

/s/ Faith E. Alvarez
Nathaniel Lee #10159-49
Faith E. Alvarez #32497-49