Q: OK. This is a statement given by Michael Nesbitt. This statement is being given to Detective Sergeant Jeffrey L. Wager of the Indianapolis Metropolitan Police Department. This statement is being given in reference to a, uh, in-custody death of a prisoner, uh, which occurred in the ten thousand block of East 10th Street, just north of the Speedway gas station. Uh, sir, would you please state your name for me and spell it?

A: Uh, Michael Nesbitt, M-I-C-H-A-E-L, is the first name, the last name Nesbitt, N-E-S-B-I-T-T.

Q: And what's your, uh, birthday, sir?

A: Uh, July 3rd, 1986.

Q: And, uh, how are you currently employed?

A: I am currently a full-time loss prevention agent for Burlington Coat Factory, um, 10202 East Washington Street.

Q: OK, and, uh, tell me what happened today in reference to, uh, this, uh, death that we're investigating.

A: Um, there was a, two male subjects, uh, that I observed in our store, um, who we've previously asked them not to come back in our store, uh, due to them, um, stealing.

Q: OK.

A: Um, I observed him via CC TV cameras, uh, where he had a watch that still had the sensor on it. Um, that subject, um, then walked over to the shoe de...the shoe aisle of the Burlington Coat Factory, 10202 East Washington Street.

Q: OK.

A: He then, um, walked to the shoe aisle and then he walked to the men's underwear aisle. He was trying to take the sensor off one of the watches via CC TV.

Q: OK.

A: Um, the subject then walked, you know, he sat the watch box down by the underwear and he walked away with another black male subject, um, that was wearing a blue hoodie and dark blue pants.

Q: So he did get the sensor off of it, correct?

A: Um, he was attempting to get it off, but he couldn't....

Q: Oh, he didn't? OK.

A: ....and then he walked away from it.

Q: So he put it down?

A: Yep. Um, about a minute or two later, he walked back over to the watch box. He then opened the box up and removed the watch, the gold watch that still had a sensor on it, and he placed it in his, uh, I can't remember if it was his left or his right front pocket.

Q: Of his pants?

A: Yes, sir.

Q: OK.

A: Um, he then had the watch box in his hand and he set the watch box back over on a pair of shoes.

Q: OK.

A: Um, at that time, I tried to walk out to deter them. I knew I had visual, um, visual, um, um, floor surveillance of both male subjects. Um, you know, he never once dumped the merchandise. As they were walking out of the mall, I looked for the areas that they walked in to see if the individual had dumped the watch. He didn't. Um, I then called mall security and asked them to assist me, uh, with the stop.

Q: OK.

A: Um, both male subjects made it out of the mall, or they made it out of Burlington Coat Factory and they made into the mall. Uh, the male subject that had the merchandise in his hand had seen me and he started speed walking. At that time I, um, I, uh, intercepted one of the female mall security officers and I advised them also over the phone of the two male subjects and she was walking towards me and I told her "hey, there's the two guys."

Q: OK.

A: Um, at that time, I approached the male subject in the red shirt with dreadlocks and I asked him, I said "hey, man," I said "I really do need that watch that you put in your pocket." Um, he began, um, to look at me crazy

and I asked him once again, I said "Sir, I need that watch that's in your pocket" and at that time he started diggin' in his pockets and he was like "All right, bro. All right. Cool, cool, cool." Um, he digs in his pocket and he hands me the watch and I said "well do you mind coming back to the office, the loss prevention office, so I can get your information, you know, and get you on your way?" Um, he said "Yeah, man. Yeah, sure. Shit I ain't fucked up about it." So we started walking back and at that time he started diggin' in his pocket. I asked him, I said "Sir, can you please keep your hands out of your pockets for me and walk back to my office?" and he then turned around and he reached in his, I believe it was his left front pocket, and which at that point in time I seen the magazine of a gun. I told him, "Man, keep your hands up and just please keep your hands away from your pocket." At that time, he then reached in his pocket and I seen, as he was pulling it up, I seen the butt end of the gun.

Q: OK.

A: So, as he was close by me, I pushed him away from me. He took off running in the mall. Um, at that time, I got on the phone and I called 911 and I told them what was going on. Um, he ran down to MCL Cafeteria and I speed walked around the corner to see where he was at. He looked back and he saw me as he was dartin' down the hallway and he started pointin' his gun.

Q: OK.

A: Um, I was still on the phone with 911 and I told them what was going on, uh, which direction he was going. Mall security also intercepted him via their vehicle and seen this young man running with a gun in his hand.

Q: OK.

A: Um....

Q: Do you know who in mall security saw that?

A: Oh, I don't know the guy's name. They have his information (inaudible).

Q: They do? OK, all right, OK, go ahead.

A: Um, he was running with a gun in his hand. Um, the driver of the mall security vehicle, uh, was telling, um, witnesses and stuff "hey, get back you guys, get in your cars, get in your cars." Um, the male subject with the red shirt and dreadlocks, he continued running down the parking lot. Um, I stepped off the curb and I looked out in the parking lot and I seen where he was goin' and I was telling the police dispatcher, um, where he was going, the direction of travel, and that he still had the firearm in his hand. Um, the

A: male subject then ran, with the dreadlocks and the red shirt, he then ran across and as he made it to the median, I was in the parking lot and I visually seen him and he stopped. He still had the gun in his hand and there was a car that was coming and which I visually saw him raise the gun.

