# INDIANAPOLIS POLICE DEPARTMENT
## Internal Affairs Statement

THIS IS A STATEMENT OF STEVE MONDAY TAKEN ON TUESDAY OCTOBER 6TH, 2015 SGT. JOHN ARVIN AT THE INTERNAL AFFAIRS OFFICE AT 4134 N. KEYSTONE AVENUE WITH MARION COUNTY SHERIFF'S OFFICE DEPUTY STEVE MONDAY. THE REFERENCE IS INTERNAL AFFAIRS CASE NUMBER 15-080 IN-CUSTODY DEATH OF MR. TERRELL DAY.

**EXHIBIT**

53

Q.    Deputy Monday can you state your name and spell your last name?

A.    Steve Monday, M o n d a y.

Q.    I'm investigating an in-custody death at Speedway gas station a different address than the other place it looks like it's 10th and Mitthoefer on the east side happened of 15. You're in the your own CAD as the wagon driver for this run were you in fact on this run?

A.    Yes sir.

Q.    What was your involvement?

A.    They had a wagon run was typed up for me to pick up at 10th and Mitthoefer for an adult male. I dispatched myself to it. I was there about maybe 10-15 minutes or less and then I arrived on the scene. Upon arriving on the scene I observed Mr. Day on the ground on his back in handcuffs and when I approached him I patted him on his left ankle and verbally asked him hey, buddy are you okay and I got no response from him verbally. So I picked up his-I picked up his leg and took off his shoe to shake his shoe for contraband which is a normal thing that we do and then I put his foot back on the ground and I let it drop just a little bit to see if I could get some sort of reaction out of him and there was no physical or verbal reaction from that. Went to his other foot and checked took his shoe off checked his shoe again dropped his foot a little had his foot a little higher off the ground dropped it again to see if could get some sort of reaction out of him there's no reaction out of him after that. At that point and time I kind of gave him a visual to see how he was looking. His eyes were open he was breathing. I saw his eyes moving back and forth as if he was looking at something or someone. We tried to pick him up off the ground and he was not helping us help him at which time I said hang on let's put him back down for a minute because I wanted to double check to see if he was okay and that was when I applied a sternum rub. I applied my right hand/knuckles to his chest and gave him a sternum rub to see if I could get some sort of reaction out of him either verbal or physical and I mean got no reaction from him whatsoever from that sternum rub at that point and time I figured something might be wrong with him so I did a second one I lifted his shirt up and then went straight to his skin and did another one just a little bit harder to see if I could get any type of reaction whatsoever and again nothing no verbal, no physical response a jerk or anything saying "ow" that hurt anything to that nature which at that time I advised that he-that he probably wouldn't be accepted at the APC due to his-due to his state and at that time the IMPD sergeant on the scene called for a medic to show.

Q.    Did you know there was a first set of medics?

A.    When I arrived there the Sergeant on the scene had advised me that the medics had already been there and that he had been checked out and that he was okay to go by wagon.

Q.    Were our officers' close by when you were doing the feet check and the sternum rub?

A.    Yes.

Q.    Did you hear our officers giving any commands to Mr. Day?

A.    Commands.

Q.    Like hey buddy cooperate or can you stand up or we'll help you up anything like that?

A.    I don't remember. I do remember the sergeant letting him know that I was here, but the wagon was here and that it was time for him to-time for him to go which is kind of a normal thing.

Q.   Alright so in your opinion were our officers' attention to Mr. Day as he was in the grass waiting for you to arrive?

A.   When I got there he wasn't in the grass. When I got there he was on the side-on the sidewalk or street rather parking lot flat on his back.

Q.   So he's not in the grass.

A.   Not when I arrived no. I was told before I was there that he was up and talking and sitting up and but then before or just before I got there that's when he was non-responsive so to speak.

Q.   So you arrived he was not in the grass he was on his back and handcuffed.

A.   Correct.

Q.   But the officers weren't in close proximity so they could get keep an eye on him?

A.   Correct yeah as soon as I walked got there they were two officers there and then I walked up so there was three and I believe possibly there was some security people from I think the mall that were there as well.

Q.   Right okay were you there when the second ambulance arrived?

A.   Yes I was.

Q.   What happened with that?

A.   I waited actually I could've left after I made my decision not to take him, but I waited because sometimes the EMT's they will probably want to know why I'm not going to take him and I was going to let him know what I did and just to say hey I can't take that you know in my wagon because I have no way of to apply any type of medical treatment like an ambulance can. If something if this guy were to fall out the back of my wagon so I just waited and they showed up and they didn't ask me anything and I would say within just a couple minutes they had put him on a gurney and I just stood on the side of the gurney. When they picked him up to put him on there so he wouldn't slide and then they took him and put him in the ambulance and they never asked me anything. I never said anything to them.

