IMPD IA2015-080 000022

# Indianapolis Metropolitan Police Department

## STATEMENT OF RIGHTS

I wish to advise you that you are being questioned as part of an official investigation of the Indianapolis Metropolitan Police Department. You will be asked questions specifically, directly and narrowly relating to the performance of your official duties as a police officer or concerning your fitness for service as a police officer. You have the constitutional right not to incriminate yourself.

Under no circumstances will the results of this investigation or your statement be used in any subsequent criminal court action against you. However, factual information contained in the Internal Affairs file on this investigation, including your statement, is generally discoverable in civil rights litigation filed in either a Federal court or in a State court, and may be used to impeach your testimony in such a suit.

I further wish to advise you that if you refuse to testify, or to answer questions relating to the performance of your official duties or fitness for duty, you will be subject to Departmental charges which could result in your dismissal from the Indianapolis Metropolitan Police Department.

_John A_____
Internal Affairs Investigator

I have read the above and understand it fully. I sign this statement having been advised of the above rights before any questions have been asked of me.

_____
Police Officer, City of Indianapolis

Signed at __0858__ o'clock __A__.M. this __21ST__ day of __January__, 20__16__, at Indianapolis, Indiana.

IMPD Form No. 3-5-7 R4

R. Denny

# INDIANAPOLIS POLICE DEPARTMENT
## Internal Affairs Statement

THIS IS A STATEMENT OF RANDALL DENNY A POLICE OFFICER FOR THE INDIANAPOLIS METROPOLITAN POLICE DEPARTMENT TAKEN ON THURSDAY JANUARY 21ST, 2016 AT 0858 HOURS. THIS STATEMENT IS BEING TAKEN AT THE OFFICE OF INTERNAL AFFAIRS 4134 N. KEYSTONE AVENUE SUITE A BY SGT. JOHN ARVIN, ATTORNEY ED MERCHANT IS PRESENT FOR THE OFFICER.

Q. Sir would you state your full name spelling your last name?

A. Randall Jason Denny, D e n n y.

Q. Are you aware this interview is being recorded?

A. Yes.

Q. What's your appointment date?

A. March 30th, 2002.

Q. And your ID number?

A. D9879.

Q. Present duty assignment including district?

A. I work day shift East District.

Q. And let's see what were your duty hours and shift assignment on September 26th of 2015?

A. It's day shift which the hours 0530 to 1400 hours.

Q. Were you in full police uniform that day?

A. Yes.

Q. Have you read and signed the Police Officer's Statement of Rights?

A. Yes.

Q. And have you read the IMPD Rules and Regs pertaining to being truthful and cooperative?

A. Yes.

Q. Drawing your attention to Internal Affairs 15-080 reference a case involving a Terrell, T e r r e l l, Day, D a y, your name is listed in the CAD I152691312 reference this arrest were you in fact on this run?

A. Yes.

Q. In detail can you give me your involvement in the run?

A. Yes I was dispatched to a shoplifting in progress where the Loss Prevention was chasing the suspect and the suspect had pointed a firearm at him while they were chasing him.

Q. Where were you when the run came out?

A. I was approximately I think I was near 10th and Post and maybe about-about 8500 East 10th Street when the run came out.

Q. The run was at Washington Square Mall so you were pretty close.

A. Yes it was about a mile and a half maybe.

Q. Good so what happened upon your arrival and when I say arrival I don't know I don't know if you went to the mall or gas station or somewhere else what happened upon your arrival?

