**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| SHANIKA DAY Individually, and as the Administrator for the Estate of TERRELL DAY, and HARVEY MORGAN Individually, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:17-cv-04612-TWP-TAB |
| THE CITY OF INDIANAPOLIS, FRANKLIN WOOTEN Sergeant, Individually, and as an IMPD Officer, and RANDALL DENNY Officer, Individually, and as an IMPD Officer, | ) ) ) ) ) ) | |
| Defendants. | ) | |

## ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter is before the Court on a Motion for Summary Judgment ([Filing No. 51](#)) filed by Defendants City of Indianapolis ("Indianapolis"), Sergeant Franklin Wooten ("Sergeant Wooten"), and Officer Randall Denny ("Officer Denny") (collectively, "Defendants"). After Terrell Day ("Day") died while in the custody of the Indianapolis Metropolitan Police Department ("IMPD"), Shanika Day, his mother and the Administrator of his estate, and Harvey Morgan, Day's father (collectively, "Plaintiffs"), brought this suit alleging unreasonable seizure and excessive force in violation of the Fourth Amendment to the United States Constitution, negligence under Indiana law, and loss of child's services ([Filing No. 19](#)). Defendants argue the undisputed evidence shows that neither officer violated Day's constitutional rights, they are entitled to qualified immunity, and that Plaintiffs' state law claims fail as a matter of law. ([Filing No. 53 at 7](#).) For the following reasons, Defendants' Motion for Summary Judgment is **granted in part** and **denied in part**.

# I.     BACKGROUND

The following facts are not necessarily objectively true, but as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to Plaintiffs as the non-moving party.  *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The facts of this case begin with a confrontation between Day, an eighteen-year-old with a medical history of obesity, and Michael Nesbitt ("Nesbitt"), a loss-prevention officer at a Burlington Coat Factory ("Burlington") located in Washington Square Mall in Indianapolis, Indiana.  On September 26, 2015, Nesbitt observed Day, and a friend enter Burlington on the store's surveillance cameras.  ([Filing No. 52-8 at 10](#).)  Nesbitt believed that he recognized Day as an individual he had observed stealing from the store on two prior occasions.  *Id.* at 8-9, 41.  On both prior occasions, Nesbitt had asked Day to leave the store and said he would be arrested if he returned.  *Id.* at 8.While watching the stores surveillance video, Nesbitt believed he saw Day pick up a watch, put it in his pocket, and exit the store.  *Id.* at 10.  He followed Day out of the store to confront him about the watch and radioed mall security.  Nesbitt was soon joined by mall security officer Anna Mahoy ("Mahoy") in the mall common area.  Day first denied having taken anything from Burlington, but ultimately returned a watch to Nesbitt.  *Id.*  Nesbitt requested that Day return to the store, but Day refused and began to walk away.  ([Filing No. 52-9 at 10](#).)

Nesbitt and Mahoy's testimony differ vastly as to what happened next. Mahoy testified that she noticed the handle of what looked like a gun sticking out of Day's pocket, but she never observed him point or remove a gun, instead he just returned the watch and disagreed with returning to the story and he ran.  *Id.* at 12.  Nesbitt alleges that Day removed a gun from his

pocket and pointed it at him, pushed Day and took cover, and Day began "running through the mall with the gun in his hand. ([Filing No. 52-8 at 13](#).)

Nesbitt called 911 and reported the events to the operator. *Id.* While on the telephone with the 911 dispatcher, Nesbitt alleges that he observed Day unsuccessfully attempt to carjack two vehicles. *Id.* at 17-20. Mahoy's recollection of events again differs—she testified that Nesbitt chased Day out of the mall and across the parking lot toward Mithoeffer Road and then, when Day changed course, toward 10th Street.[1] ([Filing No. 52-9 at 14-17](#).) Mahoy did mention Day attempting to carjack anyone during her deposition.[2]

Nesbitt continued to chase Day into the parking lot of a Speedway gas station until Day slipped and fell on a grassy downslope ([Filing No. 52-8 at 21-22](#).) As Day laid in the grass behind the Speedway, law enforcement arrived on the scene. Cumberland Police Department ("CPD") reserve officer John Covington ("Officer Covington") was the first officer to arrive in response to a radio call of an armed shoplifter running from the Burlington store across 10th Street to the Speedway gas station. ([Filing No. 52-2 at 7](#).) Officer Covington encountered Nesbitt in the Speedway parking lot, and Nesbitt pointed out Day's location—laying on his back on the grassy slope just north of the gas station. ([Filing No. 52-5 at 10-11](#).) Officer Covington parked his vehicle just east of the Speedway station, three or four car-lengths south of Day. *Id.* at 11-12. Believing Day was armed, Officer Covington drew his firearm and exited his police cruiser. *Id.* at 12. Day was on his stomach with his arms out to the side or to the top. *Id.* At 8. While waiting for other

---

[1] Mithoeffer Road and 10th Street are the two main access roads bordering Washington Square Mall—Mithoeffer to the west and 10th Street to the north. The mall is bound by Washington Pointe Drive to the east and US-40 to the south.