Q: So he's on 10th Street right now?

A: Yes, sir.

Q: OK.

A: Um, the vehicle sped off. Um, I was coming up through the parking lot and I made it like by the curb, giving the police dispatcher everything, his description, the mode of travel, where he was going. I seen a, uh, Cumberland Police, uh, officer that was riding with their lights and sirens on and I flagged him down on the median and I immediately told him "hey, there he is, there he is. He still has the gun in his hand." Um, the officer then, um, intercepted him into the parking lot....

Q: OK.

A: ....by this gray wall over here. Um, he told him, um, uh, "put your hands up, put your hands up," um, but the young man still had, um, uh, I believe he still had the gun in his hand.

Q: OK.

A: Um, the officer kept giving him verbal commands "turn around, turn around, turn around," uh, "put your hands behind your back." At that point in time, um, he rolled over and he....

Q: Is he laying down on the ground now?

A: Yes, sir.

Q: OK.

A: Um, he was actually, I believe he was laying on the gun....

Q: OK.

A: ....and, uh, the officer still had him at gunpoint. Um, another IMPD officer then arrived, he intercepted into the scene. Um, they were able to place him in mechanical restraints. Um, they rolled him over and which the handgun was retrieved.

Q: OK.

A: Um, (clears throat) at that point in time, the male subject, um, uh, he was talking. Uh, he wasn't listening to the officers, you know, they were asking him "to sit up," you know, "hey, man, you need to sit up," you know, this, that and the other. Um, he was just very, um, disobedient in their complies with sitting up. Um, he stood up, or he sat up and then he laid back down, and, um....

Q: Was this guy kind of heavy?

A: Oh, yeah.

Q: (Inaudible).

A: He was, he, yeah, he was pretty big, um...

Q: OK.

A: ....a pretty big guy.

Q: OK.

A: Um, (clears throat) the medics came because, um, when the police officer showed up, um, the gentleman stated "I think I just shot myself," it sounded like he said "I think I just shot myself"....

Q: OK.

A: ....and, um, and the officer immediately called for a ambulance.

Q: OK.

A: Um, they already had him in mechanical restraints. Um, once again they kept telling him "Man, you need to sit up. Sit up, sit up." Um, the medics came out and they checked him out. He was fine. He was talking. Um, he was listening. Um, (clears throat) the medics left. Um, I don't know the approximate time of when the wagon showed up, but then when the wagon showed up, um, the individual with the dreadlocks and red shirt, um, he laid down on the ground and he started sayin' "man, I can't, I can't F'n breathe. Man, what the F is goin' on?" this, that, and the other, and the officers were talkin' to him like "man, please sit up," um, "please sit up, man, just sit up" and, um, he was just like "man, I can't F'n breathe, I can't F'n, F'n breathe." So, uh, the wagon driver arrived and, um, he, you know, he was talkin' to the guy and, you know, the guy was responsive.

Q: Uh-huh.

A: Um, he, all of a sudden the kid just, um, he laid down and he wouldn't respond to anything that the officers were saying, so the wagon driver did a sternum rub on him.

Q: Uh-huh.

A: He was like "hey, man, you need to get up, it's time to go." Um, the kid just sat there, he laid there, and he did a sternum rub on him again and, uh, the wagon driver advised the Metro officers and the Cumberland police officers, he was like "guys," he was like, uh, "I can't take him to the APC like this." He said, uh, "we need," um, "you guys might need to get a medic out here and," uh, "we can go from there."

Q: So they called another in?

A: Yes, sir.

Q: OK.

A: They actually even tried to pick him up, because he was responsive, um, for, for about a minute or so he was responsive and then, uh....

Q: Would he go in and out of responsiveness or was he like out and then he came back and then he went out again?

A: (clears throat). He was talkin' and then he would just sit there and, and, and just like move his lips and, um, one of the Cumberland police officers was like "man, do you need some water?" and he was like, you know, he like mumbled something. I couldn't really hear, because I was like right by the corner....

Q: OK.

A: ....like right there....

Q: OK.

A: ....and, um, he was like "sir, do you need some water?" So the officer, the Cumberland police officer went and got him a bottle of water and they gave it, they sat him up. He went and got him a bottle of water. Um, they sat him up. Matter of fact, I even helped sit him up because the other officer, uh, was saying that "he had a hard time pickin' him up."

Q: OK.

A: So we kind of picked him up and he was sitting down in a seated position with his feet out.

Q: Was he sittin' on the grass or here?

A: He was actually like right on the curb.

Q: (Inaudible).

A: No, no, no, no. When we picked him up, he was like right there because they tried to pick him up. He actually, he put his legs out when the wagon got here and then he like moved over and then he just, you know, he just stopped moving and then they were asking questions and he was like "oh, yeah," and, um, (clears throat) so the other officer had a hard time picking him up, so I helped him and so did the wagon driver. We kind of picked him up and just kind of held him there. The Cumberland police officer went and got him a bottle of water and he was drinkin' it, like he poured it down his mouth and he was drinkin' it.