Q.   Did you hear our officers talking to the ambulance folks?

A.   I don't remember I don't recall.

Q.   My thinking is did the second ambulance know about the first ambulance so.

A.   Oh.

Q.   If our officers said anything about hey this guy just got checked out a half an hour ago or (inaudible).

A.   Honestly I don't remember if I did or not I worked (inaudible).

Q.   And once he was loaded in the ambulance what did you do?

A.   Once they put him on the gurney they started wheeling him to the ambulance I went back to my wagon and went to pick up another run (inaudible).

Q.   So you didn't know anything about the after part as far as the second wagon working on him anything like that like inside the wagon not wagon?

A.    Yeah.

Q.    Second ambulance.

A.    No I knew nothing about until after the fact.

Q.    Alright was there anything about our officers' actions while you were on the scene that you thought was unusual?

A.    No.

Q.    Okay.

A.    No as soon as I made the decision that I wasn't going to take him they immediately called for a second ambulance s no.

Q.    Right nothing unusual, nothing no rudeness to the guy, no um, nothing else nothing out of sorts with you with your training experience?

A.    No, okay when I asked what happened and they just gave me a brief run down on what happened that was about it.

Q.    With the chase and all that and the mall?

A.    Yeah the chase and the mall and the gun and everything else and the watch I think it was he took or whatever.

Q.    Right.

A.    But no he uh, I noticed when after they called for the second ambulance I was still looking at him because he was-he was you know awake I was just trying to figure out if something was wrong with him or he was faking and I asked the sergeant I said what's that on his lips because his lips were kind of white. He said-he said he's probably thirsty because his lips were chapped so other than that I mean that's based on everything that I seen when I rolled up and what I had done that was pretty much it. I mean I wasn't there a whole real long.

Q.    Right did you notice any Cumberland Police Officers there?

A.    Oh yeah Cumberland was there.

Q.    A lieutenant I think and a patrolman?

A.    Yeah and I think there was three there. I know there was a lieutenant and then the canine guy was there and there was a third guy. The third guy the lieutenant is the one I saw down at the uh, detective's office I think you can.

Q.    Alright did you see anybody give Mr. Day any water?

A.    I heard them ask to get him some water and then I remember the loss prevention guy from Burlington was helping him leaning up. I never now I never actually saw them actually put the water in his mouth, but then when I was behind him at that time I just assumed that they did. I seen him bringing water holding him up.

Q.    Right.

A.     I just didn't see the actual action, but when I came back around to look at him I seen that there was water on his shirt that wasn't there before so I can you know presume that attempted to give him some water.

Q.     They tried to give him some water okay.

A.     Exactly yeah so.

Q.     Is there anything else you think I need to know that will help me do a complete investigation?

A.     No I don't think I have.

Q.     If I come up with any follow ups I'll send you a quick e-mail.

A.     Sure.

Q.     And we can knock it out.

A.     Do you need my cell phone number or anything?

Q.     Sure go ahead.

A.     313-6680.

Q.     80 I'll put that in my file we'll be good to go.

A.     Okay.

Q.     Thank you very much let me talk to the recorder.

This concludes the statement of Deputy Steve Monday on 10-06-2015 at 10:26 hours.

Q: This will be an officer's statement given by Off. Steve Monday of the Marion County Sheriff's Department. This statement's being given to Detective Sergeant Jeffrey L. Wager of the Indianapolis Metropolitan Police Department. We are at 50 North Alabama. It is Saturday, September 26th, 2015. The time now is 1738 hours. This statement's being given in reference to a death investigation reported under IMPD case number PD 15-111643 which occurred at 10036 East 10th Street. Sir, would you please state your name for me?

A: Steve Monday.

Q: And how are you employed?

A: I'm employed with the Marion County Sheriff's Office.

Q: And what is your current assignment?

A: I drive for the East District APC wagons.

Q: Okay. And--who's your immediate supervisor?

A: Lt. Steve Vaughn.

Q: And what's your i.d. number?

A: SH-30519.

Q: Okay. And today's assignment you were assigned as what radio number?

A: Wagon 8.

Q: Wagon 8, okay. And do you know the confidential of the wagon you were driving?

A: Yes, sir, 145204.

Q: Alright, alright, thank you. Tell me how you became involved in today's incident. Something about picking up a prisoner?

A: Correct. A run--a wagon run came out for 10th and Mitthoeffer area at the--right behind the Speedway gas station.

Q: Okay.