A. Well the run came out at the Burlington Coat Factory at Washington Square Mall. As I was en route to the run the call updated stating that the suspect was running north crossing 10th Street into the Speedway gas lot which is the Speedway Gas is the northeast corner of 10th and Mitthoefer. So when I was arriving to the scene east on 10th Street so when I got to Mitthoefer I went north to get behind the Speedway because that's where that was the last location and he was supposed to have been a Cumberland Reserve Unit I don't recall his name was my backup and he approached from the west or from the east he was coming west on 10th Street so we kind of met at the Speedway gas station. He was about 5 seconds ahead of me both for all intents and purpose we-we came to behind the Speedway gas station at about the same time. Since he arrived from the east Mr. Day was actually already when we pulled up was already in the grass on the northeast corner of the Speedway gas station property. The Speedway gas station sits about 7 feet higher than the surrounding strip mall so there's a grass, so there is a grass hill that separates the-the shopping mall from the gas station. On the northeast corner of that hill Mr. Day was already in the grass and the Loss Prevention officer whose name escapes me at the moment flagged us down so the Cumberland Officer got there just seconds before I did since he was closer and had gotten his gun out and was pointing his gun at Mr. Day stating you know don't move, don't move. Mr. Day was on his um, was on his stomach with his hands out forward just and so I got out of my car and ran up preparing to handcuff Mr. Day since the Cumberland officer had him at gun point. When I walked up I immediately noticed that just outside the reach of Mr. Day's hand was a black semi-automatic handgun in the grass right where he was laying. I was getting him handcuffed. As I was handcuffing Mr. Day the Loss Prevention officer came over to me and mentioned he goes I think he's-he told me the Loss Prevention officer was referring to Mr. Day had told me he had shot himself so I get him handcuffed I put gloves on and since it was a hill it's pretty it's probably like a 5-it's like a 5 degree incline it's a pretty significant incline I kind of moved him to his side and I started-I started to feeling and I asked Mr. Day I was like have you been shot and-and I got him on his side and I started feeling um, his chest, his legs, anything I couldn't see immediately. He goes I'm fine, I'm fine. I was like I have to do just check to make sure you're not injured I don't see any blood, but I have to make sure. He goes I'm fine and then I noticed I looked down and he had-he had crapped himself so I think what the Loss Prevention what he was telling the Loss Prevention officer I had-I had "shit myself" not shot myself, but he had misinterpreted that um, so once I determined that there was no immediate-there was no um obvious injury I had him handcuffed I had one he was a big boy I had one handcuff. I was able to get one pair of handcuffs behind his back and we was on a hill so what I did was he was on the side and if I left him on his side he would roll down the hill, so I grabbed his feet and I scooted him and to where his feet were facing down so it would be a nice angle for him to he could just sit up and it wouldn't be that uncomfortable. Well he looked at me and then he just decided to he would-he laid back and then he-and then he pushed himself to start rolling to and I'm like so once again I scooted his feet down towards-towards the bottom of the hill I was like keep your feet facing towards the parking lot and you can use this as kind of like a chair you can sit upon it and as soon as I let go of him he would scoot himself to the side and start rolling, so as soon as he got paced good down to the hill you know at that point he got to the hill-the hill the bottom and so I just kept him on his side and I was like he was telling me um, he goes…he goes I…he goes I can't breathe when he was sitting up, but he was saying it almost in like the tone I'm saying it now he goes I can't breathe he was breathing heavy and I was like well you just run half a mile if you're talking to me you can breathe. I was like you have to calm down. I was like I'm sure your exhausted you have to just you have to calm…calm down and you'll be alright and he didn't say anything more to me after that it was about that time everybody else started showing up um, Sgt. Wooten showed up, um, Roger Wagner from Cumberland showed up so once I had enough officers there this was I'm primary on run this is my run it's going to be my arrest, so I started talking to the witnesses and I started talking to Loss Prevention tried to figure out technically what I had um, so Loss Prevention officer again his name escapes me had stated that him and Mr. Day's friend had been in that Burlington Coat Factory before and had stolen from them before, but they were unable to catch them. This time they were able to stop them as they were exiting the store apparently they pocketed at least Mr. Day pocketed a wrist watch and they watched on video so they exited the store. The Loss Prevention officer stopped Mr. Day. Mr. Day acted like he

   didn't know what he was talking about however he eventually got the wrist watch back. Mr. Day either got in his pocket or the Loss Prevention officer got it somehow the Loss Prevention officer got his watch back, so the Loss Prevention the LP officer said okay both you guys need to come into our office and wait for the police that's when they started taking off. They took off running his friend took off in a different in direction. I don't really have a very good description of him. I didn't have a name anything at all. The only thing I know from him was the Loss Prevention officer said the friend had a large silver revolver because he saw it tucked in his pants. Mr. Day took off north and pointed his handgun at the Loss Prevention officer. The Loss Prevention officer continued running after him and I mean that's I...I...I appreciate his bravery he continued and that's when he was on his phone to us as he was chasing him through the parking lot. Either in the parking lot or on 10th Street I wasn't real...I don't remember Mister....a car had stopped because Mr. Day had run across his path it had stopped. The Loss Prevention officer thought he was trying to carjack a car because he pointed the gun at the driver, but then the driver just-just took off didn't...didn't have ...didn't give him a chance to do anything else. Um and then they ran to where and he got down on the ground before we arrived I don't know if he tripped or he just was exhausted, but he was and then the Loss Prevention officer said he-he fell into the grass right before we-we got there. Um, so while I was talking to him Sgt. Wooten and I think Roger Wagner both were watching Mr. Day that's pretty much.