[2] Plaintiffs dispute much of this portion of the Defendants' "STATEMENT OF MATERIAL FACTS NOT IN DISPUTE," arguing that Nesbitt is unreliable, that his narrative of events has become more fantastical each time he has reported it, and that much of his deposition is contradicted by other witnesses or by video evidence. On a summary judgment motion, the Court construes any disputed facts in Plaintiffs' favor as the non-movants.

officers to arrive, Officer Covington ordered Day to show his hands and to point to his gun, which was no longer on his person. *Id.* at 13. Day complied with both orders, pointing out a gun in the grass, which was out of his reach. *Id.*, [Filing No. 52-2 at 8](). Officer Covington kept Day "under cover" until Officer Denny arrived on the scene, ([Filing No. 52-2 at 8]()). Officer Covington then exited his vehicle, approached Day on foot. Day showed his hands and complied with the officer's orders.

Officer Denny placed Day in a single set of chain handcuffs. *Id.* at 9, 16. While handcuffing Day, Officer Denny observed that Day was overweight, sweating, and breathing heavily. *Id.* at 16, 18. Officer Denny repositioned Day so that he was "sitting on his behind" at the top of the slope with his legs out in front of him and his hands cuffed behind his back. *Id.* at 10. Day informed the officers that he was having trouble breathing. *Id.* at 13. Officer Denny told Day that he had exerted himself by running and that he should take deep breaths in and out to slow his heart rate. *Id.* Officer Denny did not observe any signs of distress, and never observed that Day was having trouble breathing.

Officer Denny instructed Day to remain seated upright in the position he had put him, believing that would be most comfortable for Day while the officers completed the investigation and effected the arrest. *Id.* at 79. Officer Denny preferred this position because, while it is comfortable for the detainee, it also makes it difficult for the detainee to stand because his hands are cuffed behind his back. *Id.* at 80. The next best position for the detainee, in Officer Denny's opinion, was to be lying on his side or back. *Id.* Officer Denny was aware of the risks posed by a standing detainee—that he could flee or attack the officers—because he had dealt with uncooperative detainees in the past. *Id.* at 80, 87-89.

As Officer Denny repositioned Day, he noticed that Day had defecated on himself. *Id.* at 10. Under the circumstances, Officer Denny believed that Day had over-exerted himself. *Id.* at 86-88. Day was unable to follow Officer Denny's instructions about how to position himself while he was detained and in handcuffs. When Officer Denny moved Day so that he was seated upright, Day laid back onto his back and rolled down the slope a bit. *Id.* at 92-93. As he started to roll, Officer Denny sat him back up in the middle of the slope with his legs out in front of him. *Id.* Wary that Day could asphyxiate himself if he rolled onto his stomach, Officer Denny reprimanded Day to remain in an upright seated position. *Id.* at 10-11. Day did not heed Officer Denny's instructions and rolled down the rest of the hill to where the grass met the pavement. *Id.* at 11. At that point, Officer Denny decided the best course of action was to have Day lie down on his side. *Id.* at 93.

Shortly after Officer Denny detained Day, Sergeant Wooten arrived on the scene to assist. *Id.* at 100. As the arresting officer, Officer Denny had investigative duties that precluded him from personally monitoring Day after initially detaining him. *Id.* at 89-90. Sergeant Wooten or a CPD officer remained near Day to monitor him from that point forward. *Id.* at 78; [Filing No. 52-4 at 58-59](#). The last law enforcement officer to arrive on the scene was CPD Lieutenant Roger Waggoner.

Sergeant Wooten observed Day roll from his side onto his stomach. ([Filing No. 52-3 at 32](#).) Sergeant Wooten and the other officers repositioned Day several times when he attempted to roll onto his stomach. *Id.* at 56; [Filing No. 52-2 at 94](#). Day complained to Sergeant Wooten that he could not breathe. ([Filing No. 52-3 at 31-33](#).) Sergeant Wooten was skeptical of Day's complaints because Day also stated that he had done nothing wrong and was asking for the officers to let him go. *Id.* Sergeant Wooten called for an ambulance to evaluate Day approximately five

minutes after Day was initially detained. *Id.* at 31; Filing No. 52-2 at 13. As Sergeant Wooten observed him, Day appeared to calm down and began to breathe normally. (Filing No. 52-3 at 31.)

The ambulance, staffed by Douglas York ("York"), a paramedic, and James Brown ("Brown"), an emergency medical technician, arrived within several minutes. (Filing No. 52-6 at 14-15; Filing No. 52-14.) When York and Brown first encountered Day, he was lying on his back with his hands cuffed behind him. (Filing No. 52-6 at 21-22; Filing No. 52-7 at 33.) Day again complained of difficulty breathing but was able to speak to York and Brown in clear, full sentences. (Filing No. 52-6 at 25.) Although Day stated that he could not breathe, York did not observe Day to have any trouble breathing. *Id.* at 63. When asked by medics if he had any medical problems, Day stated that he did not. *Id.* at 32.