Q: All right.

A: Uh, it seemed like things were fine and then all of a sudden, um, he, uh, (clears throat) they kept askin' him, they was like "hey, man," you know, "it's time to go, it's time to go" and then he wasn't responsive, so he had got laid down and then they started....

Q: They did a sternum rub on him?

A: Yeah....

Q: OK.

A: ....and then they called the medic....

Q: OK.

A: ....again and, uh, they came out and, uh, they came and got him and, uh, we helped lift him up and we put him on the bed. Um, the paramedic, um, checked his pulse via neck and, uh, they were like "guys, we need to get him in the back" and, uh, that was it from that point on. I actually walked around to see what was goin' on because I was just, I was shocked.

Q: Uh-huh.

A: I walked around and I seen them doing chest compressions on him and, um, that was it.

Q: OK. Did, uh, so you had the initial conversation with him and he had the watch and where is the watch at now that he had?

A: Uh, I believe the officer has it in his custody.

Q: OK. So the officer has it?

A: Uh-huh.

Q: OK. Had you carried that watch with you while you were chasin' him?

A: Um, I wasn't chasin' him, I was just following him.

Q: Well, following him.

A: Yeah, like....

Q: No, right.

A; Yeah, I had it, I had it in my pocket.

Q: OK.

A: I had it in my pocket.

Q: So the officer's got the watch....

A: Yes, sir.

Q: ....and the gun, it was laying up in the grass then when they rolled him off of it?

A: Yes, sir.

Q: OK, and what kind of, can you describe it to me, what kind was it?

A: Um, I'm pretty sure it was a Ruger SR9.

Q: So like a nine millimeter automatic....

A; Yes, sir.

Q: ....or semi-automatic?

A: A semi-automatic.

Q: OK, all right, and, um, did, um, uh, did he say anything else then than what you've already told me do you think? (sound of phone ringing).

A: He didn't say, he didn't say a word, um, after, you know, like....

Q: Right.

A: ....from this incident....

Q: Right.

A: ....he was just, he was goin' off on them, callin', you know, bein' disrespectful to 'em and they were....

Q: Was he being disrespectful to the officers?

A: Yes, sir....

Q: OK.

A: ....and they were being polite to him, you know, like "hey, man," you know, "this isn't our fault"....

Q: Right.

A: ....you know....

Q: Right.

A: ....and he said, you know, "you guys, you, you stole somethin', man" and, you know, the guy was just sittin' there goin' off and they were, you know, they weren't disrespecting him....

Q: OK.

A: ....you know, they, they treated him with the upmost respect in, in that type of situation.

Q: OK. Uh, other than applying the handcuffs and the sternum rub that the wagon officer did, did the officers touch him in any other way?

A: Just to help pull him up, that was it.

Q: OK, all right. Uh, did at any time did anybody have to use any physical force to actually put the handcuffs on him?

A: No, sir.

Q: So in other words, he was, he put his hands behind his back....

A: Yes, sir.

Q: ....and they cuffed him up?

A: Yep.

Q: OK, all right. Um, all right, I appreciate that. Is there gonna be, do you have the ability to record, have the video of him doing the theft and stuff....

A: Yeah.

Q: ....in your store, can you make copies of that for me?

A: Yes, sir, uh-huh.

Q: All right. I'll give you my card here when we finish and, uh, I'll meet up with 'ya....

A: (coughs).

Q: ....and a different time and I'll pick those up from you.

A: OK, all right.

Q: Is there anything else you think's important you need to tell me?

A: Um, he was with another black male and I seen the outline of his handgun, too. Um, it was a black male with a blue shir...a blue hoodie on, dark blue pants, and short dreadlocks, like dread twisty locks.

Q: Do you know, uh, you said you'd seen him before and you barred him from the store?

A: Yes, I did bar him.

Q: Do you know who that other guy is?

A: I have no idea. Um, when I told him, when he was caught stealing, the last time he was in our store, um, I walked up to him and I said "Hey, man," I

said "You've got to go. Like you're in here stealing" and he was like "all right, bro. Shit, fuck it"....

Q: Uh-huh, OK.

A; ....and that was it.

Q: All right. Hold on. There's a guy tryin' to back out here, so. (pause). Um, so do you think, um, all right, you can make a copy of that for me. Uh, is, would there be any other video that would be pertinent as you guys chased him out?

A: I have no idea.

Q: OK, all right. Um, all right, and so then do you know if there's outside video at the mall where we can see him running through the parking lot and such?

A: I, I don't know. I don't know if they have a camera system outside the mall, to be honest.

Q: Do you know who I would contact?

A: Um, probably the mall manager.

Q: The mall manager?

A: Yes, sir.

Q: Do you a name or anything?

A: No, sir, I don't know that.

Q: All right. Well, if there's nothing else, I'll just conclude the statement given by, um, uh, Michael Nesbitt. It is Saturday, September 26th, 2015, and the time now is, uh, 3:55 p.m.

END OF STATEMENT.

JLW
IMPD
9-28-15