A: Picked up the run approximately 1329 hours. And upon my arrival, the--suspect was laying down on his back in handcuffs. And I walked up to the officers on the scene. They advised me of what the situation was, that he was involved in an armed robbery at the Burlington Coat Factory.

Q: Okay.

A: Me and a couple of the officers attempted to sit the suspect up so we could exchange handcuffs. During the process, the suspect was--very--non-responsive

and he did not help us help him get up. Kind of a limp body so to speak. At which time I had--told the officers, "We're laying him back down."

Q:    Okay.

A:    His eyes were open at the time. I--noticed that he was breathing. He never verbally said anything to me or anybody else after my arrival. My concern was that maybe he was--

Q:    Sorry, keep goin'. Let me just (inaudible).

A:    My concern was that he might have been in some sort of distress--some type of distress. So I--performed a sternum rub--

Q:    Okay.

A:    --to--see if there was any type of response. There was no--verbal response like, "Ouch." or anything like that. There was no--physical response from the sternum rub like, you know, maybe a jerk from maybe some pain.

Q:    Okay.

A:    Or discomfort. I did it a second time just to be sure. And again, the same results. No verbal response, no physical response. Eyes were open. I could see that he was breathing. He did look to the left and right a couple times but I felt at that time somethin' wasn't right. I advised the officers on scene that based on what I had done with the sternum rubs and his non-verbal reaction or physical reaction to those sternum rubs that it'd probably best if he go to the medic. At which time the sergeant on scene--IMPD sergeant on scene called for a medic and they arrived within probably less than ten minutes.

Q:    Okay.

A:    And--they--they put him on the gurney and then put him in the ambulance. And after that, I left the scene and picked up another wagon run.

Q:    Okay.

A:    I did note in my CAD that I did not pick him up due to his--lack of reaction from the sternum rubs.

Q:    Okay. I know what sternum rub is and--

A:    Mm-hmm. (Yes)

Q:    --just for the people that'll be listening to this can you--just describe the sternum rub and what's the procedure for it and what's the response you're supposed to have?

A: Any type of physical response from a sternum rub like--to see if he's--coherent enough. 'Cause some people do tend (inaudible) tend to fake their--issues-- medical issues 'cause they don't wanna go to jail.

Q: Right.

A: And I've come across that in my experience and on the job training. I've learned that (inaudible) medical staff--excuse me, EMTs perform that type of--procedure just to get a response out of--to see if they're, you know, awake.

Q: Mm-hmm.

A: Really awake and not, you know, faking it. So when I applied that and I got no response to me, I took that as, "Okay, there might be somethin' wrong with this guy. It's best for him to go by ambulance."

Q: So just to be clear, if someone was fakin' it, the sternum rub usually--

A: Yes.

Q: --gets a response?

A: Correct. The sternum rub would get some sort of "ow" or maybe a body jerk or somethin' like that. 'Cause I've had it done to me and--

Q: Mm-hmm.

A: --you know, just like in training and it does have a--some effect to where it would make the person say something or like a little body jerk, you know.

Q: Okay.

A: Like when you pinch somebody and they kinda just jerk away. It's kind of the same concept. You just rub your knuckles on the sternum to get some sort of either verbal or physical response.

Q: Okay.

A: Basically, to check on their welfare.

Q: Okay. And you did that twice?

A: Twice, correct.

Q: And you got no response?

A: Neither time.

Q: Okay. And when you said he was laying back and his eyes were open, he was breathing?

A: Correct.

Q: The way he was laying--now your experience as a wagon driver--was that interfering with his breathing or anything like that?

A: He was laying on his back. The whole time that I was there, he was never on his side. He was never on his stomach. We did try to sit him up and he--and he wouldn't--basically was unable to. And we weren't sure if he was unable to or just wasn't complyin' with what we were tryin' to do.

Q: Mm-hmm.

A: Other than that, he--well, after I made a decision not to pick him up, the other--I think the--one of the IMPD officers and a Cumberland officer got him to sit up a little bit and they were tryin' to administer some water to him.

Q: Okay, did you see him--

A: (Inaudible).

Q: --take--drink some of that water?

A: No. I seen them--I was standing kinda behind him at the time.

Q: Mm-hmm.

A: 'Cause I--I struck up a conversation with the Loss Prevention guy--Security--

Q: Okay.

A: --'cause I was curious as what happened.

Q: Right.

A: And--I did not see him actually drink it but I did see the officer put the bottle of water up towards the mouth. And then once I walked around towards the front, I did see water on his shirt from where--

Q: So like he might not have drank any?

A: Correct, yeah--

Q: Okay.