Q.  You were talking to Loss Prevention and then you weren't involved with Mr. Day anymore at that time?

A.  No.

Q.  Now what about paperwork were you also away from your car doing paperwork or away from Day doing paperwork?

A.  Paperwork, recovering the handgun. I was trying to do everything um, just easier with the chain of custody if I do everything.

Q.  How did you know that the first ambulance was called?

A.  Well about 5 minutes after while I was talking to the Loss Prevention officer um, either I don't know if it was either Roger or Frank added a second pair of handcuffs so instead of the one being tight they because I remember and I don't remember if it was I think they were my handcuffs I think they asked me for hey do you have a second a spare set of handcuffs I said yes because I carry two pairs and so that allowed them with two pair of handcuffs handcuffed his arms were not quite to his side they were still behind him, but they were not like I mean so it was-it was a lot more of freedom of movement with two pair of handcuffs and then one of them...one of them said hey I think we should just go ahead and call an ambulance because he's complaining he can't breathe I said that's fine I had no problem with that you know and let the medics come check him out and that we called the ambulance it wasn't 5 to 10 minutes after we had initially made contact with him it wasn't very long.

Q.  Were you there when the first ambulance folks did their checkout?

A.  Yes I was walking back and forth I didn't stand there while the whole time they were checking him out um, when 41 showed up I do remember they have I think it must've been a heartbeat monitor the little cup that goes on the finger I remember them applying it twice. Once they...the first when they got there and measured his heartbeat and then once not long before they left um, but they checked it twice. They um, he was-he was standing...he was standing and talking to them I think for the most part and I think around that time Roger went into the liquor store I don't know if he bought it or if they you know donated it, but he came out with a bottle of water and he was um, mister um, um, Day was drinking well I mean he was drinking the water and then um, then when they left we called for a wagon because the medics were like there's no they didn't see any medical reason to take him to the hospital he was answering their questions, standing up drinking, alert he seemed fine, so I said okay go ahead and so I call...I got on the radio and said go ahead and start us a wagon. The wagon I think was busy it took the wagon a little awhile to get

there so while in the meantime he was laying on his…he was…we tried to put….laid back down on the ground he just wouldn't sit up and we didn't want to lay him on his stomach so he wouldn't stay on his side, so we laid him on his back um, because I mean laying on the stomach that's when they choke. We just had in-service on that a couple of years ago.

Q. Positional Asphyxiation and all that.

A. Positional Asphyxiation and especially for his size we're not going to put him on his stomach so he ended up being on his back and that's when and the wagon showed up I think he was on his back so the wagon driver got there again I was still doing my paperwork so it was the wagon driver and either Frank or Roger that was helping the wagon driver get him into he's a big guy trying to help get him in the wagon. Well they had him they'd stand him up and I could see um, well I'd look up and see he'd walk and then he went stiff leg and we've had prisoners go stiff leg before it's like it's almost like you know I don't want to go in the wagon you know like no come on you got to get in the wagon and then he would just go limp and like dead weight and so they put him back on the ground they tried that a couple of times and as the wagon driver told me he goes I can't take him to the APC like this you're going to have to call another ambulance he's complaining of …he's complaining….he's complaining he can't breathe um and then he wasn't complaining he wasn't saying anything at all he was um, not being responsive he goes you need to call another ambulance I was like okay call another ambulance and that's when the other ambulance showed up. They got him on the gurney. They un-handcuffed him put him into the ambulance and they were going to transport so I was getting myself ready to follow them to the hospital because they said this is serious they thought he was going into I guess they thought he was going into some sort of heart failure right there so they were going to transport him so I said I'm going to follow him he's my prisoner I have to follow him and then they said no we have to work him for 30 minutes before we transport and I looked at Frank and I was like that's-that's not good I mean…I mean it won't because if…if they don't have them stabilized they won't transport them and if he's not stable that's bad, so and then after 30 minutes they called him in the ambulance you know so we just left him in the ambulance until everything until the coroner and everybody else showed up.