The medics conducted an evaluation which involved checking Day's vitals, obtaining his heart rate, respiratory rate, and his blood oxygen saturation. (Filing No. 52-14.) They attempted to take Day's blood pressure, but he would not allow them to. (Filing No. 52-6 at 16.) They also listened to Day's lungs with a stethoscope and found bilateral breath sounds present and clear. (Filing No. 52-14.) Based on their evaluation, the medics concluded that Day was breathing regularly and normally. *Id.*

The medics also conducted a Glasgow Coma Scale analysis on Day, which determines how oriented and responsive an individual is on a fifteen-point scale. *Id.*; Filing No. 52-6 at 35-36. Day scored a perfect fifteen. (Filing No. 52-14; Filing No. 52-6 at 36.) During the medical evaluation Day's hands remained behind his back, but at some point, the police and medics helped him to stand. (Filing No. 52-6 at 40, 82.) Based on their medical evaluation, York and Brown believed that Day did not need to be transported to the hospital for medical treatment. *Id.* at 62-64, 70.

When medics decide that a handcuffed prisoner is not going to go to the hospital, they have an officer sign as a witness that they are returning the prisoner back into officer custody. (Filing No. 52-2 at 94.) In order to memorialize that transfer, medics have a law enforcement officer on the scene sign a signature of release form. (Filing No. 52-11 at 3-4; Filing No. 52-2 at 95-98.) Using the screen on a tablet, the officer signs this form as a witness to the transfer, not as a representative of the detainee. *Id.* Sergeant Wooten signed the signature of release form so that law enforcement could regain custody of Day. (Filing No. 52-3 at 57-60.) Because Day was handcuffed, the officers did not request that he sign the form. *Id.* at 61.

Sergeant Wooten used his finger to sign his name in a box on a laptop screen. He explained "[i]t's a laptop, and it's got all the information on there, all the stuff. And then in the lower right corner there's a box, and they said can you sign here to release, and I said yes." (Filing No. 52-3 at 58-59.) Sergeant Wooten's signature was attached to an Indianapolis Emergency Medical Services form called "Treatment/Transport Refusal," which is meant to be signed by a patient when he refuses to be transported to the hospital after being evaluated by medics. (Filing No. 52-14 at 5.) Plaintiffs believe Sergeant Wooten refused hospitalization on Day's behalf, and had he not signed the Treatment/Transport Refusal form, the medics may have decided to transport Day to the hospital. (Filing No. 75 at 16.)

Because Day was once again in law enforcement's custody, Officer Denny requested a "jail wagon" to transport Day to an appropriate detention facility. (Filing No. 52-2 at 35-36.) Marion County Sheriff's Deputy Steve Monday ("Deputy Monday") was the driver of the jail wagon. When Deputy Monday arrived, he spoke to Sergeant Wooten, who explained why Day was under arrest and notified Deputy Monday that Day had been evaluated by medics. (Filing No. 52-10 at 14-15.) Day was lying on his back when Deputy Monday arrived, and Deputy Monday

lifted Day's leg to begin searching his shoes for contraband. *Id.* at 15. Day was generally unresponsive to Deputy Monday, and his legs fell to the ground after Deputy Monday removed his shoes and Day was unable to answer when Deputy Monday asked if he was okay. *Id.* at 15-16. When Deputy Monday and Sergeant Wooten attempted to stand Day up, Day's legs straightened, and his knees locked. *Id.* Deputy Monday considered Day uncooperative.

Deputy Monday was unsure whether Day was obstinate or was unresponsive because of a medical issue. He performed a sternum rub—the application of painful stimulus to an unresponsive subject's chest—to see whether Day would respond. *Id.* at 16. Day did not respond physically or verbally to the sternum rub, so Deputy Monday lifted his shirt and performed another one . *Id.* Although his eyes were open, and he was breathing, Day's lack of response to the sternum rubs led Deputy Monday to urge Sergeant Wooten to call for another ambulance. Sergeant Wooten called for a second ambulance and a different team of medics was dispatched to the scene. ([Filing No. 52-3 at 82](#); [Filing No. 52-15](#).) At some point after the first ambulance left the scene but before the second ambulance arrived, Officer Denny put a second pair of handcuffs on Day. ([Filing No. 52-2 at 38](#).) Using two pairs of handcuffs is meant to make the detainee more comfortable. Day was telling Officer Denny that we was having problems breathing, and Officer Denny chose to add a second pair of handcuffs because they believed Day was having a medical problem. *Id.* at 39-40.

When the second ambulance arrived, the medics asked the officers near Day to assist them in placing him on a gurney. ([Filing No. 52-5 at 42](#).) At this point, Day's eyes were open, and he was breathing. *Id.* at 43; [Filing No. 52-3 at 121](#). Officer Covington overheard one of the medics say that Day's pulse was very weak. ([Filing No. 52-5 at 43](#).) Once Day was loaded into the back of the ambulance, medics performed CPR on him. *Id.*; [Filing No. 52-3 at 119](#). If they are unable

to transport someone to the hospital in stable condition, the medics are required to attempt to revive the person for thirty minutes at the scene. (Filing No. 52-2 at 15.) At 2:30 p.m., after thirty minutes of attempting to revive Day, the medics exited the ambulance and pronounced him dead. *Id.* at 16; Filing No. 52-15. Deputy Coroner Carrie England, dispatched to the scene as part of the Critical Incident Response Team, examined Day's body in the ambulance and noted that he had suffered no visible trauma. (Filing No. 52-19 at 5.) An autopsy later revealed that Day died of "Sudden Cardiac Death due to Acute Ischemic Change." (Filing No. 52-18 at 2.) The autopsy report listed contributory causes as "Sustained respiratory compromise due to hands cuffed behind the back, obesity, underlying cardiomyopathy." *Id.*