A: --yeah, that or was sloppy or somethin' like that.

Q: Okay. Alrighty. Is there anything else? Anything I haven't asked you that you think might be important?

A: No. I did stick around. After I made a decision not to--pick him up, I did stick around for the EMTs 'cause sometimes they're wondering why we don't pick 'em up--

Q: Right, exactly.

A:     --and I was just gonna basically let 'em know what I had done.

Q:     Okay.

A:     But I never did speak to 'em. They came over, checked him out and then put him on the gurney and put him in the ambulance.

Q:     Had his condition kinda changed between the time that you were and then they picked him up and--?

A:     Not that I'm aware of. He was pretty just--how to say? He was--not normal but kept the same look on his face the whole time.

Q:     Okay.

A:     It wasn't like he was looking like he was crying or anything of that nature. I saw no tears. He didn't have like a painful look on his eyes.

Q:     Was he moving at all? Did you say you saw him moving?

A:     Just from his breathing.

Q:     Okay.

A:     Yeah, I saw, I mean, I--

Q:     You could see his belly going up and down?

A:     Yeah, 'cause his shirt was up--

Q:     Okay.

A:     --above his belly and I could see his belly--his belly moving and his chest moving from the breathing. I didn't check for like a pulse or heartbeat when I did the sternum rub or anything like that but I did see him breathing. But he stayed pretty much in the same position until they sat him up, tried to give him some water. We--like I said, we attempted to sit him up so I could exchange cuffs which we never did. But other than that, he was pretty much on his back and then when--when we tried to--when they tried to put water--or give him water, they sat him up.

Q:     Okay.

A:     And then--right about that same time, the ambulance showed up and that's-- when they picked him up and put him on the gurney. They laid him back down so they could all--I think four of 'em picked him up to put him on the gurney. He's a pick guy.

Q:     So in other words, they kinda tried to keep him sitting the entire time while they waited for the ambulance?

A:    Yes, they did--they did attempt to keep him sitting him up. Once I'd made a decision not to pick him up, they were--the sergeant made the call on the radio and called for an ambulance to come pick him up.

Q:    Okay. Can you describe to me how he was handcuffed? Did he have more than one set of cuffs on?

A:    He had one set of handcuffs on, they're--and they were behind him when I--when I rolled up.

Q:    Okay.

A:    And then--when--they decided to put him on the gurney, they were going to unhandcuff him and then handcuff him to the gurney.

Q:    Mm-hmm.

A:    I didn't see that happen but that's what they were going--they were talking about they're going to do.

Q:    Okay.

A:    'Cause about that time, that's when I--when they picked him up, put him on there, that's when I started to walk towards my wagon to leave.

Q:    Okay.

A:    But they did speak of putting--the Cumberland officer did speak of putting two handcuffs on him for--I guess comfort and to ease things--

Q:    Yeah.

A:    --for the EMTs.

Q:    But they--but they didn't do that in front of you or anything?

A:    I didn't see it.

Q:    You didn't see it?

A:    Yeah, I was walking to my wagon right after that, so--I did--I don't know if they did or did not. I assume they did but I don't think they--I don't know if they did for sure, I didn't see it.

Q:    Okay. Alright. Very good. Anything else?

A:    I don't believe so.

Q:    Alright. This will conclude the statement given by--Off. Steve Monday. It is Saturday--September 26th, 2015. The time now is 5:47 p.m.

END OF STATEMENT

lsk
IMPD
9/29/15

## Indianapolis Metropolitan Police Department

## STATEMENT OF RIGHTS

I wish to advise you that you are being questioned as part of an official investigation of the Indianapolis Metropolitan Police Department. You will be asked questions specifically, directly and narrowly relating to the performance of your official duties as a police officer or concerning your fitness for service as a police officer. You have the constitutional right not to incriminate yourself.

Under no circumstances will the results of this investigation or your statement be used in any subsequent criminal court action against you. However, factual information contained in the Internal Affairs file on this investigation, including your statement, is generally discoverable in civil rights litigation filed in either a Federal court or in a State court, and may be used to impeach your testimony in such a suit.

I further wish to advise you that if you refuse to testify, or to answer questions relating to the performance of your official duties or fitness for duty, you will be subject to Departmental charges which could result in your dismissal from the Indianapolis Metropolitan Police Department.

_____
Internal Affairs Investigator

I have read the above and understand it fully. I sign this statement having been advised of the above rights before any questions have been asked of me.

_____
Police Officer, City of Indianapolis

Signed at __10:15__ o'clock __A__.M. this __6TH__ day

of __OCT__ ; 20 __15__ , at Indianapolis, Indiana.