Q. In your mind was there any issue with the handcuffing?

A. No he was never and like I said we transitioned from a single pair of handcuffs to double handcuffs so that doubled the length between his hands um, we never put him on his stomach because again I was trained that was against our training. I tried to put him on his side. I tried to sit him up he never um, so that's why he ended up on his back that's the only that was the only other place that we could sit him that he would stay.

Q. Right there was no force used during handcuffing, no need for a knee strikes anything like that?

A. No, no.

Q. Would you describe him as cooperative during handcuffing?

A. He was cooperative the entire time no.

Q. Before you were able to get him handcuffed did you see the Cumberland officer use any force at all?

A. No he never got close enough he was-he was my cover.

Q. He was gun point so he was keeping (inaudible)?

A. Yes.

Q. How about the Loss Prevention guy by the way his name Nesbitt, N e s b i t t.

A. That's right Mister.

Q. Michael Nesbitt.

A. Mr. Nesbitt that's right no he never got close enough he was probably about 20 feet away signaling us, but he never got closer than 20 feet from him until we got hands on him.

Q. Did Mr. Day make any complaints besides the "can't breathe".

A. No, no.

Q. Did he admit to being on any sort of alcohol, pills, marijuana anything like that?

A. No.

Q. We're not medical personnel once that first ambulance makes that decision he can stay was there any conversation between you and Frank Wooten or the Cumberland guy about trying to override these guys?

A. No we can't we're not the medics.

Q. And they do their little checkouts and say they can to in the wagon they can go in the wagon?

A. Correct.

Q. Was there any talk about trying to override the wagon driver when he said I can't take him to the APC with these complaints?

A. No the wagon driver knows his job.

Q. And we called for a second ambulance right away?

A. Correct.

Q. Did you stay on the scene after the medics declared Mr. Day deceased?

A. Yes.

Q. Who did you talk with after that did Homicide come out?

A. The CERT team came out so yeah there were and then we ended up going well we ended up going down to Homicide, but I didn't actually make a statement at the Homicide in the Homicide Office.

Q. Is there anything different you would do today on that same run?

A. No, no.

Q. I mean you listened to his concerns; you tried to position him where he could breathe. He was obviously awake and doing stuff because he's trying to roll down the hill?

A. Yes.

Q. Once he got to the bottom of the hill you left him there, but not on his stomach?

A.	Correct.

Q.	When he had complaints we called for medics?

A.	Yep.

Q.	The last question is standard is there anything else you think I need to know that will help me do a complete investigation?

A.	No.

Q.	Mr. Merchant?

(Mr. Merchant)

Q.	With regard to the handcuffing is there any General Order requiring the handcuffing behind the back?

A.	Yes.

(Sgt. Arvin)

Q.	The prisoner handling is 8.1.

A.	Yes prisoner handling 8.1 it requires that all prisoners are to be handcuffed to the rear yeah.

Q.	There are some exceptions pregnant females, but even with the obesity we use more than one set because you spread the cuffs out. The last thing you want to do is be able to handcuff a guy in the front and have him get to a weapon that we don't know exist.

(Mr. Merchant)

Q.	Right.

(Sgt. Arvin)

Q.	In these days people could put weapons in their crotch, they put them in interlining of pockets of coats I mean or even an ID can have a razor taped to the end of it so it's just his ID in his pocket well no it's not it's got a razor blade on it.

A.	Well and the prisoner handcuffed from the front especially if we transport that handcuff now becomes I will choke you and there's nothing as the driver I can do to defend against that once they get that around you that's why it's very dangerous.

Q.	So one of my jobs is look at our policy are we did we follow it and does the policy need to be tweaked and we've done it before we have the General Orders. This one I don't see an issue right now, but will dig into it and see what's up any other follow ups?

A.	No.

Q.	Good to go this will end our interview it is 0919 hours.