Following Day's death, Plaintiffs brought this suit alleging unreasonable seizure and excessive force in violation of the Fourth Amendment to the United States Constitution against Officer Denny and Sergeant Wooten in both their official and individual capacities. (Filing No. 19 at 5-7.) The Complaint also alleges negligence under Indiana law against both officers and the City of Indianapolis. *Id.* at 7-8. Last, the Complaint alleges a claim of loss of child's services for the loss of monetary contribution Day would have made to the family if he had not died. *Id.* at 8-9.

## II.     <u>LEGAL STANDARD</u>

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v.*

*Quotesmith.com, Inc.*, 476 F.3d 487, 489-90 (7th Cir. 2007). In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox Cnty. Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of the claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

## III. <u>DISCUSSION</u>

### A. <u>Federal Claims</u>

#### 1. <u>Official Capacity Claims</u>

Sergeant Wooten and Officer Denny move for summary judgment on the claims against them in their official capacities on two grounds. First, they argue that "[a]ctions against individual

defendants in their official capacities are treated as suits brought against the government entity itself." (Filing No. 53 at 26 (citing *Walker v. Sheahan*, 526 F.3d 973, 977 (7th Cir. 2008)).) Plaintiffs respond that their claims against the two officers in their official capacities should "merge into one claim against Indianapolis." (Filing No. 75 at 20.) Defendants reply that Plaintiffs' Amended Complaint did not plead "any factual content to allow the Court to draw a reasonable inference that Day's purported deprivation of a constitutional right was caused by an official custom, policy, or practice of the City." (Filing No. 79 at 5.)

The Court disagrees. The Plaintiffs' Complaint does allow the Court to infer that the officer Defendants were acting on City policy when they took some of the actions that support the claim. First, the Complaint alleges the officer Defendants acted unreasonably when they handcuffed Day with a single pair of handcuffs even though he was observably overweight. (Filing No. 19 at 6.) Moreover, the Complaint alleges that the officers placed Day on his back with his hands behind him and left him in that position for an extended period of time. *Id.* The Complaint also alleges that Sergeant Wooten "recklessly forged/signed Terrell Day's name to waive all medical treatment" on his behalf. *Id.* Designated evidence shows that these actions are the subject of IMPD guidelines or are common practices of the IMPD. (Filing No. 52-2 at 51, 117-119; Filing No. 52-3 at 67.) The Complaint alleges the officers committed these actions "under the color of state law, and within the course and scope of their employment as police officers". (Filing No. 19 at 5.) Those allegations support a constitutional claim against the officers in their official capacities which, in the Seventh Circuit, is treated as a claim brought against the government entity itself. *Walker* at 977. In this case, that government entity is the city of Indianapolis.

The Defendants also seek summary judgment on the claims against the officers in their official capacities arguing the Plaintiffs "abandoned these claims" when they "acknowledged in

their answers to the Defendants' contention interrogatories that they are not pursuing any *Monell* claims." (Filing No. 53 at 26 (citing Filing No. 52-12 at 6.)) In their contention interrogatories, Defendants asked:

> Identify whether you are making a *Monell* claim against the City stemming from the Incident. If you are making a *Monell* claim, identify with specificity the alleged policies, practices, or customs which constitute grounds for imposing entity liability under 42 U.S.C. §1983 on the City. Additionally, identify with specificity what constitutional rights were violated due to the aforementioned policy, practice, or custom. Further, identify all facts, documents, testimony, or other evidence which supports your contention that you possess a *Monell* claim.

(Filing No. 52-12 at 6.) Defendants' attorney responded, "No, I am not making a Monell claim."

Contention interrogatories, allowed under Federal Rule of Civil Procedure 33(a)(2), provide parties a "useful tool to 'minimize uncertainty concerning the scope of [a plaintiff's] claims.'" *Deputy v. City of Seymour*, 2014 WL 4907911 at *5 n. 2 (S.D. Ind. Sept. 30, 2014) (citing *Vidimos, Inc. v. Laser Lab Ltd.*, 99 F.3d 217, 222 (7th Cir. 1996) (brackets in original)). Defendants cite caselaw in which this Court and the Seventh Circuit have reminded plaintiffs that they may not change a position they have taken in the past or amend their complaint through later filings. *E.g.*, *Zimmerman v. Bd. Of Trus. Of Ball St. Univ.*, 940 F.Supp.2d 875, 884 (S.D. Ind. 2013); *Grayson v. O'Neill*, 308 F.3d 808, 817 (7th Cir. 2002). But they did not cite any caselaw in which a court found an argument was waived specifically because of a plaintiff's answer to a contention interrogatory.

Plaintiffs argue that they do not make a *Monell* claim, but instead they make a claim against Indianapolis as a municipality based on the city's widespread practices underlying Day's injuries. Defendants contend that this type of action against municipalities predated and was unaffected by *Monell*. (Filing No. 75 at 20.) But the Plaintiffs misinterpret *City of St. Louis v. Praprotnik*, the case they rely on for that assertion. 485 U.S. 112 (1988). *Praprotnik* applies in cases where a

municipal policymaker had sought to insulate herself from liability that stems from unconstitutional city policies by delegating her policymaking authority to another official. *Id.* at 126. In those "egregious attempts by local governments to insulate themselves from liability," a principle that has not been affected by *Monell* "ensures that the most deliberate municipal evasions of the Constitution will be sharply limited." *Id.* at 127. But Plaintiffs do not allege any such delegation occurred here. The Complaint seems to allege a straightforward *Monell* claim—city police officers, in their official capacities and following the city's policies, violated Day's constitutional rights. (Filing No. 19 at 5-6.) *Praprotnik* is irrelevant to the Plaintiffs' claim because they do not allege that any delegation of policymaking authority occurred here.

That leaves the Court with the question of whether the Plaintiffs waived their *Monell* claim by stating clearly that they were not asserting it in response to Defendants' contention interrogatories. Although there is no case directly on point from any court in this Circuit, for a contention interrogatory to serve as a useful tool to "minimize the uncertainty of [a plaintiff's] claims," the defendant must be able to rely on the answers the plaintiff gives. *Vidimos* at 222. Here the Defendants attempted to identify the Plaintiffs' claims by asking the Plaintiffs outright if they asserted a *Monell* claim. (Filing No. 52-12 at 6.) By answering in the negative, the Plaintiffs waived any *Monell* claim their Complaint might have asserted[3].

---

[3] Even if the Monell claim was not waived, Plaintiff has failed to designate sufficient evidence to establish that the City has a "widespread practice of signing away prisoners' rights to medical treatment" or a "practice of placing a single set of handcuffs on overweight persons and allowing them to have handcuffs on and lay on their backs for extended periods of time." (Filing No. 75 at 20). To hold a municipality liable, the plaintiff must prove that the municipality's "*deliberate* conduct . . . was the 'moving force' behind the injury alleged." *Bd. Of Cnty. Comm'rs. V. Brow,* 520 U.S. 397, 404 (1997). (emphasis in original). "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* The plaintiff carries this burden by proving that "the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by [the municipality's] officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cnty. Sheriff's Dep't,* 604 F.3d 293, 303 (7th Cir. 2009).

Therefore, summary judgment is **granted** as to the Plaintiffs' official-capacity claims against Sergeant Wooten and Officer Denny and as to any *Monell* claim against Indianapolis that the Complaint might have asserted.

### 2.     Individual Capacity Claims

Defendants Sergeant Wooten and Officer Denny seek summary judgment on Plaintiff's claims that they violated the Fourth Amendment in their individual capacities. Defendants argue that Plaintiffs' claims fail as a matter of law and that, even if they did not, the officers are entitled to qualified immunity.

### a.     Fourth Amendment

The Plaintiffs allege that the officer Defendants violated Day's Fourth Amendment right when they unreasonably seized Day and used excessive force to apprehend and detain him. Excessive force claims are analyzed using the Fourth Amendment's "reasonableness" standard in the context of "an arrest, an investigatory stop or any other type of seizure." *Stainback v. Dixon*, 569 F.3d 767, 771 (7th Cir. 2009). The Fourth Amendment protects against the use of force that is not "objectively reasonable." *Kinney v. Ind. Youth Ctr.*, 950 F.2d 462, 465 (7th Cir. 1991). The "right to make an arrest…necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). However, this right is not without limits: a "police officer's use of force is unconstitutional if, judging from the totality of the circumstances at the time of the arrest, the officer used greater force than was reasonably necessary to make the arrest." *Payne v. Pauley*, 337 F.3d 767, 778 (7th Cir. 2003) (citation and quotation marks omitted).

Fourth Amendment unreasonable seizure claims, like excessive force claims, are analyzed in light of the totality of the circumstances to determine the objective reasonableness of the seizure.

To determine the reasonableness and therefore the constitutionality of a seizure, courts must "balance the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion." *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985) (citation and quotation marks omitted). In considering this balance, whether under an excessive force or unreasonable seizure claim, the court considers the severity of the crime at issue, whether the suspect posed an immediate threat to the safety of others, and whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396. Here, where the Plaintiffs allege that the officers' use of overly tight handcuffs constitutes excessive force, the Court also considers the specificity of the detainee's complaint of pain or discomfort, *Rabin v. Flynn*, 725 F.3d 628, 636 (7th Cir. 2013); the number of complaints the detainee made during the course of the arrest, *Sow v. Fortville Police Dep't*, 636 F.3d 293 (7th Cir. 2011); the injuries the detainee sustained, *Tibbs v. City of Chi.*, 469 F.3d 661, 666 (7th Cir. 2006); and the medical treatment, if any, sought by the detainee, from the handcuffing, *id.* When balancing these factors, the Court views the circumstances "from the perspective of a reasonable officer on the scene." *Graham*, 490 U.S. at 396.

Plaintiffs allege Officer Denny's and Sergeant Wooten's use of force was unreasonable because although Day was clearly obese and out of breath, they handcuffed Day with a single pair of handcuffs and allowed him to lay on his back for an extended period of time. Plaintiffs and Defendants differ on many facts of this case. For instance, Defendants credit Burlington loss prevention officer Michael Nesbitt's testimony, and therefore assert that "Day pulled out a gun in a shopping mall, and with gun in hand, fled from Nesbitt. Shortly after Day began to flee, he pointed his gun at Nesbitt.... During Day's flight, he also unsuccessfully attempted to carjack two different people." ([Filing No. 53 at 28](#).) Defendants point out that Nesbitt's testimony is

contradicted both by video evidence, which shows that Day begins his flight from Nesbitt without a gun in his hand, (Filing No. 76-8), and by the testimony of Washington Square Mall security officer Anna Mahoy, who testified that she observed what appeared to be a gun in Day's pocket, but that he never removed it (Filing No. 52-9 at 12).  Mahoy also observed law enforcement's pursuit of Day to the hill behind the Speedway gas station and did not testify that she saw Day attempt a carjacking.

As a result of this factual dispute, the parties disagree as to the severity of the crime committed, a factor the Court considers under *Graham*.  Defendants contend that Day pointed a gun at the loss prevention officer and that he attempted two carjacking's.  (Filing No. 53 at 28.)  Plaintiffs argue that Day merely stole a $19.99 wristwatch from a department store, and then returned that watch to the loss prevention officer before being chased out of the mall.  (Filing No. 75 at 22-23.)  Designated evidence supports each party's version of events, and the Court will not resolve that conflict at the summary judgment stage.

It is undisputed that a gun rested inches from his Day's hand when law enforcement first apprehended him, and thus Officer Denny's first handcuffing of Day was unquestionably reasonable.  But after Officer Denny had handcuffed Day and confiscated his handgun, it is unclear whether Day was a risk to the safety of the officers or others at the scene or whether he was capable of flight.  Testimony of the officers and video evidence reveals that Day was barely able to sit up.  (Filing No. 52-2 at 92-93; Filing No. 76-4; Filing No. 76-16.)  After he was initially handcuffed, it is not clear that any of the *Graham* factors weigh in favor of keeping Day handcuffed in an uncomfortable and possibly dangerous position.

The evidence, when construed in the light most favorable to the Plaintiffs, indicates that Day made several complaints of pain, difficulty breathing and discomfort to officers. Day never

specifically complained about how tight the handcuffs were, but he complained multiple times to different officers and to the medics that he was unable to breathe. ([Filing No. 52-2 at 13](#); [Filing No. 52-3 at 31-33](#); [Filing No. 52-6 at 25](#).) After he eventually died of "Sudden Cardiac Death due to Acute Ischemic Change," the autopsy noted that he had "[s]ustained respiratory compromise due to hands cuffed behind [his] back…." ([Filing No. 52-18 at 2](#).)

Considering the facts in the light most favorable to the Plaintiffs, the Court cannot say that the officers acted reasonably as a matter of law. While the choice to handcuff Day initially may have been objectively reasonable, the officers' conduct after confiscating Day's gun could constitute an unconstitutional seizure under the Fourth Amendment. Some designated evidence indicates that Day had not committed a severe crime, that he no longer posed a danger to the officers, and that he was incapable of flight. Moreover, he complained numerous times about his difficulty breathing and ultimately died in part because his hands were cuffed behind his back, restricting his breathing.

### b. <u>Qualified Immunity</u>

But that conclusion does not end the Court's analysis of this claim. Officer Denny and Sergeant Wooten also contend that summary judgment is warranted because they are entitled to qualified immunity. Qualified immunity shields public officials from civil liability for acts done in their official capacity, insofar as their conduct does not violate clearly established statutory or constitutional rights to which a reasonable person would have known. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The issue of qualified immunity is a question of law for the court, not the jury. *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). To determine whether qualified immunity applies, the Court must determine whether, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?"

*Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court also determines "whether the right was clearly established. This inquiry, it is vital to note, must be undertaken in light of the specific context of the case, not as a broad general proposition." *Id.* As stated by the United States Supreme Court, "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Court explained in Section III.A.2.a that, based on the evidence in the record, a reasonable jury could find that Officer Denny and Sergeant Wooten violated Day's Fourth Amendment right. But the question of whether Day's right was clearly established such that a reasonable officer would have known his conduct violated the right remains. The Court must define the right in a particularized, rather than a general sense. *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

Defendants argue that there is no case establishing "a right which prohibited a non-resisting obese detainee from laying on his back and on top of his handcuffs on pavement after medical personnel informed the officers that he had no medical issues and could be transported to jail." (Filing No. 53 at 41.) "Nor is there any clearly established right for a suspect to be taken to a hospital despite being examined by medical professionals, being cleared for transport to jail, and never having requested to go to the hospital." *Id.*

Plaintiffs respond with several cases that they argue establish that "officers act unreasonably by failing to consider an injury or condition while handcuffing an individual." (Filing No. 75 at 33.) One case Plaintiffs cite is *Salyers v. Alexandria Police Dep't*, 2016 WL

2894438 (S.D. Ind. May 18, 2016). In *Salyers*, the court denied law enforcement defendants' motion for summary judgment on a Fourth Amendment excessive force claim because:

> it was clearly established at the time of Salyers's arrest that when an officer is made aware that an arrestee who poses no risks of flight or safety suffers from a preexisting shoulder injury, the officer must fully consider the injury and surrounding circumstances in deciding whether it is appropriate to handcuff that arrestee behind his back or whether such restraint would inflict unnecessary pain.

*Id.* at *3. Citing *Stainback* at 773 (7th Cir. 2009), the *Salyers* court said that:

> a body of law has developed holding that if an officer knows of a preexisting injury or medical condition that will be aggravated by handcuffing an arrestee behind his back, the officer is 'obligated to consider that information, together with the other relevant circumstances, in determining whether it [is] appropriate to handcuff [the arrestee in such a fashion.]'

*Salyers* at *3 (brackets original). "If the officer fails to consider the injury or condition and handcuffs the arrestee behind his back regardless of his impairment, the clearly established law provides that the officer has acted unreasonably." *Id.* But a reasonable officer is not expected to accommodate an injury that is not apparent or has not otherwise been known to him and generalized complains of pain are not sufficient to alert an officer that handcuffing an arrestee will aggravate a preexisting condition. *Id.* at *4.

Because whether a right is clearly established "turns on a fact-sensitive examination of the dimensions of the constitutional violation, the question can be difficult to resolve as a matter of law on summary judgment where the parties' versions of events are as far apart as they are in this case." *Phelps*, 2004 WL 1146489, at *12. "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate," even if there is an issue of material fact precluding a finding that the officer's actions were reasonable. *Saucier*, 533 U.S. at 202 (2001), *receded from on other grounds*, *Pearson*, 555 U.S. at 236. But, "[w]hen the qualified immunity inquiry cannot be disentangled from disputed

facts, the issue cannot be resolved without a trial." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009).

Here, assuming the Plaintiffs' version of events occurred, reasonable officers would know they were violating an established right by leaving Day's hands cuffed behind his back after he complained of difficulty breathing. It was "well established that it was unlawful to use excessively tight handcuffs and violently yank the arms of arrestees who were not resisting arrest, did not disobey the orders of a police officer, did not pose a threat to the safety of the officer or others, and were suspected of committing only minor crimes." *Payne v. Pauley*, 337 F.3d 767, 780 (7th Cir. 2003). While officers were not aware of Day's family history of heart problems, Day alerted officers multiple times that he was having trouble breathing. It was evident to the officers that Day was at risk of medical harm; they testified that they were constantly monitoring him to attempt to keep him in a position where he would not asphyxiate himself. The cell phone video shows that Day was unable to stand unassisted ([Filing No. 76-4](#)); he was bleeding ([Filing No. 76-2](#), [Filing No. 76-22](#)), his lips were pale ([Filing No. 52-4, at p. 35](#):6-8), and he was sweating, ([Filing No. 52-2, at 16](#):21). Day was clearly overweight, winded, and complained of difficulty breathing ([Filing No. 52-2, at 104](#):3-9). In addition, Officer Denny testified that Day "was on the verge of hyperventilating a little bit." *Id.* at 13:15-16. This evidence supports a finding that Officer Denny observed some signs of distress. And like the detainee in *Howard v. Ealing*, a case in which the District Court for the Northern District of Indiana denied an officer defendant's claim of qualified immunity, Day did not present a risk of harm to officers during the long period in which his respiratory difficulty aggravated his cardiomyopathy. *Howard v. Ealting*, 876 F.Supp.2d 1056, 1075 (N.D. Ind. 2012) ("Although, when Taylor discovered the gun, Howard did pose a threat to the officers, once he was patted down for the second time, handcuffed, and placed in the squad

car, he no longer posed a threat to the officers.") The law has clearly established this conduct as violative and therefore precludes the officers from qualified immunity.

Officer Denny and Sergeant Wooten are not entitled to qualified immunity on Plaintiffs' individual-capacity claims. Defendants' Motion for Summary Judgment as to those claims is **denied**.

## B.    State Law Claims

Count II of Plaintiffs' Complaint, titled "NEGLIGENCE/WRONGFUL DEATH," alleges that the Defendants were negligent in their care of Day and as a result Day passed away. (Filing No. 19 at 7-8.) To prove negligence under Indiana law, Plaintiffs must show: (1) a duty owed to the Plaintiff by the Defendant; (2) a breach of duty by allowing conduct to fall below the applicable standard of care; and (3) an injury proximately caused by the Defendant's breach. *Webber v. Butner*, – F.3d –, 2019 WL 1970306 at *3 (7th Cir. 2019). Defendants argue they cannot have committed negligence because they acted intentionally. (Filing No. 53 at 42.) That argument ignores the elements of negligence in Indiana and finds no support in Indiana or Seventh Circuit caselaw.

Defendants also argue that the Indiana Tort Claims Act ("ITCA") immunizes them from the claim. The ITCA governs tort claims against governmental entities and public employees. *Veolia Water Indianapolis, LLC v. Nat'l Trust Ins. Co.*, 3 N.E.3d 1, 5 (Ind. 2014); Ind. Code 34-13-3. Under ITCA, a governmental defendant is personally immune from liability for acts or omissions within the scope of his employment. Ind. Code § 34-13-3-5(b). Therefore, only Indianapolis can be liable under Plaintiffs' state law claims on the theory of *respondeat superior*. *See Ballheimer v. Batts*, 2019 WL 1243061 at *12 (S.D. Ind. March 18, 2019). Thus, Defendants'

Motion for Summary Judgment is **granted** with respect to Officer Denny and Sergeant Wooten on all Plaintiffs' state law claims.

Indianapolis argues that a different section of the ITCA shields it from liability. "Pursuant to the ITCA, 'governmental entities can be subject to liability for tortious conduct unless the conduct is within an immunity granted by Section 3 of [the] ITCA.'" *Veolia Water* at 5 (quoting *Gary Cmty. School Corp. v. Boyd*, 890 N.E.2d 794, 799 (Ind. Ct. App. 2008)). The party seeking immunity bears the burden of establishing that its conduct comes within the act. *Id.* Indianapolis asserts immunity under section 3(8) of the ITCA which protects governmental entities or employees from loss resulting from "[t]he adoption and enforcement of or failure to adopt or enforce a law (including rules and regulations)." ([Filing No. 53 at 43](#).) Commonly referred to as "law enforcement immunity," the Indiana Supreme Court has said that "what is 'required to establish immunity [is] that the activity be one in which government either compels obedience to laws, rules, or regulations or sanctions or attempts to sanction violations thereof.'" *F.D. v. Ind. Dep't of Child Serv.*, 1 N.E.3d 131, 138 (Ind. 2013).

It is undisputed that IMPD officers were investigating a criminal offense—the parties differ over whether that offense was simple theft, armed robbery, carjacking, or some combination—when they arrested and handcuffed Day. Officers testified that they continued an investigation while Day remained handcuffed and eventually passed away. ([Filing No. 52-2 at 79](#).) IMPD was plainly attempting to enforce the law, whether it be the laws against shoplifting or the laws against carjacking. Because Indiana Code § 34-13-3-3(8) immunizes governmental entities from liability for activities involving "the adoption and enforcement of…a law," the Court **grants** Defendants' summary judgment motion on behalf of Indianapolis as to Plaintiffs' negligence claim. To the

extent Plaintiffs' wrongful death and loss of child's services[4] claims constitute separate state law claims, the same logic applies to them. Consequently, the Court **grants** summary judgment in favor of all Defendants on those claims as well.

### IV.   CONCLUSION

For the reasons explained above, Defendants' Motion for Summary Judgment (Filing No. 51) is **GRANTED in part** and **DENIED in part**. As to Plaintiffs' Fourth Amendment excessive force claim, the Court **grants** summary judgment in favor of the City of Indianapolis and Officer Denny and Sergeant Wooten in their official capacities but **denies** summary judgment as to Officer Denny and Sergeant Wooten in their individual capacities. The Court **grants** summary judgment in favor of all Defendants on all Plaintiffs' state law claims.

**SO ORDERED.**

Date:  5/13/2019

_(signature: Tanya Walton Pratt)_

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

---

[4] Count III of Plaintiff's Complaint is titled "LOSS OF CHILD'S SERVICES." It alleges that as a result of Defendants' actions, Plaintiffs "suffer from the loss of Terrell Day's services and other monetary contributions," that Plaintiffs are "deprived of Terrell Day's love, companionship kindness [sic]," and that they "have incurred costs for the funeral and burial of Terrell Day, and for administering his estate." (Filing No. 19 at 9.) Count III does not cite any statute. Defendants argue that this Count and the wrongful death claim from Count II are not actual stand-alone claims under Indiana law—just categories of damages. (Filing No. 53 at 46.) Assuming wrongful death and loss of child's services constitute separate state-law claims, ITCA shields all Defendants from liability as to both.

DISTRIBUTION:

Faith Elizabeth Alvarez
LEE COSSEL & CROWLEY LLP
falvarez@nleelaw.com

Nathaniel Lee
LEE COSSEL & CROWLEY LLP
nlee@nleelaw.com

Martin Austin Brown
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS, LLP
mab@rucklaw.com

Darren Craig Chadd
TAYLOR, CHADD, MINNETTE, SCHNEIDER & CLUTTER, P.C.
dchadd@tcmsclaw.com

Andrew R. Duncan
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS, LLP
ard@rucklaw.com

Anne Celeste Harrigan
OFFICE OF CORPORATION COUNSEL
CITY OF INDIANAPOLIS
anne.harrigan@indy.gov

John F. Kautzman
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS, LLP
jfk@rucklaw.com

Edward J. Merchant
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS, LLP
ejm@rucklaw.com

Andrew J. Upchurch
OFFICE OF CORPORATION COUNSEL
CITY OF INDIANAPOLIS
andrew.upchurch@indy.gov

Adam Scott Willfond
OFFICE OF CORPORATION COUNSEL
CITY OF INDIANAPOLIS
adam.willfond@indy.gov